# Exhibit 5

# Deposition of Michael Schor

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-cv-00028-BO-BM

BKV GROUP DC, PLLC,          )
                             )
        Plaintiff,           )
                             )
vs.                          )
                             )
TREELINE ACQUISITION, LLC    )
d/b/a TREELINE COMPANIES,    )
                             )
        Defendants.          )
                             )
and                          )
                             )
TREELINE ACQUISITION, LLC    )
                             )
    Counterclaim Plaintiff/  )
    Third-Party Plaintiff,   )
                             )
vs.                          )
                             )
DISTINCTIVE LIVING           )
DEVELOPMENT, LLC, DISTINCTIVE )
LIVING, LLC, DAVID BANTA,    )
CHRISTOPHER HOARD,           )
JACK BOARMAN AND             )
JOSEPH JEDLOWSKI,            )
                             )
    Third-Party Defendants.  )
-----------------------------

REMOTE
30(b)(6) DEPOSITION
OF
MICHAEL IAN SCHOR
as agent/representative
on behalf of
TREELINE ACQUISITIONS, LLC
TAKEN AT 10:08 A.M.
ON WEDNESDAY, FEBRUARY 11, 2026

HELD VIA ZOOM

Reported by
Melissa Suzanne Shore
Verbatim Stenomask Reporter
Job 177185

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 2

A P P E A R A N C E S

For the Plaintiff:        Robert C. deRosset, Esq.
                          Young Moore Henderson
                          3101 Glenwood Avenue, Suite 200
                          Raleigh, NC 27612
                          bob.derosset@youngmoorelaw.com
                          Attorneys for Plaintiff
                          BKV Group DC, PLLC


For the Defendants:        Jeffery I. Stoddard, Esq.
                          Ward and Smith, P.A.
                          P.O. Box 7068
                          Wilmington, NC 28406
                          jistoddard@wardandsmith.com
                          Attorneys for Treeline Defendants


                          Daniel G. Katzenbach, Esq.
                          Cranfill Sumner, LLP
                          5440 Wade Park Blvd., Suite 300
                          Raleigh, NC 27611-7808
                          dgk@cshlaw.com
                          Attorneys for BKV Group DC, PLLC,
                          David Banta, and Jack Boarman


                          Amie Sivon, Esq.
                          Ragsdale Liggett
                          2840 Plaza Place, Suite 400
                          Raleigh, NC 27612
                          asivon@rl-law.com
                          Attorneys for Distinctive Living
                          Development, LLC

For the Third Party
Defendant:                Meredith Brewer, Esq.
                          Maynard Nexsen PC
                          4141 Parklake Avenue, Suite 200
                          Raleigh, NC 27612
                          mbrewer@maynardnexsen.com
                          Attorneys for Third-Party
                          Defendant Distinctive Living, LLC


Also Present:             Daniel Schor
                          Glenn Schor

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 3

\* \* \* \* \* \* \* \*

INDEX

EXAMINATION                                          Pages

By Mr. Dale Katzenbach                           4,291

By Ms. Sivon                                          213

By Mr. Stoddard                                      282

\* \* \* \* \* \* \* \*

Exhibits                          By              Pages

57 - Notice of Deposition          Mr. Katzenbach      7

58 - 2023 0515 Crossroads Agreement    Mr. Katzenbach    76

59 - 000043 Flowers                Mr. Katzenbach    91

60 - 000044 Flowers                Mr. Katzenbach    91

61 - Email, 1/17/24, Treeline 474      Mr. Katzenbach    100

62 - Treeline 743                  Mr. Katzenbach    105

63 - 000083 Flowers                Mr. Katzenbach    170

64 - 000077 Flowers                Mr. Katzenbach    174

65 - Invoice                  Mr. Katzenbach    177

66 - Termination agreement          Mr. Katzenbach    190

67 - Discovery Responses          Mr. Katzenbach    206

68 - Email, 5/29/24              Ms. Sivon        263

69 - Email, 3/20/24              Ms. Sivon        271

\* \* \* \* \* \* \* \*

Adjournment                                      299

Witness Certification and Errata Sheet          300,301

Reporter Certification                          302

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 4 of 303

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 4

P R O C E E D I N G S

(10:08 a.m.)

THE COURT REPORTER: Okay. We are on the record. It is stipulated and agreed by and between counsel for the parties in the aforementioned action that the witness may give testimony for this deposition without being sworn or affirmed; that said testimony may be used in the foregoing action as if the witness were sworn or affirmed; that the witness is subject to the penalties of perjury as if they were sworn or affirmed; and that any objection to the use of said testimony based on the witness not being sworn or affirmed is hereby waived.

MICHAEL SCHOR

under penalty of perjury, testified and was examined as follows:

EXAMINATION BY MR. KATZENBACH

Q. Okay. Good morning, Mr. Schor. My name is Daniel Katzenbach. I represent BKV, David Banta, and Jack Boarman in the litigation that we're here about today. Have you ever had your deposition taken before?

A. Yes.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 5

Q.   Okay.  And how many times have you had your deposition taken do you think?

A.   A few.

Q.   Okay.  So you may be familiar then with how this process works.  I'm just going to go over a few ground rules just so we're all kind of on the same page.  I think you've been sitting in some depositions, so you've probably heard these exact same ground rules, and the ones you've heard before are applying to this one as well, which is I'm not trying to trick you or put words in your mouth.  So if you don't understand my question, please don't answer it.  Just tell me you don't understand it, and then I'll try to ask it again, hopefully in a way that's clear for you, okay?

A.   Sure.

Q.   The court reporter, Melissa, is taking down everything we're saying and preparing a written transcript of the deposition that we can read later.  As a result, it's hard for her to record non-verbal responses that we use in common conversation, kind of like nods or shakes of the head or uh-huhs or huh-uhs.  And so, if you can just try to answer every question verbally, and particularly with a yes or no answer, if you can actually just say yes or

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 6 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 6

no, that will make her job a lot easier and make the transcript a lot clearer.  Is that okay?

A.   I'll do my best.

Q.   Yeah, and I will too.  And us doing our best also pertains to you and I not talking over each other and that's definitely a two-way street.  I'm going to certainly try to wait until you're fully done giving an answer before I start another question.

And if you can also similarly just kind of wait until it seems like I'm fully out with the question before you start answering it, even though you may, you know, think you know exactly where this question is going, if you can just kind of wait until we get -- I get the question out so you and I are not talking over each other, that also helps the court reporter a great deal, okay?

A.   Sure thing.

Q.   And it's not designed to be an endurance test, but I'm sure we'll be here for a number of hours.  We're going to try to take a regular break.  I'm going to try to take a break every hour, but if you need a break sooner, you just let me know, or if I just kind of lose track of time going longer than that, you need a break, just speak up and let me know that, okay?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 7

A.   Will do.  Thank you.

Q.   Thank you.  So I think you understand that I've noticed this as a 30(b)(6) deposition of Treeline, and that you've been designated as a corporate designee for Treeline in this deposition.  Do you understand that?

A.   I do.

Q.   Okay.  Are you going to be -- are you generally going to speak on all the topics in the notice or -- let me do this.  I'll mark as the first the -- what -- what number are we up to, exhibit-wise?  Is it --

MR. DEROSSET:  57, I think, Dan.  Let me double check.  Let me see.

MR. KATZENBACH:  Let me see.  Yeah, I think we're at 57.  That's right.  Okay.  So I'll mark as Exhibit 57 the notice today.

(EXHIBIT NUMBER 57 WAS MARKED FOR IDENTIFICATION.)

Q.   And I'll put that up on the screen.  And Mr. Schor, I sent all these exhibits out earlier today, so if you want to pull them up on your screen, that'll be fine and I'll try to share them all on the screen, but, you know, sometimes that can be hard to see and have them in front of your computer, that's perfectly fine as well.

A.   I have the folder, but for purposes of this, if I

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 8

need to, I'll open it.  Thank you for offering.

Q.   Okay.  Great.  Perfect.  That works for me as well.

And then, all right, so I put Exhibit 57, which is the notice of deposition, and there are a number of topic, deposition topics.  Are you the designee for all these topics, or are there some that you're not the designee for?

A.   No.  In general, I can testify about all of these items.  There are some that I'm more knowledgeable about than others, but I can certainly testify about them.

Q.   Okay.  My understanding from your counsel was that anything that you would not be testifying about, Daniel Schor would be testifying about.  And so if there's -- if we get to any point in here where you think that Daniel is, you know, the most knowledgeable on the topic and he's the one that should speak for Treeline, please just let me know, okay?

A.   Sure.

Q.   Great.  Thank you.  All right.  Please, if you could, just tell me what you did to get ready for this deposition.

A.   Well, since I'm the 30(b)(6) representative, I've -- I reviewed the books, and I reviewed the responses

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 9 of 303

02/11/2026    BKV Group DC vs Treeline Acquisition, et al.    Michael Schor

Page 9

that we provided to the interrogatories, and I reviewed the responses, the discovery requests, and some selected documents. I did not review every document that was produced in this case, because I think it's about 50,000 or 60,000 pages or more, so I did not do that.

Q. I think it may be even more than that, to be honest.

A. Right. So I did not. I spoke with Mr. Stoddard and with Ms. Waller, and discussed potential topics that you might be interested in --

Q. I don't want to know -- I don't want to know anything you talked to your attorney about.

A. Yeah, just in general, I spoke, you know, they -- they worked with us.

Q. That's fine. That's all I need to know about that. There's no question I'll ask you today which is asking for you to tell me anything that you've talked to your attorneys about, okay? So please --

A. Okay.

Q. -- please don't do that. Did you talk to anybody besides your attorneys, outside the presence of your attorneys, to get ready for this deposition?

A. Yes.

Q. Okay. Who did you speak to who was not your attorney to get ready for this deposition?

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 10 of 303

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 10

A. My brother, Daniel.

Q. Okay.

A. And my father, Glenn.

Q. Okay.

A. That's it.

Q. Okay. And Glenn Schor is your father?

A. Yes, he is.

Q. And Daniel Schor is your brother?

A. Yes, he is.

Q. Okay. And were both of those conversations that you were referencing, were they outside the presence of any of your attorneys?

A. Some yes, and some no.

Q. Okay. So I only want to ask you about those conversations where your attorney was not present, okay?

A. Sure.

Q. For those conversations where your attorney was not present, what do you recall talking to Daniel and Glenn about with regard to this deposition?

A. Just what our causes of action were. We talked a bit about -- actually, I watched Mr. Hoard's deposition. I watched Mr. Banta's deposition. So we talked to get about our impressions, how they testified and what they testified about.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 11

Q. Okay. And you only -- you only sat in on David (sic) Hoard's deposition; is that right?

A. Chris Hoard, yes.

Q. Okay. Chris Hoard, yes, thank you. Chris Hoard's deposition. And so, when you all discussed his deposition, what was your take on his deposition?

A. That he testified to his version of the facts. Obviously, we don't concur with that. And we talked about -- we -- sorry about that. I just got a --

Q. Yeah, I heard it too.

A. -- strange Zoom thing too.

Q. Yeah.

A. Yeah. Sorry. We talked about whether we thought he was effective as a witness. And that was pretty much it.

Q. Okay. When was the last time that you would have spoken to anybody from Douglas Construction about either this project or this lawsuit?

A. Are you including in that sending an email?

Q. Sure. Yeah.

A. Okay. When you were -- at some point, I believe in late 2025 or early 2026, I sent an email to Bruce Douglas asking him to voluntarily provide us with documentation regarding the case so that we could avoid having to serve his firm with a subpoena. And

02/11/2026  BKV Group DC vs Treeline Acquisition, et al.  Michael Schor

Page 12

it was -- actually, I recall it was pretty much around Christmas time. And Bruce responded back that while he would certainly like to voluntarily comply, that due to their corporate sort of requirements, that we would have to serve them with the subpoena. I really -- but there was no substantive conversation whatsoever, and he didn't provide me with any documents or testimony or statements or anything at that time. Prior to that, the last time I would have communicated with Bruce Douglas was in the fall of 2024.

Q.   Okay. Just tell me just a little bit about yourself, a little background about yourself. Sort of educational background and sort of, you know, work history kind of generally leading up to today.

A.   Sure. So I'll skip elementary school and high school.

Q.   I did mean college. You're right. I was not interested. You were right because I'm not interested in those.

A.   So I am a graduate of the University of Chicago. I have a degree in economics. I obtained that degree in 1992. I am a graduate of Georgetown University Law Center, where I received a JD degree in 1995. From 1995 until 2000, I worked at a New York City

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 13

law firm called Weil, Gotshal & Manges. I'm happy to spell that. It's W-E-I-L. And Gotshal is G-O-T-S-H-A-L. And Manges is M-A-N-G-E-S. It's a large international law firm where I practiced in the business finance and restructuring department. So basically, I was a bankruptcy lawyer. The focus of my practice was on real estate bankruptcy. In April of 2000, I joined Treeline, and I have been here ever since.

Q. Okay. So tell me about Treeline. Tell me about how long they've been in existence, that company, and what it is that that company generally does.

A. Okay. So the word Treeline is sort of in the same way that Distinctive kind of treats an umbrella of companies under the roof Distinctive. Treeline, per se, is a series of companies that operate under an umbrella whereby we own different properties and different companies, but to the world we're known as Treeline. That's kind of our d/b/a, if you will. Some of our companies that operate under that d/b/a are -- have the name Treeline in the title. So like, for example, the party and interest here is Treeline Acquisition, LLC. Sometimes we'll use the acronym TL. Sometimes we'll use companies that don't have the name Treeline in it at all.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 14

As far as LLCs, all of our projects are owned in what are called single-purpose vehicles. Okay? So you know, any real estate project is owned independently. We have different partners and investors in each property. The commonality is that my brother Daniel, my father Glenn, and myself are involved in the project. We also have separate and related companies like Treeline Acquisition, LLC, which is our acquisition company. We have a company, TL Asset Management Corp, which is a company that is in charge of doing property management. We have a company called Treeline Leasing, LLC, which is a company that is the umbrella for our leasing team, because for many of our properties, we do our leasing through in-house personnel.

And just broadly, and again, I think if you look on our website, you can find all this. My parents founded this sort of umbrella d/b/a, Treeline, if you will, or Treeline Companies in 1985, and it's been an ongoing enterprise since.

Q. Okay. Great. Thank you for that. That was very detailed, and I appreciate you providing all that information to me. That's very helpful. So I gather that, like, the entity that's involved in

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 15

this lawsuit, Treeline Acquisition, LLC, that's --
you mentioned single-purpose entities, but I gather
that one is not one of those.  Am I right about
that?

A.   It's a single-purpose entity.  It only does one
thing.

Q.   Okay.  But I guess I was thinking single -- okay.  I
was thinking more single purpose as, you know,
entities that own particular and singular projects.
You have the --

A.   Based upon -- based -- sorry, I didn't mean to cut
you off.  Go ahead.

Q.   You're okay.  It's okay.  Go ahead.

A.   Based upon that definition, you are correct, it's
not a single-purpose entity.  It doesn't own any
real estate.

Q.   Okay.  Okay.  So and -- feel -- you can feel --
you're not going to insult me.  I assume that you --
what you were saying is I'm using the term single-
purpose entity incorrectly is what you're saying,
right?

A.   Not necessarily.  I mean, not at all.  Don't be --
don't worry.  I won't be afraid to insult you.  I
promise.

Q.   Okay.  That -- and I won't take any insult either.

I promise.  Okay.  So and that's -- I guess what I meant is I assume that from your description that the Treeline umbrella, they have lots of single-purpose entities that own just the singular projects that are being developed.  Am I correct about that?  Like, when you're developing --

A.   Yes.

Q.   -- a project, you would create a single-purpose entity to own, run, and manage that project?

A.   The answer to your first question is yes.  And the answer to your second question is, in general, yes.  So the -- the -- the way we do it is when we acquire a project, and it was the same thing here with Flowers, we had formed some companies that ultimately had we taken title to the property, would have been the LLCs that owned the property.  Those LLCs operate the properties independently as what's referred to probably in the lending world parlance as an SPV, a single-purpose vehicle.  And those do operate, you know, only one property.  But for example, TL Asset Management Corp., right, which is our management company, okay, it only performs one function, which is building management, right, but it performs building management services for multiple buildings.  So to me, it has a single

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 17

purpose, --

Q.   Yep.

A.   -- but it does not only do one thing for one property.  So hopefully, that is --

Q.   It does.

A.   -- clarifying.

Q.   Yeah, that does help me understand.  You're saying there's single-purpose entities that literally just have, like, a "single purpose," whatever it is, and then there are others that are single-purpose ownership entities?

A.   Yes.  Right.  Correct.

Q.   Okay.  And thank you for --

A.   Ownership of real estate, just to clarify.  Ownership of real property.

Q.   Okay.  Ownership of real property.  Okay.  And that was -- you answered, I think -- one of my follow-up questions was going to be, which is that had this project -- had you closed on the real estate in the Flowers project, there would have been another single-purpose entity other than Treeline Acquisition, LLC, that would have actually been the owner of that property?

A.   Yes.

Q.   We just didn't -- you didn't get to that.  So we

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 18 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 18

don't see that. Like, we don't see that entity in this lawsuit, correct?

A. Well, actually, we had formed the entity, but it had no assets. What would have happened if we had closed is right at the closing, we would have assigned the contract over to that company, and Mrs. Flowers would have given the deed into that company.

Q. Okay. So how would you describe just the overall business of the Treeline entities? Like, what is it, would you say, that Treeline does?

A. We're in the real estate development business.

Q. Okay. And has that been the business they've been in going all the way back to when your dad formed the company?

A. Yes.

Q. Okay. That's what Treeline has always done?

A. Real estate development, yes. But I --

Q. You mentioned --

A. -- just want to qualify -- I just want to qualify by saying that development does not mean building a building from ground up, necessarily. Development means any, okay, development means any kind of -- what we like to define a developer as, and what I'm defining it as for this purpose is, --

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 19

Q.   Yeah.

A.   -- it's somebody who buys real estate with an intention of improving the real estate in some way, and creating value for themselves and their investors.  So that could be through construction, it could be through leasing, it could be through streamlining management operations to increase cash flow.  Those are all development functions.

So we've been engaged in that business since 1985, across different property types at different points in time in the evolution of a business that's been around for forty-some, 40, what -- wow.  Forty-one years?  Yeah.  Wow.  Yeah.

Q.   So yeah -- so that -- and you're doing a good job.  That was sort of where my next question was going to be.  By real estate development, like, that has many different facets, some of which is basically building something from the ground up.  Some of it may be buying an existing building and, you know, rehabbing it or renovating it.  Some of it may be buying an existing building and just running it as a, you know, as a real estate, you know, concept, leasing it.

How much of Treeline's business over the -- and maybe it's changed over the 41 years, so if it has,

02/11/2026                BKV Group DC vs Treeline Acquisition, et al.                Michael Schor

Page 20

you can please tell me that.  But how much of their business would be what you did in the Flowers project, which is starting from nothing, buying a piece of land and, you know, constructing a project on the land?

A.   Virtually none.

Q.   Oh, okay.  Okay.

A.   We -- I'll tell you that --

Q.   Yeah.

A.    -- we only completed one project -- in all the time I've been at Treeline, which is since 2000, we've only completed one project that involved full ground up construction where we bought a piece of land and a building was constructed on that piece of land.  That was in Astoria, New York, which is in Queens.

Q.   Okay.

A.   Okay.  The building that was constructed and completed was called The Astoria Central.  It was a 114-unit free-market apartment building.  In that deal, we sourced the land and we did initial massing studies with an architect much like BKV did with us here.  And then we ultimately partnered up with a group called Mega Construction.  And Mega took the project over and played the role that Mr. Hoard and Mr. Jedlowski were going to play here.  They -- we

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 21

at Treeline participated in design meetings and things like that, but they were the owner's representative and they did the construction. They put up half of the equity for the deal and we and our investors put up half of the equity for the deal, and we brought in an institutional equity partner as well. And that was the only ground-up project that was completed. And we sold it, I believe, in 2017, '18 time frame.

Q. Okay. And if you sold it in 2017, 2018, when approximately did that project first start?

A. Around 2014.

Q. Okay. So that's the only ground-up project that you've been involved with since you've been at Treeline since 2000?

A. Purely ground-up construction, yes. We do have an existing project in Wilmington, North Carolina. It's 2830 Highway 421 South in Wilmington. That project, we purchased an existing building of 115,000 square feet, which we renovated. We had a partner in that as well who was the owner's representative and an equity partner in the deal who took the laboring oar on the renovation.

And then we do currently have one empty lot where we have a plan to raise -- to build a 30,000

Case 5:25-cv-00028-BO-BM      Document 102-6      Filed 03/20/26      Page 22 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 22

square foot metal industrial building.  But in that project as well, we've brought in two local contractors as our partners to take on the owner's rep and to actually raise the building.  So ultimately, we're not really in the business of raising buildings from ground up.  We don't have that expertise.

Q.   Okay.  What about, do you know, and if you don't, it's fine.  But what about prior to 2000, do you know if Treeline did any ground-up projects prior to you joining Treeline in 2000?

A.   I do because it was done in my youth when I was still living at home.  And what I can tell you is that in the mid-1980s, my father had a partner named Jack LaGrassa, L-A-G-R-A-S-S-A.  And at the time, my father was still actively practicing law.  Jack was a friend of his.  Jack was a builder.  And my father and Jack partnered on a couple of deals where my dad raised capital and did the legal work and things like that to build some row houses in Brooklyn, New York, and a couple, I think, like row houses in a couple of neighborhoods in Queens.  And I believe they did a couple in upper Manhattan.  But these were, if you've been to New York City, you see them, you know, kind of typical two and three story row

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 23

houses where --

Q. I was born and raised there.

A. Okay. So you've seen them. So you know what I'm talking about.

Q. Yeah.

A. Yeah, it's a typical kind of basic brick construction. But again, my father was not involved in the construction. He was on the finance side, the legal side, and his partner, Jack LaGrassa, was the builder.

Q. Okay. Since you've been with Treeline, have there been any other ground-up projects like Flowers where the project got started but, you know, didn't get to fruition for whatever reason?

A. None that got anywhere near down the road this far, no.

Q. Okay. But you've had, I guess, some others that did at least get somewhat started and just didn't go anywhere?

A. Well, by started, I'm referring to we may have signed a contract or something, started due diligence, like we did an environmental report, or we did a study on the property, or we reviewed the topography of the property, and they said, guys, you can't build on this at an effective price. So we

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 24

terminated the contract. There's probably one or two of those, very few.

Q. Okay. Okay. So since you've been involved with Treeline, I guess, since 2000, what has been your role at Treeline?

A. Well, as I mentioned to you, I'm an attorney.

Q. Right.

A. So I do some legal work. You know, when we're doing financings and things like that, I will review, you know, legal documents, negotiate things. We usually use outside counsel. But I -- we also have a general counsel in-house, but if it's kind of a big thing, I'll get involved in the legal work. And obviously, if the general counsel has questions for me, she'll come and see me about those items. I chiefly am involved in obtaining financing and raising investor equity for deals. I help source transactions and make relationships with brokers and other parties so that we see desirable properties. That's my major functionality.

We have some old investors. And by old, I mean, like, well into their 80s and 90s, and they require a lot of babysitting, unfortunately. And since they've known me for a long time, I spend more time than I'd like babysitting those investors. But

02/11/2026    BKV Group DC vs Treeline Acquisition, et al.    Michael Schor

Page 25

that's pretty much my function.

Q. Do you have any kind of, like, title at Treeline?

A. It's on the website. I think they call me chief investment officer.

Q. Okay. Okay.

A. I didn't invent the title, by the way.

Q. Okay. That's fine. I won't hold it against you.

A. I don't want to tell you what my wife calls me.

Q. Well, then I won't tell you what my wife calls me either. We'll make a deal on that. How about your brother, Daniel, what is his role?

A. Similar. Daniel and I have the main responsibility for raising investor capital in our deals. So I do that. Daniel does that. Daniel has a more active role in running the day-to-day operations of our office. That I do not do, basically, at all. Daniel is also an attorney. But Daniel --

Q. You have a whole family of attorneys?

A. Yes. My wife's an attorney, too. But -- and her mother was a judge, and her dad was an attorney. So yeah, you're in attorney central here. Sorry, Mr. Katzenbach.

Yeah, but in any event, Daniel's background as an attorney before he joined us was in labor relations. So he's been here for -- he'll tell you

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 26

five years and change, maybe as many as six years, but not quite as long as me. So over the last number of years, when there's been real estate legal questions, they tend to get referred to me, although Daniel and I collaborate on those things as well. And obviously, with the amount of experience he has, he's taking a more active role in those areas. Daniel also does a lot more with the on-the-ground leasing activities of our industrial properties in North and South Carolina. I -- I don't -- I get updates from him. I don't tend to get involved on a day-to-day basis.

Q.   Okay. And obviously, your dad, Glenn, is the founder of the company. But what --

A.   Actually, he's not the president.

Q.   He's not?

A.   Mom is.

Q.   I'm sorry, who is?

A.   Mom.

Q.   Okay. Okay.

A.   So mom actually founded the company.

Q.   Okay.

A.   Her name's Fran.

Q.   Okay.

A.   Mom doesn't really come into work anymore, although

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 27 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 27

she's a voice of reason and somebody who we rely on for good advice. But yes, my father is one of the founders of the company. But I think the website says mom is the president. And for so long as mom is around, she's going to be the president.

Q.   Now, I also saw a reference to a Howard Schor. Is he also your brother?

A.   He is.

Q.   Okay. Is he involved in Treeline?

A.   He is.

Q.   Okay. And what is his role? How long has he been there and what is his role?

A.   Howard's been here for -- since 2004 or '05. Howard is very much on the management side of the business. So Howard runs the property management, which is pretty much his exclusive role.

Q.   Is that property management -- would he have been involved in this project, the Treeline -- if the Flowers project had gotten to fruition, would he actually have been involved in that? He would involve the management of the facility once it got up and running? Or was that -- is that not kind of what he would have been doing?

A.   In this case, he would not have because the concept here was that we had contracted with Distinctive for

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 28

a full panoply of services. Now again, there are what I'll call asset management level things within the office that he would probably be dealing with. Like, you know, if the property had come to fruition, Distinctive, as the onsite manager might run into problems, might run into needing to spend money on something, you know. That he would probably have been involved with consulting about, about, you know, budgeting for the property, but he would not have been involved in the day-to-day management of the property.

It was our intention to give the management out to Distinctive, as we did, by the way, on our Astoria Central project. Even for the brief time that we owned it, we did not manage it. We asset managed it, meaning got reports from the property manager. If they ran into something very significant, they would call us and say, oh hey, there's a leak in the roof. Like, we need to spend $50,000 fixing the roof. Is that okay? Yes, they good, they fixed it. But we were not involved in the day-to-day. Like the tenants didn't call us or we didn't, you know, go to the property very much. It was a similar kind of arrangement.

But what happened -- but for our office

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 29

properties, Howard does do the day-to-day management. So we have a superintendent, things like that, and they report directly to Howard.

Q. So that would be projects where you all acquire, like, a commercial property and then manage it -- lease it and manage it, and then Howard sort of runs that?

A. Right, like I'm sitting in a building right now where my office is which we own. Okay?

Q. Right.

A. It's a four-building office complex. We've owned it since 2001, okay? And we run it as a stabilized office complex. Howard gets the calls from the tenants or the superintendent or whatever. He's sitting here in the office next to me. He manages those buildings. But on a building like Flowers or this residential building, we're not set up to manage those on a day-to-day basis. I wouldn't have taken on the project had Distinctive not represented that they had extensive management services. I never would have taken on the project.

Q. Okay. So given what you've described to me as sort of Treeline's, you know, background over the years and what it generally does, I mean, it seems like building a, you know, active senior housing

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 30 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 30

development from the ground up is not something that Treeline had ever done before.  Am I right about that?

A.   Absolutely.  You're correct.

Q.   Okay.  So that's fine.  You're fine.  So tell me then sort of what led you all to even approach this type of concept at all then?

A.   Sure.  So we had been looking at deals in the Carolinas, all right, generally with a focus on, actually on industrial property starting in about -- it was prior to COVID, so probably in 2018-ish. Okay?  And we came across lots of different kinds of projects through various different brokers. Obviously, the COVID period was a difficult one. We, you know -- and we were looking for different avenues of business as the world started to open up post-COVID.  As I had mentioned to you, in a lot of our deals, we partner with institutional equity partners.  Okay?  So meaning on a larger deal where you need 10, 20, 30, 40 million dollars of equity, Daniel and I aren't capable of raising that from individual investors.  It's a very difficult lift for us.  We will partner with an institutional investor.

And so, at some point in 2022 or so, the office

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 31

business was very challenged because interest rates had gone up. We were doing a number of industrial developments. And I was having lunch with someone from J.P. Morgan where I had previously completed, actually, an office deal. And I was -- the purpose of the lunch was kind of to pick his brain on what J.P. Morgan was interested in investing in at that time because they were an institutional partner that obviously has the capability of writing a big check. And in addition, is someone who we had done business with and we had a good track record with, so they liked us and they wanted to do further business.

And the gentleman from J.P. Morgan mentioned to me and said to me, we're really looking to get into the senior living space. We really think that that's a space of growth and we like the Carolinas in general. Right? So he said, it's something that you might think about if you come across something. It would be something that if it was an exciting project, we would potentially be looking to get involved.

After I had that lunch, I came back to the office and I spoke to Daniel and to my father. And as you appropriately said in your question to me, we had no idea exactly what this was about. We did

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 32

know a very prominent developer in our neck of the woods, which is Engel Burman. Engel Burman was not a developer of active adult, but they did a lot of assisted living and memory care type stuff, which I came to know were licensed facilities, meaning that you need a license from the state. I actually -- and so, you know, I had some general familiarity from just talking to these guys over the years about what it took to get a licensed facility and a licensed business, not anything specific, just general knowledge sort of seeing someone at a cocktail party.

But in any event, it seemed like an exciting opportunity and I said to Daniel, before we start getting -- looking at sites or whatnot, let's get some education because before we would embark on anything like this, we would want to know what the heck we were embarking on. So Daniel set off to find some folks who were in this space. And he'll tell you at his deposition, but he found some companies and he made contact with this -- with Mr. Jedlowski from Distinctive, which he did by an internet search, and ultimately, there were all certain conversations between Daniel and Mr. Jedlowski. During that time, we were working

Case 5:25-cv-00028-BO-BM   Document 102-6   Filed 03/20/26   Page 33 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 33

with a broker. Her name is Sarah Godwin,

G-O-D-W-I-N.

Q. I saw her on some of the emails, I think.

A. Yeah. So Sarah was a broker at Foundry and she had

been showing us mainly industrial properties, but

she was in that -- she -- her focus was really more

on development sites and, you know, ground-up

development sites and whatnot. But she had been

showing us some industrial properties. And I

happened to mention to her that we were exploring

getting into this sort of active adult and whatnot,

and she said, oh, that's so interesting because I

have this deal. And she showed us the Flowers site.

Q. So was it kind of like Daniel's role or

responsibility to -- the or -- not role, but was it

Daniel who took the lead on trying to find some kind

of management company to assist you all with this

project that ended up being Distinctive?

A. It was more than a management company.

Q. Okay.

A. We were looking for someone who was going to

quarterback a project for us. We didn't know quite

what the project was at that point in time, but

first we needed some education. Right? We needed

to learn about what are we looking for. And we

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 34

needed someone to help us evaluate various different sites so that we could know what we're looking at and know what we're looking for. And so, yes, Daniel took the responsibility on of finding companies that did that and Distinctive presented itself as having all of those qualifications that we needed and to be our quarterback and our leader in doing these sorts of deals which they represented to us they had extensive experience in doing.

Q. Right. Right. Do you know or remember any of the other possible companies that Daniel had looked into or researched?

A. I don't. I didn't speak to anyone other than Distinctive. By the time I sort of came on to the scene here, if you will, Daniel said he had already had conversations with Jedlowski and Hoard.

Q. Okay. All right. It sounds like this initial sort of, you know, just, you know, foray into this concept or possible concept or even if it's just an idea of, you know, active adult, was it mostly you and Daniel who just sort of were exploring this idea generally or did Glenn and Howard or anybody else at Treeline, were they involved in it as well?

A. Howard wasn't. As I said, he has a very sort of discrete set of responsibilities in terms of the

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 35

management.  He doesn't participate in the sourcing of new transactions.  I mean, I -- he's my brother and we're a small office so I see him all the time. So I certainly may have mentioned who we were working on, but he was not engaged in the sourcing of that transaction or any other transaction.  Much like, you know, he doesn't tell me if he's dealing with a pipe burst -- break or something like that. He may mention but he doesn't consult me about how to handle it.  Frankly, I wouldn't know even if he did consult me how to handle it.

But anyway, but, yes, most definitely Daniel and I were kind of the lead roles, but we consulted with our dad.  You should understand, our dad is 81 years old.  Well, he's 80 right now.  He'll be 81 in a month.  So Daniel and I are kind of leading the charge of the business in terms of new acquisitions. Dad is always there to help us, advise us.  He certainly will tell us his opinion.  And obviously, if it's something that he feels strongly about, Daniel and I will respect that.  And frankly, on this deal, I kind of wish I had listened to my dad a little more than I actually did because, you know, he sort of smelled the rat here a little earlier on than Daniel and I did.  Unfortunately, I was hoping

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 36

that we could get things to work out, and ultimately, they didn't.

Q.   So you all get, I guess, as you said, you get connected with Distinctive.  And I guess after Daniel finds them and meets them, it sounds like there is another meeting where you get to meet them as well; is that correct?

A.   There wasn't a particular meeting.

Q.   Oh, okay.

A.   There were -- there started to be some calls.

Q.   Oh, okay.  Okay.

A.   But there wasn't a meeting.  But Hoard and Jedlowski participated in those calls.

Q.   That was going to be my next question is who participated.  So was it you, Daniel -- I mean, you, Daniel, Hoard, and Jedlowski were on those calls?

A.   Yeah, and sometimes they brought this guy George Draghiceanu.  His name is hard to spell, but it's D-R-A-G-H-I-C-E-A-N-U.  And there were some other calls where they brought someone on; I think her name was Angela.  But they brought other professionals on the calls.  But ultimately, after a period of time, Hoard sort of, you know, took the chief responsibility and then, you know, would defer to Jedlowski and keep Jedlowski apprised, and

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 37

Jedlowski would participate from time to time as well.

Q.   I assume in these calls there were discussions, I assume discussions about Distinctive's background, experience and trying to figure out whether or not they would be a good fit for what you're saying you wanted, which was a quarterback for this project.

Am I right about that?

A.   By the time I got on the calls, okay, --

Q.   Yeah.

A.   -- Daniel had really already determined, based on the representations that Hoard and Jedlowski made to us as to the expertise and the extensive number of projects that they had completed and the marketing materials that they had sent Daniel and that Daniel had reviewed, that it seemed like it was a good fit.

By the time I started to be engaged in these conversations, we were already talking about substantive deals, and BKV became involved very early on.  I would say that the conversations that we were having with Hoard and Jedlowski were in January of 2023 and certainly by February of 2023, and I think it was even before the middle of February of 2023, we were already talking fairly extensively to Mr. Banta at BKV because we weren't

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 38

only evaluating the Flowers site. There were other sites that -- that we were evaluating that we had given to the folks at Distinctive to run market studies on to look at potential feasibility for other projects because we weren't viewing the Flowers situation as a one-off project.

The whole gestalt of the relationship with Distinctive was that it was really supposed to be a partnership between us and Distinctive, much like I had structured other deals before where I partnered with Mega Construction to build Astoria and where I partnered with -- my father partnered with Jack LaGrassa to build, you know, six, seven, eight different projects. It was supposed to be the first of an ongoing relationship. And so we were evaluating multiple projects. And Mr. Hoard brought BKV to the table very early on to assist us in what I had referred to earlier on some of our projects as doing massing studies and feasibility studies and preliminary code reviews to make sure that we were looking at properties that were a possibility to execute the business plan.

Q. Okay. And so by the time Daniel brings kind of Distinctive to you, had he basically already vetted them? Had that already kind of -- he -- Distinctive

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 39 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 39

had been vetted and you were -- had decided you were going to move forward with them?

A. Daniel had vetted them, yes.

Q. Okay. I was just trying to -- that's all I'm trying to -- I was trying to figure out, like, whether, as far as the vetting of Distinctive, whether that's just what -- Daniel kind of did that or whether you were involved in, like, the vetting of them before deciding to kind of move forward with them.

A. If you say involved in the vetting of it was Daniel told me and my father what his impressions were, what his thoughts were, and what credentials they presented to us and that he thought that they were strong and impressive, the answer to that is yes, Daniel did it. Daniel consulted with us, but I didn't say, oh, let me go behind Daniel's work. Daniel's a conscientious guy and if he did what he said he did, I take it on face value. I didn't think I had to diligence it again.

Q. Okay. And then you said you were evaluating more than just the Flowers parcel. Were you evaluating more than just -- I'm trying to understand, were you looking at more than just the Flowers parcel to be this first one you were going to do? Or were you looking at the Flowers parcel to be the first one,

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 40 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 40

but you also had your eye on other parcels that could be other projects down the road?

A.   Yes.  The -- again, sort of a compound question.

Q.   Yeah.  It is.

A.   Because of the timing, right, Flowers was going to be the first one.  Okay?  That was the intention. But we were simultaneously looking at others, right, that we could do at the same time or start six months later or 12 months later.  Remember that in these construction projects, right, there's a lot of lead time to getting them into the ground.  Right? You have to draw pictures, you have to make tests, due diligence.  There's work that has to be done to get the projects into the ground.  So what we were trying to do was create a pipeline, right.  A good developer in whatever space, you have a pipeline of deals.  Right?  That's how you run a business.  It's no different than running on an assembly line, right?  If you stop putting stuff in on one end, you don't get anything out on the other end.  So you have to kind of feed the pipeline.

But the idea here was -- and we actually created a brand called Verdant, which was supposed to be our active adult brand, right?  We worked with a marketing company and really created extensive

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 41

branding materials. So we were looking at other projects at the same time. But based on the timing and whatnot, it was -- Flowers was the initial focus.

Q. Okay. So Verdant was kind of the brand that you had created to be sort of the brand that was going to hopefully open a series of active adult senior housing facilities?

A. Correct.

Q. Yeah.

A. And Chris Hoard and Jedlowski and Anna and George -- not Anna -- Angela and George Draghiceanu and them, they were all involved in helping to create that brand. We had a company, and actually this is one area that Howard did get involved in on the deal, because Howard's background, he has an MBA, but his background is in marketing. And he actually has a pretty creative eye. So he did help us on this aspect of the deal in working with the marketing company.

But the Distinctive folks were also involved in creating the brand because, again, Flowers was supposed to be the first of a number of projects that would have been done under the Verdant brand. And BKV was involved from very early on in helping

Case 5:25-cv-00028-BO-BM Document 102-6 Filed 03/20/26 Page 42 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 42

us to evaluate the suitability of various different sites to see if they would be suitable for a -- an active adult project.

Q.   Do you sort of -- at this early stage, sort of January, February of 2023, had it pretty -- sounds like it's been pretty much decided that you wanted to go forward with the idea of the active senior living housing model as opposed to, say, something that was more like assisted living, memory care, something that would involve, you know, getting licensed to run those types of facilities?

A.   Yes.  And the reason for that is in order to get the license -- it can be a multi-year project -- you have to apply to the state for what's called the certificate of need.

Q.   Right.

A.   That's an extensive process, which by the way, had I undertaken it, Treeline would never have been granted a certificate of need.  I would have needed Distinctive and their purported track record, which I now understand was not accurately portrayed to us. But assuming that their track record were accurate, I would have needed Distinctive or someone else like Distinctive who had experience in running a licensed facility to be a co-applicant because they don't

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 43

just give certificates of need.

So the answer is, as a developer who was looking to develop a pipeline of development, I didn't want to get into the licensed business. I wanted to keep it as active adult or what Distinctive would call independent living, which was -- basically, the big difference that they described between active adult and independent living was active adult would have food service available, but it wouldn't be like a dining room with meal services. You could go out to the pool and get a cheeseburger or a beer, or you could go down to the pub and get a snack, but it wasn't meal service. And in independent living, what Distinctive advised us is that an independent living has, you know, a dining room and meals available, you know, somewhere between two and three meals a day.

Q. And the other thing the independent living and assisted living and memory care have too is they have medical professionals, registered nurses, and they dispense medication, which is what -- is it your understanding that that's what sort of the licensing really is relating to those?

A. Independent living is not licensed. So the answer is, is that from what Distinctive explained to us,

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 44

yeah, you're correct with assisted living and memory care. Independent living, anything where you're, again, this was all told to me by Distinctive. This isn't my independent knowledge. But what Distinctive explained to me is to the extent you have, like, you're giving out medicine or assisting people with things that, like, their day-to-day activities, that already falls into the licensing -- licensed facility.

Now, could you, in an independent living potentially have something like a physical therapist on staff that people could take advantage of? I suppose you could. I never really delved into it that deeply. But again, for the purpose of whatever we were discussing, the major difference between independent living and the adult was the provision of meals.

Q. Okay. Did Distinctive tell you that there were -- that in the independent living space that there were facilities that were literally independent living only and did not also have connected assisted living and memory care as part of that?

A. Repeat your question. I'm sorry.

Q. Sure. Did Distinctive tell you that there were, you know, independent living housing facilities that

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 45

were literally just only independent living and didn't also have, like, connected assisted living, memory care facilities as part of that?

A. Yes. And I've seen them. They exist.

Q. Okay. So the only difference between independent living and active adult is the provision of meals?

A. In the way that I was discussing it with the folks at Distinctive and the folks at BKV during the course of this project, yes. Okay? And the major difference was is that independent living provided meals, but it didn't fall under what you needed for a licensed facility.

Q. Okay. But you all were not even interested in independent living; you wanted to be active adult?

A. Initially, yes. And the reason there again is because we felt that active adult was really the most growing space within the market and that was what Distinctive and Hoard and Jedlowski kept telling us was you want to be in the active adult space. And when they did demand studies, they studied demand for active adult units on various different properties and found that based on their studies that they reported to us that the demand was good.

Q. When who did demand studies?

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 46 of 303

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 46

A. The folks at Distinctive, Hoard, Jedlowski, they used -- they did -- they studied the demand on each and every project. They had some proprietary software. They also had an outside company that they used to get data. But they would report back to us and say there's -- the demand in this area is good. We think that a facility of X, Y, and Z units could be appropriately absorbed. Absorbed meaning, you know, people will rent the apartments over a certain period of time. And based on that, they felt that it was a good location or not a good location. There were some locations where, you know, the demand wasn't as strong as we had anticipated.

Q. BKV didn't do any demand studies for you, did they?

A. No.

MR. KATZENBACH: Okay. We've been going almost about an hour now. Do you want to take a break?

THE WITNESS: It's up to you. I'm fine. But if you -- if you're at a good stopping point, we can take a break.

(A short break was taken at 11:09 a.m.)

(The proceedings resumed at 11:20 a.m.)

Q. (Mr. Katzenbach) All right. Mr. Schor, we're back

Case 5:25-cv-00028-BO-BM Document 102-6 Filed 03/20/26 Page 47 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 47

from our first break of the morning. I want to turn to the Flowers parcel, and just, if you can tell me, sir, how did you first become introduced to the Flowers parcel?

A. By Sarah Godwin.

Q. Okay. By Sarah. Okay. She knew you -- I guess you had reached out to her, told her what you were looking for, and then she brought the -- this opportunity to you?

A. Yeah. As I had said earlier, she -- we were looking at -- she's a pretty well-known broker in the area.

Q. Right.

A. And we were looking for not just these types of sites; we were looking for industrial sites as well. And if it happened to land, I would have looked at an office deal too. But when I mentioned to Sarah that we were interested in this space, she proposed this site.

Q. Okay. And at the time that you all were looking at it, what exactly -- I'm not sure, like what exactly was available? My understanding is that there was the parcel that you ultimately, you know, went forward with the project on, but then there were other parcels connected to it. But I don't know, were those available at the time you were looking,

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 48 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 48

were they not?  Trying to figure out what was available.

A.   They were not offered to us.

Q.   They were --

A.   The parcel that was offered to us was the 7.4-acre parcel that we ultimately went to contract for.

Q.   At the time you were looking at that parcel, was there any discussion about the other parcels next to it?

A.   Well, there were two parcels next to it.  One parcel was already being built with what I understand to be a market rate apartment building.  There was a small parcel on the corner that was never discussed, never office -- never offered to us at the time.  There were also parcels of land across the street that I had observed to be vacant, but they weren't initially offered to us.  It was the 7.4-acre parcel.

Q.   Okay.  So a 7.4-acre parcel was the only one that was being looked at or even considered?

A.   Initially, yes.

Q.   Yeah.  Right.  And so tell me, what did you all -- what was the process that you all went about with evaluating that parcel in February of 2023 to determine whether it was even a parcel you'd be

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 49

interested in, you know, moving forward with?

A.   Sure.  Mr. Hoard and Mr. Jedlowski on behalf of Distinctive did a commissioned market studies about the property to find out what, as I had discussed earlier, what the demand was for the various space to determine if there was even a market for active adult units in Clayton.  We also then -- again, Hoard and Jedlowski brought BKV to the table and BKV prepared initial studies of the land based on code review documents that we provided to them, you know, surveys, you know, baseline documents that we obtained from the seller.  And they put together, you know, a -- what I would call a massing plan of the building on the site.

And during that period of time as well, Hoard and Jedlowski and a fellow named Ryan Herchenroether from Distinctive started to do some numbers on the deal, like an underwriting.  And I visited the property.  I don't recall exactly; it was part of a larger visit.  I visited several properties with Sarah Godwin on a visit down to North Carolina, but that was on the agenda.  I visited the property.  That's basically what it.

Q.   Okay.  So when you said that BKV prepared initial studies of the land, was that in -- are you talking

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 50 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 50

about that they did that in February before the

letter agreement was presented?

A.  Yes.

Q.  Okay.  And what exactly, when you said they prepared initial studies of the land, what exactly did they do and provide to you?

A.  They requested that we give them various documents that a seller would ordinarily provide to a prospective purchaser like a land survey and various other information.  We gave it to them, and based on looking at that and the topography and various other things, they prepared, again, what I would refer to as a massing plan of the building.  But well prior to the letter agreement.

Q.  Okay.  And so what was -- when you say it was a massing plan of the building, what do you mean by that?  What was it?

A.  So Chris Hoard and Jedlowski and the team at Distinctive like this guy, Draghiceanu, and others worked up what they called like the program, if you will, for the building.  Right? So this was an active adult project.  The thing about active adult is it's a highly amenitized type of resonance. Okay.  It's not a typical apartment building where, you know, you might have a swimming pool and a

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 51

pickleball court. That's, you know, a typical apartment building. An active adult has all sorts of amenities. It's really -- what someone who moves into these properties is buying is a lifestyle. Right? And the lifestyle includes having club facilities and a very nice gym and sauna and all sorts of -- and actually programs, right, lectures, art programs, amenities that include, you know, private gardens, all kinds of various different things and activities like yoga classes and things like that. So they're paying for a lifestyle. And the folks at Distinctive proclaimed an expertise in developing that lifestyle.

And so what they did was they created a document that they referred to as the program, and the program defined a number of units, and then it defined different spaces within the building that you -- that they thought were important in a highly amenitized building like an art room and a gym, and a sauna and a community room, and all kinds of various spaces. They provided that to BKV, right.

Q. Okay. Right.

A. And based upon the sort of program that Jedlowski and Hoard created, they -- BKV created an outline of a building and various amenity spaces. They didn't

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 52

design the building, right; that would have been beyond the scope. But they said, does the building of this size, right, because the program contemplated the size, does it fit. That's what BKV was doing at that time, determining if the building fit.

Q. Okay. And did the outline of the building that they created, did it show it on the site?

A. Superimposed upon a picture of the site, yeah.

Q. Okay. And did it seem like it fit?

A. At the time?

Q. Yeah.

A. The initial massing plans indicated based on what Hoard was telling me about the land that it fit.

Q. Okay. And that initial outline that BKV created, was that based off of a 160-unit, 175,000 square foot property or was it something different?

A. No, plus or minus, that was it. There's definitely a document that's been produced that if you want to show it to me, I can tell you which one it -- you know, but there's definitely a document that's been produced that the cover page was the program. It shows a -- an -- it's like an Excel sheet on the front and then behind it there are some drawings. And that was produced prior to the March, whatever,

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 53

letter agreement with BKV.

Q. Right. No, I'm just trying to -- yeah, no, so I'm trying to figure out if that -- that outline was -- so that outline that they created and put on the property, that was based off 160 units and 175,000 square foot building?

A. To my recollection plus or minus, yes.

Q. Yeah.

A. It could have been 155 units and 182,000 square foot building, but substantively, yes.

Q. Okay. Because I just want to make sure, because I've heard like references to -- in this -- in these depositions to like a much smaller building initially, like 120 units or something like that. Was that ever the case or was this thing always going to be, like right from the beginning, it was going to be 160 units, 175,000 square feet?

A. Okay. The answer is, that was determined by Hoard and Jedlowski to be the feasible number of units and size of the building based upon the construction costs and the economics of the project. At -- during that earlier period of time, during February of 2023 when they got the demand study, I think I exchanged maybe one or two emails with Chris Hoard in which I said, hey, what do you think about

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 54

building 140 units? And Chris responded to me, well, 140 units is okay, but the economics really only work with 160 units, and I think the demand is there for 160 units. So we went forward with the 160 units, and that generated the 175,000 square foot building because the units -- at that stage, right, we were estimating the sizes of the units and of the various program areas which would change, obviously, as the building got, you know, formally what I would say designed into design development as opposed to a massing plan when you're using more general figures.

Q. Right. Okay. Is your recollection that the massing plan and the outline that the -- of the building that BKV prepared in February of 2023, that that ended up being pretty similar to what the site plan for the building ended up being as far as the size and the way it fit on the lot? Or they -- or do you remember it being very different?

A. Well, ultimately there was no real final site plan for the building because the building didn't fit because of various errors that we've alleged in our complaint that BKV made and various omissions that we've alleged in our complaint that BKV made. However, the building changed materially from that

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 55

initial massing plan.

Q. How did it change materially from that massing plan?

A. It was moved all over the site.

Q. Okay. Did -- in February of 2023, did BKV do anything else as far as helping you evaluate the site other than preparing this massing plan?

A. Well, we discussed with them that -- the scope of due diligence that we would want to do in order to verify, you know, the constructability of the site.

Q. And so -- and what was that scope of due diligence that you wanted?

A. Well, it was a whole host of things. And really what we discussed mostly with BKV was the timing of doing it because we were trying to determine how much of a diligence period we needed from the seller in order to finish the physical due diligence which involved soil borings. So that was really the big item we discussed with BKV.

Q. And what did you talk about as far as the timing?

A. About how long it would take to get soil borings, whether they had contractors that they recommended to do soil borings. BKV also looked at, as I had mentioned earlier, surveys, topography of the property and various other things, and we talked about that in general terms.

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 56

Q. Okay. What specifically --

A. And I just want to clarify one thing, that these conversations were with Chris Hoard, and in certain cases, also with Jedlowski on the phone. I as a professional am not professionally qualified to make any judgements about soil borings and stuff like that. It was actually mostly a conversation between Mr. Banta and Mr. Hoard where I was kind of an interested observer. I wanted to know as a lawyer, what did I need to go back to on a contract with Mrs. Flowers and say I needed in terms of a due diligence period or how long, you know, or what access I would have needed to the property in order to be able to perform soil borings. So I was -- I wasn't involved in planning what was being done. I was more -- I was relying on Distinctive and Hoard and Jedlowski to work that out with Mr. Banta.

Q. Okay. But were you involved in those discussions where the timing of soil borings was discussed?

A. Yeah. How long it would take to get a contractor out there, do it, send them to a lab, get evaluated, yeah, I was on those calls. But again, I didn't have anything to do with figuring out how many borings you needed, where one needed borings. I had nothing to do with that. I don't have any technical

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 57

knowledge.

Q. Right. And so what was discussed about the need for soil borings and when that would be done?

A. That it would be done during a due diligence period and that they were necessary. And that between BKV as our expert architect and Distinctive and Hoard and Jedlowski as my quarterbacks and partners on the deal, that they would figure it out between them.

Q. And what was the period -- what was the time period of the due diligence period?

A. I don't recall offhand.

Q. Okay. Was it two months, five months, eight months?

A. I don't recall. It likely wasn't eight months but there's a contract, so it will say that.

Q. Okay. So it was whatever the due diligence period was in the purchase contract with Flowers?

A. Yes. Now, they may have allowed us to do some preliminary due diligence prior to that, but I don't believe they let us do physical due diligence like borings and things like that until a contract was signed.

Q. So you couldn't -- you weren't going to be able to do any soil borings until you signed the contract with Flowers in May --

A. Actually, you know what? Let me correct myself.

Q.   Sure.

A.   I actually think that what happened was that there was an access agreement.  And what happened was, was we were negotiating with Mrs. Flowers and we wanted to get that diligence moving.  And she may have allowed us prior to the signing of a contract to do some physical due diligence on the property, which may have included for the soil borings pursuant to an access agreement.  I'm not 100 percent certain, but I have a recollection of that.

Q.   Okay.  But if there wasn't an access agreement that allowed soil borings, you could not have done soil borings before you executed the purchase agreement with her in May of 2023, correct?

A.   I would have been arrested for trespassing on her property.

Q.   And so when you're talking about soil borings needing to be done in the conversation that you were involved with that, that was within the period of the due diligence period of the purchase agreement, correct?

A.   I don't know.  I can't say because I -- as I said, my recollection now is that there was an access agreement that we signed with Mrs. Flowers, before we signed the contract, that allowed us to do

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 59

certain things on the property, which may have included the soil borings. So that would not be the case that the -- that we may have been able to access the property and do the borings prior to the due diligence period commencing but I'm not entirely sure. If you show me the document, I could definitely be -- you know, my memory could be refreshed on that.

Q. Okay. I will represent to you that there's a lot of documents in this case. I've not seen an access agreement. Doesn't mean it doesn't exist; it just means that, I guess I haven't come across it yet.

A. Well, what I can tell you --

Q. It may be -- it may be one. I'm not saying there's not. I'm just saying I would show it to you, but I don't -- I haven't seen an access agreement yet.

A. Well, here's one thing I can tell you which I'll volunteer, I don't mind, is that when we got the results of the first set of soil borings, it was -- I believe that was after we signed the contract. When they dug the holes, I can't tell you.

Q. Right.

A. But I'm fairly certain that the progression was that we signed the contract in May of 2023, I believe.

Q. That's correct.

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 60

A. And that we got the first report from the soil engineer, I think it was in July --

Q. That's correct as well.

A. -- of 2023. So that -- so we may have dug the holes prior to May. I don't recall that, and that may have occurred under an access agreement. But the results were received -- the initial results were received post the contract.

Q. Correct. You're correct about that. Your memory is correct.

A. Okay. So again, you know, that's kind of the progression.

Q. Right. So what I'm really trying to get at actually is, and I'll represent to you that the Terracon agreement, which was July of 2023, it appears to show that the borings were done in June of 2023, a month before, okay?

A. Uh-huh.

Q. So they were not -- does not look like any borings were done before you signed the purchase agreement in May, okay?

A. Okay.

Q. So my question is really not about that timing and anything about that, it's -- well, it is. It is about that. It's -- was there any discussion before

Case 5:25-cv-00028-BO-BM   Document 102-6   Filed 03/20/26   Page 61 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 61

the purchase agreement was signed that you recall along the lines of, hey, why aren't we doing soil borings? Why aren't we digging holes to see, you know, what the geotech issues are? You know, why are we -- why is that not occurring? Was there any concern about that not occurring before May of 2023?

A. Well, I relied completely on Distinctive and on Hoard and Jedlowski and on David Banta to -- from BKV to drive that ship. By the time that had happened, I had already signed an agreement with David Banta. I had already started paying David Banta, and they were quarterbacking the deal entirely. Chris was my owner's rep. Distinctive was my owner's rep, and they were guiding the process. So they didn't seem to think it was a problem so I didn't seem to think it was a problem.

Q. Okay. But that's what I'm trying to get at, whether you recall thinking to yourself it -- this is a problem that we're not already doing soil borings in, say, April of 2023?

A. No, because I was relying on my professional advisors at Distinctive and BKV.

Q. Okay. Okay. We'll be doing some of this by -- just the nature of kind of like this project, everything that happened on it, how long it's stretched out for

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 62

and all the issues.  Like we may have situations

where we're talking about one period of time in the

project and then we go to a, you know, an earlier

different period of time.  If in doing any of that

you don't understand the context of my question or

like, wait, we were just talking about something

different, please just let me know and I'll try to

then hopefully reorientate you in a way that's clear

for you, okay?

A.   Sure.

Q.   So I know we were talking just about, you know, kind

of after BKV got involved, but I want to go back now

to sort of how BKV got involved.  And my

understanding was that BKV was brought to Treeline

by Distinctive.  Is that -- do I understand that

correctly?

A.   Yes.

Q.   Okay.  Tell me what you remember about how BKV was

brought to you and what Distinctive told you about

BKV.

A.   Sure.  As I had mentioned to you, we were evaluating

multiple projects --

Q.   Right.

A.   -- at once.  And initially Chris said, look, I work

a lot with this architecture firm, BKV.  They're

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 63

really one of the best firms in the senior living space, right. And they're willing to do some initial work to help us evaluate the sites, right, for us to consider -- for us to, you know, be able to see if there's feasibility, you know, before we, you know, dive in headlong on a due diligence and a contract and do something more detailed.

So that was the context in which I first met Mr. Banta from BKV. He assisted us in doing evaluations on several different sites in North Carolina. And then what Chris ultimately told me was that while BKV was by far not the least expensive architect, they really were the best and that he strongly recommended that we engage BKV for the project. He represented to me that he and BKV had successfully completed other projects and were working on other projects actively. And so on the basis of my quarterback's recommendation and Distinctive's recommendation, we agreed to engage BKV.

Q. Okay. Did you have any meeting or interview or discussion with BKV yourself, or did you just rely solely on Hoard?

A. I mean, I had already met -- prior to March of 2023, I had already been on a number of calls with David

02/11/2026         BKV Group DC vs Treeline Acquisition, et al.         Michael Schor

Page 64

Banta.  And --

Q.   Sorry, I meant -- so I'm going back before that, before you even heard about BKV.  I understand that Hoard brings BKV to you.  But my question is, after that do you then have a meeting or interview with BKV to talk to them yourself or do you just rely on Hoard and say, great, we'll go with BKV?

A.   Well, I -- I was trying to answer that question.

Q.   Okay.

A.   What -- the way it sort of evolved was, I never had a formal interview with BKV.  BKV came on the scene.  Chris brought them and said, hey, these guys will help us out with evaluating a bunch of projects.  So I met David Banta and I sort of informally interviewed him because he started to show us, you know, little, you know, massing studies or sketches or fit tests or various things on multiple different sites.  I had participated in several calls where we had discussions with David Banta.  He seemed like a personable guy, and Chris really strongly recommended him and the firm, and so I followed Chris's recommendation to engage BKV for the project.  But I didn't have like a, oh, I need to interview David Banta or anyone else at BKV.  I relied completely on Distinctive and on Jedlowski

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 65

and Hoard vouching for them and saying that they were really good.

Q. And what did Hoard tell you about BKV's experience in the senior housing space?

A. That it was -- BKV's experience?

Q. Yeah.

A. That it was extensive. That they -- that David Banta in particular was an expert in designing senior living buildings of various different kinds. He didn't say specifically active adult or whatever; it was senior living in general. And that he had a -- an extensive team, a really good network that he had access to really good professionals who were, you know, experienced in that space, and critically, that he had done other projects with BKV.

Q. Okay. And when you talked --

A. I mean, specifically -- Chris specifically represented that there were other projects that they -- that Distinctive had worked on with BKV.

Q. Okay. And when you talked to David yourself, did you get any additional information from him about his experience or BKV's experience that Hoard had not already told you?

A. No.

Q. Okay. And that through the course of this project

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 66

-- through the course of the project or even after the project, have you learned that anything that you were told about BKV and Banta's experience was not accurate?

A. Yes.

Q. Okay. What have you learned about that you were told about BKV or Banta experience that wasn't accurate?

A. That they were among the best architects in the field. And clearly, the number of mistakes that they made in designing the project, fitting the project, and not anticipating problems before they became real problems. So to me, that was a misrepresentation of their capabilities and abilities. And more -- moreover, which was very upsetting to me, they engaged in a kickback scheme with Hoard and with -- and Jedlowski and Distinctive, which frankly, is unethical and unheard of. And I relied very strongly on Chris Hoard's representation and Jedlowski's representation of having done business with them, of having completed projects with them. And that was a very disappointing revelation to me that wasn't apparent or wasn't true, that what Hoard told me about BKV wasn't true.

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 67 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 67

Q.   Did David Banta ever tell you anything about his prior relationship with Distinctive or Hoard that was not true?

A.   Yes.

Q.   Okay.  And what was that?

A.   He, David Banta, told me that he had completed projects with BKV -- with Distinctive, and that turned out not to be true.

Q.   When did he tell you that he had completed projects with them?

A.   During the course of discussions.

Q.   Okay.  Do you specifically recall him telling you that?

A.   Absolutely.

Q.   Okay.  So at the time that BKV was brought to the project, was the project assumption at that time that it would be 160 units and 175,000 square foot building?

A.   Are you referring to March of 2023 when I signed the letter agreement --

Q.   Yes.

A.   -- or Daniel signed it?

Q.   Well, as of -- my understanding is that BKV was brought to the project in February; is that right?

A.   Yeah.  In and around that timeframe, and I signed an

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 68

agreement with them shortly thereafter in March of 2023, yeah.

Q. Right. Before you signed the agreement though, when you were first talking to them, BKV in February, at that time was the project assumption 100 -- approximately 160 units and approximately 175,000 square foot building?

A. As I said earlier, there was a short period of time where I exchanged emails with Mr. Hoard about whether it could be 140 units, and Mr. Hoard responds back -- responded back to me that 160 units was more economically feasible. He was handling, doing all of the financial underwriting with Mr. Herchenroether, and so the project was 160 units, and again, the 175,000. At various times, it could have been 180, it could have been 160. I can't tell you that exactly but 175 sounds right.

Q. I'm just trying to understand. As far as you recall, the only -- BKV was told from the very beginning that it was going to be 160 units in 175,000 square foot building, right?

A. That was the program that Hoard gave them and Distinctive gave them and Jedlowski gave them, yes.

Q. Okay. Okay. Let's -- I'm going to show you on my screen, and this is -- this is an -- this is page 80

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 69

of exhibit -- which was previously marked as Exhibit 12. This is going to be the March letter agreement with BKV. Hang on a second. Okay. You should be able to see it now, I believe.

A. Yep.

Q. Okay. So in my -- we -- you talked about this a little bit a minute ago but I just want to make sure we're on the same page. This is the letter agreement that was signed with BKV in March of 2023. I'm sorry. Is that correct?

A. Yeah.

Q. Okay. And you'll see, I guess in here, it does reference that under the project understandings and assumptions, 160 units and 175,000 square foot in a four-story building of type VA construction.

A. Okay.

Q. And is -- as you're recalling, is that what the project assumption was as of March of 2023?

A. That's what I testified, 160 units and approximately 175,000 square feet. Yeah.

Q. Right. Okay. Now, as we scroll through here under the scope of services, I don't -- under the scope of services, under either concept entitlement phase, this first section here, concept design and entitlement, I don't see anything referenced in here

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 70

about geotechnical evaluation.

Do you recall whether or not there was discussion about whether sort of geotechnical evaluation should have been in this letter agreement? Whether anybody was concerned about, you know, it needing to be specifically spelled out?

A. You know what, I'm going to just open it on my --

Q. Great.

A. -- on my end so I can scroll through it and if you --

Q. Sure.

A. -- just be patient with me while I --

Q. That's fine. Absolutely.

A. Can you guide me to the number?

Q. Yeah.

A. Is it in your folder here?

Q. It is. Yeah, so it's in my folder. Well, that's a good point.

MR. STODDARD: Yeah, Dan, I think this is in the link that I sent this morning.

MR. KATZENBACH: Good point. Good point. It's not in my link. That is correct. Do you want to go ahead and send him the link?

MR. STODDARD: Yeah, this should only take a second.

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 71

MR. KATZENBACH: Yeah. My fault. I -- that was my fault.

THE WITNESS: No worries. Excuse me.

MR. STODDARD: Michael, I just hit send and it's going to be that Box link at the top.

THE WITNESS: Okay. Just give me a half a second and when I get it I'll let you all know.

Q. So that link that your attorney just sent you is all the previously marked exhibits.

A. Okay. Just give me a half a second --

Q. Yep.

A. -- and hopefully it'll come through quick. Can I ask you a question? You guys want to just go off the record for a minute while I do this or just close the cameras and then I'll -- I'll signal you when I'm -- when I find it, because it could take two or three minutes? Oh, hold on. Never mind. Good job. Ward and Smith email. Okay. Okay. So which exhibit number are we on?

Q. This is going to be Exhibit 12, and it's a huge exhibit. So if you scroll down to page 80 of that exhibit, that will be the letter agreement.

A. Okay. Will do. Hold on. I'm laughing because it doesn't look like it's in this box, buddy. Hold on. Wait, because they're not in numerical order, but

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 72

one sec.  Let me look.  I found it.  Okay.  There we go.  I'm getting the waiting circle of death right now.

Q.   It's okay.  You're fine.

A.   Okay.  It won't open in that.  I -- I think I may have that document in another spot.  Is it okay with you if I --

Q.   It is.

A.   -- pull up that document on my --

Q.   Perfectly fine.

A.   -- own computer?  Okay.

Q.   Yep.  Perfectly fine.

A.   Okay.

          MR. STODDARD:  Yeah, and I would forward it along but it's like -- it's way too many megabytes to go through the email.

A.   Okay.  This was one of the pleadings, right?

Q.   Correct.

A.   It's attached to Treeline's first amended answer counter claimant and third-party complaint?

Q.   Correct.

A.   Okay.  Hold on.  Let me see if I can get that open.  Okay.  That I got -- was able to get open, so hold on.  So now you want me to look at page 80 of that document?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 73

Q.   Yep.  Correct.

A.   Okay.  Will do.  Hold on.  We're almost there.  Yes, sir.  Okay.  I got it.  All right.  Let me look at it.  Give me a moment.

Q.   Please do.

A.   (Witness reviews document.)  Okay.

Q.   Okay.  So my only question really is just like in -- under -- really -- well, under concept entitlement phase one or really any of the phases, to be honest.  Like it -- the letter of agreement doesn't reference geotechnical evaluation being done.  And so my question was --

A.   Yes, it does.

Q.   -- whether you recall there being --

A.   Hold on.

Q.   Go ahead.

A.   Can you hear me?

Q.   Yes.

A.   I don't concur with that.  It does --

Q.   Okay.

A.   -- reference that.

Q.   Okay.  Sure.  Well, tell me where you see --

A.   You see how it -- sure.  It doesn't say specifically the word geotechnical, right.  But it says that the owner, meaning us, will retain an engineer to do

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 74

that. That's -- right. In other words, a civil engineer or whatever, though -- that's what Terracon does is under the scope of kind of civil engineering.

Q. Where do you -- I'm sorry, where do you see that?

A. Well, all over the place.

Q. Where's the first place you see it?

A. Anywhere you see -- you see it says civil engineer prepare the entitlement?

Q. Yeah, I do. Yes.

A. Right. Okay. Right. So basically, what was supposed to happen here was, the owner, in fact if you scroll up a little more, was we were going to contract separately. It wasn't included in David's fee, right, with a company to perform that -- those studies and provide it to BKV. So David -- BKV was not retaining the geotechnical engineer, right, under -- pursuant to their contract. My recollection is that there was a separate contract with Terracon which was the ultimate geotechnical engineer that did the project, and then they gave information to BKV, which was the basis for their design.

Q. Okay.

A. So it's assumed in here that it would be done.

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 75

Q.   Okay.  Is it assumed in here that it would be done by a certain time period?

A.   Well, there's a schedule that he gave for the project if you scroll down in your document.

Q.   Yeah.

A.   And having geotechnical studies are predicate to being able to meet these schedules because nobody could do schematic design, design development, construction documents or any of that without having geotechnical studies.

Q.   Okay.

A.   So it's subsumed in here.  It wasn't specifically mentioned.

Q.   Okay.  But you'd agree that it's not specifically mentioned in here, correct?

A.   That BKV was retaining Terracon, it is not specifically stated, no.

Q.   It's also not specifically stated that there would be geotechnical engineering done by a certain date?

A.   No, but the schedule above presumes that because no architect could proceed with anything more than concept without having, you know, a geotechnical study.

Q.   Okay.  Let's look at -- let's see here.  Now I'm going to -- in the folder that I sent you of new

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 76 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 76

exhibits, there's a document labeled 2023 5/15 Southwest Crossroads contract. I'm going to now mark that as -- agreement as Exhibit --

THE COURT REPORTER: Fifty-eight.

MR. KATZENBACH: -- 30, I mean 58; is that right?

THE COURT REPORTER: Yes.

(EXHIBIT NUMBER 58 WAS MARKED FOR IDENTIFICATION.)

THE WITNESS: I have that document open in front of me from your folder so unless you want to share it for the benefit of other counsel, you don't need to put it up on the screen.

MR. KATZENBACH: Okay. Yeah, and if anybody else wants me to share it, just let me know. I'll be happy to do that.

MR. STODDARD: Just to confirm, it was the one titled 2023 05/15?

MR. KATZENBACH: That's the one.

MR. STODDARD: Thank you.

MR. KATZENBACH: Yep. Absolutely.

Q. My understanding --

A. I have it up.

Q. Go ahead. I'm sorry. I didn't mean to cut you off.

A. No, I was just saying I have it open whenever you're ready.

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 77

Q. Okay. Great. My understanding is that this was the purchase contract with Flowers for the parcel; is that -- is my understanding correct? And read it -- read through as much of it as you need to to confirm.

A. Well, I'm not going to read it word for word. I'll just flip and make sure it's complete. Yes, sir.

Q. Okay. Great. And my understanding is that under this agreement there was a purchase price of 3.75 million for the parcel with, I guess some adjustments made depending on how many units ultimately ended up being constructed for the project; is that right?

A. Yes.

Q. Okay. And then you had a deposit of 75,000. Was that the only money you had to put down on this initially?

A. On the contract?

Q. On the -- for the parcel.

A. Yeah.

Q. Okay. Okay.

A. Sorry, yes, so it's recorded properly.

Q. That's fine. That's fine. That's fine. And then what was your understanding of what -- under this contract of what the -- like the due diligence

02/11/2026           BKV Group DC vs Treeline Acquisition, et al.           Michael Schor

Page 78

period was?

A.   Now that you're showing it to me, in Section 4B it says, purchaser shall have the right to terminate this contract by written notice to the seller sent on or before the date which is 120 days after the effective date at 5:00 p.m. Eastern Standard Time, the examination period, or the examination period at expiration date in it sole and absolute discretion, et cetera.  So I had 120 days from the effective date of the contract, which if I'm not mistaken, is probably defined as the date on which both the seller and the purchaser executed the contract.  So it was 120 days effectively from this date.

Q.   Okay.  All right.  And my recollection is -- I'm not great with math because I went to law school, but my understanding is that that took us basically generally into like the October time period, the end of October of 2023; is that what you recall?

A.   September, I think.

Q.   September.

A.   But then there were, I -- I believe 120 days from May 15th plus or minus to September 15th.  But I believe that there was an amendment to this contract where we got a -- an extension at that time.

Q.   Okay.  That's -- okay.  Maybe that's why I'm

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 79 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 79

thinking October.

A.   I think you're correct ultimately in that we did get a 30-day extension of the diligence period.

Q.   Okay.  Do you remember what brought about wanting to get the extension of the due diligence period?

A.   Not specifically.

Q.   Okay.  And how -- what is your recollection as to how closing on the property was going to be determined under this agreement?

A.   That's an excellent question, and it was something that vexed Mrs. Flowers terribly which led to her firing the attorney who negotiated this contract.

Q.   That makes me feel much better.

A.   Yes.  This contract was very vague as to the closing date because our obligation to close was tied to obtaining all of the approvals that were necessary for us to get the plan.  In fact, the only reason the word site plan is I happened to have scroll to that page, but essentially, we had to close, I believe it was 30 days after the date on which we got all of the approvals that were necessary to build the project.  And there's no time is of the essence clause in the contract.  And that was quite vexing to Mrs. Flowers because even though our due diligence period had a finite termination date, in

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 80

theory, we didn't have a fixed closing date.

Now of course, I don't know the law in North Carolina but I know that in New York there, you know, is an implied covenant of good faith and fair dealing in a contract. And so it probably wasn't that I could extend the contract out forever, but we did not have a definitive closing date stated in this contract.

Q. Okay. All right. That -- that's sort of what I thought when I read it but I also thought I must be missing something, so I'm glad that I'm not. That makes me feel better. Okay.

A. See, all that law school education paid off.

Q. No, I don't know that that's the case. Okay. I know we talked about that a little bit before. I just want to make sure I'm clear about one thing. So this contract is dated looks like five -- the last date on it or the -- so Flowers looks like she signed it last, and that's 5/25 of '23. Do I understand that correctly?

A. It appears that way from what's typed on it, yeah.

Q. Okay. At the time that this was signed, were you aware that there had not been any geotechnical work done on the site yet?

A. I was aware that we didn't have a geotechnical

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 81

report. As to whether people made borings, I did -- was not -- I don't have a recollection sitting here right now whether I was aware of that at that time or not, but I knew we didn't have a report.

Q. Okay. Do you recall having any discussions with BKV or Distinctive in May 2023 about the status of any geotechnical borings?

A. Not specifically, no.

Q. Okay. All right. And we got a little off -- a little off topic. I want to go back to Exhibit 12, which was the letter agreement.

A. Okay. Hold on. Let me -- just give me a chance to switch in between.

Q. Sure. And I apologize again for switching around like this a little bit.

A. No apologies necessary. We're here to accommodate. There we go. Okay.

Q. Okay.

A. Just tell me where you want me to head to on this.

Q. The schedule you -- the schedule part you were talking about before.

A. The date schedule?

Q. Yep. Exactly. And so there's -- up through phase four is when -- the first four phases are up through preparation of the construction documents, correct?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 82

A.   That's what it appears to say.

Q.   And those were initially contemplated in the letter agreement to be done by November 3rd of 2023, right?

A.   That's what it says.

Q.   So were you all contemplating when this -- I mean, was the contemplation in -- at least in Treeline's view, was the idea that you would be ready to start constructing, you know, the project before the end of the year?  Strike that.

A.   Well, again, I didn't -- yeah, so --

Q.   Yeah, that's a bad question.  That's a bad question. Was it your contemplation that construction documents would be done before the end of the year?

A.   So this schedule changed quite a bit over the course of time, and it was initially developed by Chris Hoard, Joe Jedlowski, and Distinctive along with Mr. Banta and his team at BKV.  It was not developed by me.  This was presented to us as the schedule that they had developed because I have no ability to know how long these various things take, okay.  I'm not an architect.  I have not previously myself engaged an architect, as I said, all on my own to do construction documents of a ground up project of this scope in a residential scenario.  So again, I completely relied on Distinctive and the individuals

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 83

that I've been mentioning over and over again at Distinctive, Hoard and Jedlowski, and on Mr. Banta and his team at BKV to develop the schedule. So when this agreement came out, they verified that this was a schedule that they could keep to.

Q. Okay. Is it fair to say that it was not necessarily important to Treeline that construction documents be done by November 3rd of 2023?

A. Like time of the essence?

Q. Yes.

A. No, it was not -- it didn't have to be time of the essence on November 2023. No.

Q. Did you have an understanding at this point in time, you know, what the cost was going to be to get through construction documents? What the cost -- what the engineering -- what the architectural fees would be to get through construction documents?

A. It's outlined in this letter.

Q. Okay. Well, the reason why I asked is that it -- it's got a total fee of 1.569, right?

A. 1.549, but yeah. Oh, well, yeah, that 20 grand, those are allowances above and beyond it.

Q. Yeah.

A. Those were things that were outside the contract.

Q. Okay.

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 84

A.   Within the contract was 1,549,000.  Those were just an estimate --

Q.   Okay.  Sure.  Fair enough.  A million, so yeah.  Did you have an understanding like how much of that fee would be to get through construction documents?

A.   Well, he shows you that here.  This letter shows you.

Q.   Okay.  Maybe I'm not seeing it.  Where does he show that?

A.   Well, if you go down, it says basis of -- it's section four, basis of payment, other terms and conditions, A, design fee.  And then you see he breaks it down and there's dollar amounts.

Q.   Okay.  Well, that shows -- but that -- when it shows that, that's just the architectural fee, correct?

A.   No, because under the architectural contract, he was engaging all -- this -- let me backtrack for a second.

Q.   Yeah.

A.   The concept with BKV was, and we insisted on this, okay, was that we wanted BKV to be a one stop shop.  Much like with Distinctive, we wanted BKV to be our quarterback.  What that meant was we wanted BKV to hire subconsultants that they had worked with before on similar projects and that they were comfortable

02/11/2026            BKV Group DC vs Treeline Acquisition, et al.            Michael Schor

Page 85

working with. So I didn't interview an engineer on this project. I did not interview a landscape architect. I did not interview anyone. I relied completely on BKV and Mr. Banta to retain these sub professionals and to subsume their contracts as sub consulting agreements within his contract, okay.

So what he's showing you on this document is that yes, some of it is showing you architectural fees, but then he's showing you, for example, interior design services fee. That is under his contract. That's in the million 549 that my understanding is he engaged Senior By Design. This was Senior By Design's fee that David was going to charge. In other words, he was going to charge me and he was going to pay Senior By Design. I have no idea if he was marking this up. I just accepted the bottom line fee. But he was giving me all these services and these are what he was telling me I would be billed for these various services.

Q. Okay. I understand what you're saying.

A. And if you see here, down here, under the civil engineering --

Q. Yes.

A. -- you see phase one ESA?

Q. Yep.

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 86

A. And you see here survey services, title, and topo?

Q. Yep.

A. David commissioned that work --

Q. Yep.

A. -- and he got it through contractors of his own, okay.

Q. Correct.

A. So just wanted to be clear. And the geotechnical.

Q. Yep. Correct.

A. See geotech services fee?

Q. Yep.

A. So he did everything. So whether it was mentioned in the paragraph above, right, it's clear in this schedule that David Banta and BKV undertook to retain all of the consultants and supervise the work of all of the consultants under their contract.

Q. So my question is, so from these fees that are set out, did you understand at this time that it was going to be roughly about $1.2 million to get through construction documents?

A. Yes, because that's the bulk of the architect's work, right, after the construction documents are done that, you know, and they're filed and everything, mostly what they do from there on is construction administration.

www.DigitalEvidenceGroup.com    Digital Evidence Group    202-706-6020

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 87 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 87

Q. Right.

A. Right. But yes, I understood that.

Q. Okay. Great. That - okay. Perfect. I think we're just missing each other. That's all I was really trying to get at. Perfect.

A. No worries.

Q. And so what was Treeline's plan for funding that portion of the cost of this project, the $1.2 million to get through construction documents?

A. We wrote checks.

Q. What I'm really trying to get at, and let me ask it a little clearer. My question's probably a bad one. At the time that you signed this letter agreement, was the plan -- was Treeline's plan to write -- to pay for the $1.2 million to get through construction documents just out of their own funds without any financing?

A. Well -- okay. So the answer is we would have -- the answer is yes, but our intention was, was to raise investor capital whether it was from individual investors, and in this particular case, from institutional investors who would be prepared to fund those expenses alongside of us. But we were prepared to advance them, you know, in substantial amounts, you know, until we got to that point, which

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 88

we did.

Q.   Well, that's what I'm really trying to get at.  So to what degree was Treeline -- at this stage, to what degree was Treeline prepared to fund expenses out of their own pocket?  To what -- to what level?

A.   If the project had been moving along appropriately and I wasn't getting concerned that I was pitching money into a hole, all of it.

Q.   Okay.  So you -- at this stage you did not need any kind of financing to help fund all of the architectural fees to get through construction documents?

A.   On March 5th, 2023, when I signed this?

Q.   Yes.

A.   No.

Q.   Okay.  Did Treeline's ability to fund through construction documents, did that change during the project?

A.   Ability, no.  Desire, yes.

MR. KATZENBACH:  Okay.  That's all I needed.  We've been going for a little over an hour again and it's now 12:20.  We've usually taken in these depos a lunch break around now. Is that what everybody would like to do now?

MR. STODDARD:  Works for me.  Back at

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 89

1:00?

MR. KATZENBACH: Back at 1:00 is fine with me if that works for everybody else.

MR. STODDARD: Sure.

THE WITNESS: Could I request that you go off the record for a second to -- I just want to ask a scheduling question?

MR. KATZENBACH: Sure.

(A short break was taken at 12:22 p.m.)

(The proceedings resumed at 12:24 p.m.)

Q. (Mr. Katzenbach) All right. So we were just talking about funding costs on the project. I -- I want -- I've seen in a number of emails the term pursuant costs. And not being in this world, I'm sort of trying to figure out what that means. I think I know what it means, but can you just explain for me what pursuant costs mean in the terms of like a development project like this?

A. Okay. Sure. First of all, pursuant costs actually I think was a typographical error by Mr. Hoard in some of the emails I had seen.

Q. Oh, okay.

A. I think what he meant to say was pursuit costs.

Q. Pursuit costs. Okay.

A. Okay.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 90

Q.   Yep.

A.   And it depends how one defines it, but generally speaking, it's the cost that it takes in putting a deal together.  But I would say to you that getting drawings to -- construction drawings are far beyond pursuit costs.  Pursuit costs might be things like commissioning a phase one report, which we did, commissioning geotechnical borings, which we did, you know, various other things.  But once you -- sort of typical due diligence kind of stuff is what I would define as pursuit costs.  When you're already drawing, and construction drawings, that to me is far beyond pursuit costs.  That's already -- it's pre-construction cost.

Q.   Okay.  That's helpful.  Okay.  So that -- that's very helpful to me.  So in the -- in -- from Treeline's perspective on this project, on the Flowers project, pursuit costs, as are referenced in various emails, were not meant to include a majority of the design fees?

A.   That wouldn't typically be.  No.

Q.   Okay.

A.   That -- that's not how I would view it.  No.

Q.   Okay.  So just to make sure -- back to my question from before was, I assume that Treeline's plan on

this project was to fund pursuit costs out of their own pocket.  Am I correct about that?

A.   Yes, and we were prepared to do more than that up to -- if the project was going forward in an appropriate manner and we weren't running into roadblock after roadblock after roadblock, I was prepared to do even more than that because I had mentioned to you very early on in the day that this was the first in what I perceived to be a very significant business opportunity.  So I was willing to invest beyond pursuit costs in the deal to get the deal to a point where I could bring in institutional investment capital or individual investment capital to then begin to fund those costs alongside of me.

Q.   Okay.  And so let's look at -- I'm going to have you look at, in the link that I sent you of new exhibits, what's referenced as -- we can open up both of these, it's referenced as 000043 Flowers --

A.   Yep.

Q.   -- and 00044 Treeline Companies.

A.   Okay.  Okay.

Q.   Okay.  And I'm going to mark these as Exhibit 59 and Exhibit 60.

     (EXHIBIT NUMBERS 59 AND 60 WERE MARKED FOR

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 92

IDENTIFICATION.)

Q.   Okay.  Do you have those open?

A.   Yes, sir, I do.

Q.   We'll talk about Exhibit 59 which is the 000043 first.

A.   Sure.

Q.   Who is Eric Johnson with Ziegler?

A.   He's a broker at Ziegler.

Q.   Okay.  And what --

A.   But actually his title, apparently he's a managing director but he's a broker.

Q.   Okay.  And what is Ziegler?

A.   Ziegler is what I would refer to as a real estate investment bank.  Basically they were referred to me by Mr. Hoard and the team at Distinctive as, again, a group that had wide experience in obtaining financing, as you can see in Mr. Johnson's title, in senior housing and care finance, that he was an expert in that.  And we were talking to him about obtaining that financing.

Q.   Okay.  And is this -- was this what you were talking about earlier about, you know, the process of reaching out to institutional investors to find financing debt and equity for the project?

A.   Right.  So if you read the note, it says, please see

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 93

attached draft engagement letter for debt.  Debt means construction debt from a bank or a debt fund or something similar.  And LP equity placement, LP stands for limited partner.  And generally speaking what they're referring to there is -- on a deal of this size, they're referring to an institutional equity partner.

Q.   Okay.  Would this -- what you were reaching out to Eric Johnson for, would this all to have been for funding after construction documents were completed?

A.   Not necessarily.

Q.   Okay.  Okay.  So this could have -- this debt and equity could have also potentially been used to fund any costs that you had on the project?

A.   Depending on the terms, depending on the willingness of somebody to lend it to you or invest in it, yeah.  But that was -- you know, we had a very -- this is obviously a very introductory type of email.  In fact, it probably was a follow up to the first time I ever spoke to Eric Johnson.

Q.   Okay.  And is -- so does this -- does -- looking at this email, does this comport with your memory that it was, you know, kind of, you know, the June 2023 time period that you first started reaching out to talk to folks about, you know, debt and equity for

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 94

the project?

A. Yeah, that feels right.

Q. Okay. And then Exhibit 60, what -- how would you describe what Exhibit 60 is?

A. Well, I'll just note, by the way, that Exhibit 60 is not signed.

Q. Yeah, I noticed that.

A. Yeah. It is a -- an unsigned and undated draft of a -- an engagement letter between Treeline Company's companies and Ziegler to act as our, as it says in the first paragraph, exclusive placement agent for acquisition and construction loan with a potential lender on a best effort's basis, and et cetera.

Q. Okay. Do -- and do you believe there's a signed version of this out there somewhere?

A. I do.

Q. Okay.

A. Well, I do believe that there's a signed version of this document. I can't tell you in what way it differs from this document without seeing it.

Q. Right.

A. Yeah, but yes, we had signed an agreement with Ziegler.

Q. Okay. Was there anybody else you were working with besides Ziegler in terms of trying to find debt and

02/11/2026                    BKV Group DC vs Treeline Acquisition, et al.                    Michael Schor

Page 95

financing -- debt equity and financing for the Flowers Project?

A.   No.  The -- it's an exclusive agreement.  So at the time we signed it, right, you see it says exclusive placement agent.  It would have been a -- it's in the fourth sentence of the first paragraph.  I'm presuming that that was not deleted.  That's pretty --

Q.   I see.  Okay.

A.   Okay.  So no, we were only working with them.  That would have been a breach of the agreement.

Q.   Okay.  I know that you mentioned that in your -- in -- in your role with Treeline that you are often working in finding sources of debt and financing for projects.  Did I understand that correctly?

A.   You did.

Q.   Okay.  So had you done any of that work on your own to find debt and financing for this project before you were introduced to Ziegler?

A.   Debt, no.  Not financing, no.  No.

Q.   Any source of debt equity, financing or anything similar like that for the project?

A.   Well, if you look in the third paragraph under background, all right, where Ziegler -- it says, Ziegler will work to source senior debt and

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 96

additional -- and Ziegler will also work to source LP equity to complete the capital stack alongside the debt. And then you see the words GP equity contribution by Treeline and their investors.

Q. I do see that.

A. Okay. By the way I'm not going to charge for the free education in the world of real estate finance for all of you who decide to expand your practices after this.

Q. We appreciate that.

A. But GP equity contribution by Treeline means general partner equity contribution. So essentially, the way it works when you get an institutional LP is they require you, the sponsor, right, the general partner to invest somewhere between ten and 20 percent of the overall equity, right, so that they have skin in the game on the deal. I had conversations with individual investors about potentially investing as an investor in the GP equity.

Q. Okay.

A. I did not have conversations with LPs. I did, however, tell Ziegler during their marketing process of LPs that I had worked with, and I told them to send the packages to those LPs. Because this

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 97

agreement, the one that was signed, requires me, I'm fairly certain, to if someone were to call me off the street and say, oh, hey, Mike, you know, I want to give you the financing for the Flowers project, I would have had to refer that under this agreement to Ziegler or I'd have to pay them a placement fee no matter what anyway. It's kind of so that I didn't circumvent their exclusive.

Q. So -- and some of these questions I'm sure are going to seem pretty stupid to you, so just bear with me --

A. Probably not.

Q. -- having not ever done anything like this in my life. So the debt and equity financing that Ziegler was going to place, that would only be up to, what, 80, 90 percent of what was needed?

A. Yeah, something like that. Like you see that -- you see in the second paragraph it says total project costs in the -- including the land or expected to be between --

Q. Yep.

A. -- right, the tilde means 50 approximately, right 54.4 million to 55 million based on the current schedule.

Q. Yeah.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 98

A.   Okay.  So essentially that's right.  Between debt and institutional equity, he was going to bring 80 to 90 percent of the money to the table, and we were going to bring ten to 20 percent, probably centering closer to the ten percent number because in a deal of this size, an institutional investor will view an investment of 5.5 million as more than sufficient skin in the game from our side.  But if we had investors who were interested in more, I'm sure we could have carved out a piece for them.

Q.   And so the piece that you were going to bring was not institutional investors but individual investors; is that -- did I understand that correctly?

A.   Generally, yeah, individual investors, high net worth individuals.

Q.   Right.

A.   You know, people with trust money, stuff like that.

Q.   Sure.  Right.  Okay.  And that's the part that you would be working on yourself sourcing, not Ziegler?

A.   Correct.

Q.   And Ziegler would be work -- everything else, Ziegler is in charge of, through this exclusive agreement, in charge of sourcing, finding, and bringing to the table?

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 99

A.   Through whatever exclusive agreement was ultimately signed which I'm not representing is this one that's on the screen, but some facsimile of it.

Q.   Okay.  So you referenced the project cost.  I'm hoping you can help me understand this part too.  So I understand that, you know, the initial thought was that, you know, the construction of the project would be 28 million.  Did I understand that correctly?  Is that what you were thinking?

A.   Well, that was the initial budget was 28 million.

Q.   Initial budget was 28, the land was going to be 3.6.  What's the rest of this, the -- to make up to 54 or 55 million.  What's that?

A.   I'd have to see the schedule of it, but there are lots of soft costs associated with building.  The 28 million was the hard cost.  So basically think about it like this.  A hard cost of construction, right, is buying the nails and the boards and the windows and the -- that kind of stuff and erecting them.  Anything that the guys who swing the hammers do.

Q.   Yeah.

A.   Right.  The soft costs are all the other stuff, right.  That includes the architects, the engineers, the marketing costs, interest on the construction loan, a lot of different stuff.  Again, I'm -- I

Case 5:25-cv-00028-BO-BM   Document 102-6   Filed 03/20/26   Page 100 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 100

don't know -- I'm not suggesting to you that this number is accurate because I don't know if this is the agreement that we signed.  It may not have been. But if you show me the schedule or the document or Ziegler's marketing materials, I'm happy to walk you through what the various calculation was in the schedules.

Q.   Okay.  So Ziegler would have set that out, kind of, or itemized that out in more detail in their materials?

A.   Oh, absolutely.  They'd have to have very detailed numbers for someone to get engaged on the project, yes.

Q.   Okay.  Okay.  Let's look at, I'm going to -- in -- in the exhibits that -- in the documents that I sent you regarding new exhibits, let's look at Treeline 474.

A.   Okay.

Q.   And I'll mark this as Exhibit 61.

(EXHIBIT NUMBER 61 WAS MARKED FOR IDENTIFICATION.)

A.   I've got to be careful that I'm exiting out.  I don't want to get rid of all of you.  It's too exciting.  Yeah, what number?  Sorry.

Q.   Treeline 474.

A.   Treeline 4 -- there we go.

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 101 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 101

Q.   And if you'll just scroll down kind of the end of that.  I'm going to start with the last email that's in this -- on this exhibit.  It's the Wednesday, January 17th email from Eric Johnson to you CC'ing Daniel Schor, Chris Hoard, and Esmond -- and Dalton Esmond.

A.   Okay.  Hold on one second.  Let me just -- I think I need to be reading this from the bottom up, right, because --

Q.   I think that's right.  I think that's right.

A.   Okay.  So give me a second.

Q.   Please do.

MS. SIVON:  Dan, what was the exhibit number you marked this?

MR. KATZENBACH:  Yeah, I marked it as Exhibit 61.

A.   (Witness reviews document.)  Okay.

Q.   Okay.  So looking at Eric Johnson's email to you -- and first of all, so this is January 17th of 2024.

A.   Okay.  So now I'm going all the way back down to the bottom of the --

Q.   Yeah.  Sorry, I meant to start at the bottom.  Yeah.  Apologies.

A.   Yeah, no worries.  All good.  Yes, sir.

Q.   So this is January 17th of 2024, correct?

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 102

A. Yes.

Q. Okay. And so it looks to me like this is him giving you an update on where Ziegler kind of stands on securing the debt and equity financing that we had looked at that -- that you had, you know, contracted for them to go find back in June of '23?

A. As I said, I don't know if that -- if I contracted them in June of 2023, but let's just say pursuant to whatever contract or agreement I had signed with them, yes.

Q. Okay.

A. It could have well been in June.

Q. But you had first talked to them about it in June of '23, right?

A. Yeah, that -- as we identified that email that you showed me previously seems to be like the immediate follow up to our initial conversation in June of 2023.

Q. Right. And so what -- am I correct that this is basically his -- an update to you all on where him sourcing this debt and equity is -- where it stands, basically?

A. As of January 17th of 2024, yes.

Q. Okay. What do you recall as having happened about this in these months between June of '23 and here,

Case 5:25-cv-00028-BO-BM      Document 102-6      Filed 03/20/26      Page 103 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 103

January of '24?  Had there been other updates like this?  Had -- I mean, what do you recall about the status of sourcing debt and equity over those months from June of '23 to January of '24?

A.   Actually, what I recall distinctly is that at some point between June of 2023 and January of 2024, okay, he -- Ziegler and Hoard recommended another group that Ziegler had located.  I don't recall their name but they were based in Canada, and we had accepted a term sheet from them on the basis of Ziegler's recommendation and Hoard's recommendation.  And I -- they demanded that we give them a $25,000 deposit on that term sheet, which we did as an advance on their due diligence costs.  And they did not conduct any meaningful due diligence and refused to return the $25,000 to us, so that was a very disconcerting a turn of events.

So by January of 2024, I certainly was not very happy with Ziegler, and actually, I was quite angry about being taken for $25,000.  I subsequently learned that Ziegler had never closed any business with this other group, and so it was quite disconcerting to me that that had happened.  But it was, you know, just one of many recommendations that Distinctive and Chris Hoard and Jedlowski made that

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 104

turned out to be exceedingly poor, but --

Q. Okay. Is that -- I don't mean to interrupt you but I think I want to make sure I'm -- we're keeping on track here. So is that other thing you're talking about? I think I've seen it in the email. Is that ACI?

A. There you go. Yes, ACI.

Q. Okay.

A. Thank you for refreshing my recollection. That's right.

Q. That's fine. Let me -- I have a document here. I want to make sure we're talking about the same thing. I think --

A. Sure.

Q. Let me just pull it up so we're talking about -- shoot, what is it? Let me see if I can find it. It's -- give me just two seconds.

A. Sure. Take your time.

Q. Okay. Here it is. So it's going to be in the thing I sent you, Treeline 1743.

A. Yep, I see it. Yeah.

Q. Okay. Is this what we're -- is this what you're talking about?

A. Yeah.

Q. Okay. I'm sorry, let me make sure for the record.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 105

I'm going to mark this as Exhibit 62 for the record.

(EXHIBIT NUMBER 62 WAS MARKED FOR IDENTIFICATION.)

Q. Okay. This is 1743. Okay. So this will help us, I think, talk about both these documents together since you mentioned it. Is ACI like the same type of, you know, entity as what's referenced as U.S. Capital in Exhibit 61? I mean, is that --

A. That's what they were represented to me to be.

Q. That's okay. Fair enough. Right. But just so we're talking about -- so at some point in time prior to January of 2024, Eric Johnson with Ziegler came to you, you know, presenting ACI as being able to provide debt and equity financing like he was in January with U.S. Capital and Origin Investments; is that fair?

A. Yes. I don't recall if ACI was giving debt and equity or just equity, but yes, they were certainly a group that was in that genre.

Q. Okay. If -- okay. So if they were only providing equity, what would that have meant as far as what kind of -- what they would have been providing to the project, to what degree would they have been funding the project? It was only --

A. Whatever wasn't funded by me or by a construction loan.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 106

Q.  Okay.

A.  The project -- the -- right.  Okay.

Q.  I got it.  Okay.  All right.  So that -- and that followed through, I take it, because you gave them $25,000 and they didn't come up with any debt equity or financing for the project?

A.  No, they did worse than that.

Q.  What was that?  Tell me what about --

A.  They ghosted us.  They ghosted us.  So basically what happened was I gave them, you could see in this chain of emails, okay.

Q.  In Exhibit 62, right?

A.  Yeah, Treeline 1743?

Q.  Yep.  Yep.

A.  Okay.  See -- so if you scroll down, you'll see an October 11th email, right.  It says, good morning, please see attached updated term sheet from ACI showing the $50,000 engagement fee, blah, blah, blah, split 25 at signing and 25 later upon the spending of the first 25,000.

Q.  Yep.

A.  Okay.  We signed the term sheet with ACI, we gave them the first 25,000 on signing and they basically absconded with it.  They didn't do any due diligence.  They never came back to us.  They asked

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 107

us maybe once or twice to provide them with information. They disappeared off the face of the earth. They never even asked for the second half, right, because the idea was that we were advancing out of our pocket their due diligence costs. They took 25 grand from us and did absolutely nothing and didn't return the money to us. And so --

Q.  And -- oh, sorry. Go ahead.

A.  I was pretty upset about that, as you could see from my email in December of 2024.

Q.  I do see that. I do see that. And what was the result of your email in December of '24? Did Ziegler return the 25 grand or how did that play out?

A.  They did not. They ignored us.

Q.  Okay. Did they give you any reason as to why they wouldn't return your money?

A.  Yeah, because we gave it to ACI and not to them.

Q.  Okay. And I noticed that the email that you sent also talks about possibly pursuing them through litigation. Did you end up doing that?

A.  We did not.

Q.  Okay. All right. Okay. So now going back to Exhibit 61, which is Treeline 474, which is the January email from Eric Johnson.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 108

A.   Yes.

Q.   He's now sending you additional possibilities for debt and equity financing for the project, right?

A.   Yeah.  Groups that he -- groups that he had -- this is an update on conversations that he's had.  It's not -- this isn't proposing specific terms to us, but it's, hey, what are parameters of deals with -- that they're doing and conversations he's having.  And he indicates here that U.S. Capital, this is the most promising so far.  And then there's a bunch of stuff.

Q.   Yeah.  And so if we scroll up to page two of this exhibit, there's an email there from Eric Johnson a little later in January, January 29th, to you and Chris Hoard.  It looks like he is -- they got the term sheet from U.S. Capital, and he is sending that to you.  Does that -- do I understand that correctly?

A.   Yes.

Q.   Okay.  And then your response, if you scroll -- scrolling up, seems to be, these financial terms seem brutal.  I don't think the deal can make sense if these metrics are even close.  We really seem to be up against it here.  This is not good.  Can you explain to me why you thought that at the time?

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 109

A.   Because the financing terms are brutal in terms of the interest rate and the carry and the amount of leverage that they wanted to put onto the project. I mean, you're talking about potentially paying interest rates here between 15 and 20 percent.  And while Chris Hoard and the Distinctive folks once again, you know, say, oh, don't worry about it.  We can monkey around the numbers.  We'll buy the rate down.  We can do this.  We can do that, you know, perpetuating his series of misrepresentations and, you know, kind of slight of hand that he was known for, unfortunately.

Well, I shouldn't say he was known for at the time, but he was clear that he was engaging in, the -- I was concerned myself that I -- I was like, whatever sort of magic Chris Hoard thinks he could do with the numbers, if the project even goes off schedule a little bit with that kind of debt carry, right, you could be in a position where you could lose the whole project.  It's brutal terms.  I mean, it's --

Q.   And -- sorry, go ahead.  I was going to say you -- I mean, given your background in dealing with these types of financing issues, I guess you understood that inherently when you saw these terms in January?

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 110 of 303

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 110

A. In -- well, it was the end of January of 2024.

Q. Right.

A. I also came to learn, by the way, that Mr. Hoard had some kind of relationship with this group. And in fact, there's a guy on here named Mick or something like that, or on some other emails who's a friend of Hoard's who I later found out Hoard had some kind of an arrangement with this guy Mick, and Mick was going to be cut in for some kind of a brokerage fee here or some percentage of the fees from U.S. Capital. So Hoard had his tentacles all over these things and figuring out how he was going to get himself a little piece of the pie from everybody here.

Q. Okay. But back to my question, like my -- you didn't need help understanding these financial terms, correct?

A. Oh, no.

Q. Right. That's what I was getting at. You understood them inherently because of your background and experience in dealing with these types of financial terms in your career, correct?

A. Absolutely.

Q. Okay. So when Chris Hoard responds to you, you know, and like you said, he, you know, says that

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 111

there's a bunch of different things we can do here, we can make this work. Like, I mean, did that really change your mind as far as how you thought about these terms?

A. Well, I wrote him. I said, then I'm not understanding the terms, right. In other words --

Q. Right.

A. -- what -- in other words, the answer is you can see that Chris is continually, and Distinctive is continually trying to push us along in the deal, right?

Q. Right.

A. And by this point in time, seeing these financing terms I was saying to myself, well, I wouldn't accept these financing terms.

Q. Right.

A. Correct.

Q. Right.

A. That doesn't mean that there weren't other financing terms that could be available over time. It just means that these financing terms were brutal, and I wasn't prepared to accept them.

Q. Right. Did you ever get any different financing terms from U.S. Capital?

A. We may have had some discussions or negotiations

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 112

with them.  I don't recall specifically, but we never signed a term sheet with them as I recall it.

No.

Q.   No.  And as you noted here, like without debt and equity financing terms that made sense to you, there was no way for this project to get to completion, correct?

A.   Ultimately, any project needs debt and equity to be able to do it.  So that's not unique to this project; it's a state of facts with every single project.  Every single real estate project needs debt and equity in order to be completed.  So it's nothing unique.

Q.   Right.  Correct.  Right.  You're talking about --

A.   But the availability of debt and equity and the terms of debt and equity are very time sensitive.  They're sensitive to the markets, they're sensitive to movements and interest rates, to what the Fed does, to what economic reports were at the time.  So it's a constantly changing landscape.

MR. KATZENBACH:  Okay.  We are almost at 1:00, and I'm about to switch to kind of -- maybe slightly different topic so maybe this --

THE WITNESS:  Okay.

MR. KATZENBACH:  -- makes sense to take a

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 113 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 113

lunch break now, if that works for everybody?

THE WITNESS:  Sounds good to me.

(A short break was taken at 12:58 p.m.)

(The proceedings resumed at 1:45 p.m.)

Q.  (Mr. Katzenbach) Okay.  Okay, Mr. Schor, we're back from our lunch break.  And if you'll open up in the link that Jeff sent you of previously marked exhibits, if you'll open up Exhibit 18.

A.  Yeah, just give me a sec.  Okay.  Eighteen.  Yes, sir.

Q.  Okay.  And I'm really just going to focus on the second email, the one from you to Chris Hoard which starts at the bottom of page one, and really all of it's on -- I mean, except for the first word, all of it's on the second page.

A.  Okay.  Just give me a minute to read it.

Q.  Sure.  Absolutely.

A.  (Witness reviews document.)  Okay.

Q.  Okay.  So just in the first paragraph --

A.  The first paragraph of the second email, not in the email from Chris Hoard to me; the email that I wrote to Chris?

Q.  Exactly.  Yep.  Exactly.  Yep.  So you mentioned that none of us dispute that BKV has done a lot of work, but the project timeline is extending far

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 114

beyond what we originally contemplated and BKV has already been paid many hundreds of thousands of dollars. I'm trying to understand the import or why the project timeline being extended, like how that related to BKV already having been paid hundreds of thousands of dollars, if you remember what you meant by that.

A. They're disparate thoughts.

Q. Okay. So they're not related to each other? Okay.

A. Not specifically, no.

Q. Okay. Because it -- the -- and then like the last -- the second to last sentence mentions that BKV themselves have caused the timeline to be extended but they're still getting paid.

A. Yep.

Q. So I'm just curious what the import to you was of the project timeline being extended. What import did that have to you as far as the project or anything else?

A. I mean, the main thing was was that I had a tremendous amount of money out of my pocket for much longer than I had anticipated, and so the opportunity cost of me recycling that capital into a new deal was getting costly. And number two was I was getting pressure from Mrs. Flowers to close even

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 115

though, as I had pointed out to you, she didn't have the right to do that under the contract, there were -- this was already -- we signed the contract in May of 2023. This is February of 2024. It's, you know, quite a long time even under any sort of reasonable conception of when the closing would take place. And that's what I was saying is just the project was dragging on and on and on and on. And although I felt that it was a very good project, and by the way, I continued to this day to believe that it's an excellent site just not for the contemplated timing that we had. Unfortunately, just didn't work out for us here.

Q. Okay. And so I take it from what you're saying that if -- you know, if the construction documents had been done, you know, by the original contemplation in the letter agreement, that that would have been better for you as far as like how your -- how -- how your money, how your -- your capital had been -- how your personal capital was being expended on the project?

A. Well, what I'm saying here is BKV made mistakes over and over and over again, right. But if you see here it says between the fire egress issue and the foundation issue, and others, which included moving

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 116

the building all over the site, right, they were causing constant delays, right, by instead of anticipating important issues, by reacting to important issues.

And so what I was saying there is that the only person who was raking money off the table here was BKV, yet they were the one who were making the mistakes. They were the ones who were causing me to have my capital out on the street much longer than I had anticipated having it out on the street without having an investor to take it out, right. In other words, I had said to you that we were prepared to go beyond what I term pursuit costs to even start fronting BKV's costs to move the project along. Normally, I'd like to have my investor lined up by then. But in this particular case, I thought it was a strong business opportunity to create a larger enterprise here, and so -- a larger enterprise in the active adult space, and so I did stuff that I wouldn't ordinarily do.

But what I was saying to here is -- saying here is a year into the job, because I signed the letter agreement with BKV in March of 2023, and it's now practically a year later, right. BKV has just made mistake after mistake after mistake and caused issue

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 117

after issue after issue that required them to draw the documents over and over and over again. And so what I was saying here is, effectively, I was calling a halt. I was saying either we have to go pencils down and we have to figure it out in the context of the deal. And that's what I said to you -- I said a few paragraphs down there, right, that you need to talk to BKV and see what can be worked out, that David needs to be flexible and carry the balances corresponding to a realistic project timeline.

So the -- that's the bottom line is that, frankly, it was caused by BKV's negligence and frankly, Distinctive's poor consultation work with BKV.

Q.   So if -- but if the construction documents had been done already by this point in time, okay, then BKV would have actually spent more money than they had spent by this point in time, right?

A.   I don't know.

Q.   They would have invoiced more than they had by now if the construction documents had been done, wouldn't they?

A.   By this time BKV had invoiced over one million dollars of a million five contract.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 118

Q. And as we talked about earlier, 1.2 was what it would take to get to the completion of construction documents, right?

A. And they had probably invoiced 1.1 by this point.

Q. Right.

A. And yet there were still issues with fire egress, foundation issues, and all sorts of other stuff. They didn't have construction documents, they had --

Q. No, but if they had construction --

A. -- they had --

Q. Okay. Go ahead.

A. Are you asking me a hypothetical question?

Q. Yes, I am.

A. Okay. So rephrase it then so I can understand it because I -- again, I tend to deal in facts not in hypotheticals, but I'm happy to listen to your hypothetical.

Q. Okay. Well, if construction documents had been completed before February of 2024, BKV would have invoiced more than they had invoiced -- actually had invoiced by this point in time in the project, correct?

A. A small amount more relative to the total contract, but yes.

Q. Okay. So -- and if you had paid all of those

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 119

invoices under that hypothetical, you would have had even more money out of your pocket than you did at this point, correct?

A. I would never have paid them because I never had useful construction documents, but I mean, again, in the hypothetical world, I suppose, yes.

Q. Okay. And if you had paid all those invoices in that hypothetical world, you also would not have had any debt or financing, would you?

A. That would depend. I can't speculate.

Q. We don't need to speculate. You weren't able to get financing by February of 2024, correct?

A. I did not have financing in place by February of '24, no.

Q. No. So if BKV had completed the construction documents, say in November of 2023, you would have paid for all that work and you still would not have had any debt or financing for the project, correct?

A. I did not have construction financing for the project in February of 2024, nor in November of 2023. I'm not sure what you're getting at but I didn't have construction financing on either of those things. But nor did I ever have usable construction documents that would have resulted in me agreeing to pay David Banta for the fees despite

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 120

-- he could invoice me for anything he wanted to invoice me for, but his work did not result -- he billed ahead of the schedule.  His bills were way more than he -- I think by this time, again, I recall that he had billed well over a million dollars.  I had paid him at least 600,000 of it or 550,000 of it, so I was well past having paid him half of what he had invoiced even through that date, and he never produced a single useful document. There's not one piece of paper that BKV produced ultimately that was a useful construction document, and yet they ran up one point whatever million dollars of bills on a $1.5 million total contract.

Q.   Why do you say that none of the work that they had done was usable?

A.   Because it was all wrong.  It didn't comply with code.  The building was placed in places that the building couldn't be built in any economic way. There were all sorts of -- I mean, the fire egress issue, overdesigning the foundation, I mean, there were myriad errors that BKV made or conditions on the property that BKV failed to adequately anticipate or that they didn't address before they started drawing construction drawings.  I mean, nobody would start to draw a building before they

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 121

knew where on the site it could sit. And even as late as May of 2024, these guys are moving the building all over the site. It doesn't make any sense what they did. And Chris Hoard and Joe Jedlowski and Distinctive were managing that process. So they were talking to -- to BKV and to David Banta and directing their activities. I didn't know what David Banta was doing and drawing and -- and Chris Falkowitz (phonetic) on a day-to-day basis. I met with them once a week. And when we met, we talked about very broad issues.

We talked about things like, oh, unit sizes, are the bedrooms right or the -- they -- this was all -- again, I had a quarterback on this deal, Chris Hoard, Joe Jedlowski, Distinctive. And BKV and David Banta were basically their agent. They hired them. And now that I know that there was kickback payments going in between them, they clearly were working together.

Q. Did anybody ever tell you that the drawings that BKV had prepared as of February 2024 were not usable?

A. Did anybody tell me that?

Q. Yes.

A. Well, I've had -- we -- we've engaged an expert witness and you'll have a chance to depose him. But

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 122

what I'll tell you is that our expert witnesses definitely of the opinion that BKV's documents were not usable.

Q. Besides your expert, has anybody else told you that their documents were not usable?

A. It was obvious.

Q. Okay.

A. In May of 2024 when they were shifting the building around on the site -- a building isn't -- you don't just pick a building up and move it from place to place. Moving the building around the site changes the design of the building. You don't just pick it up. The soil conditions are different. How the foundation would be is different. They're moving the building all over the site. That changes --

Q. Why do you contend they were moving the building around in May of '24?

A. Why don't you show me the picture of the exhibit and I'll explain it to you.

Q. Okay. Let's look at, hang on, let me find it.

MR. STODDARD: Dan, I'm not sure if what you're looking for is what I marked as Exhibit 49 --

MR. KATZENBACH: It is.

MR. STODDARD: -- 2024 05/02 BKV document?

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 123

MR. KATZENBACH:  It is.  It's Exhibit 4 --

it's Exhibit 49.

A.   Okay.  You want me to open that?

Q.   Yeah.  Go ahead.

A.   Sure.  Excuse me.  Oh, sorry.  Hold on.  I'm in the
pleading envelope here.  I hate to say it but this
would really be so much easier to do in person.
What number was it?  I apologize.  Sorry.

Q.   Forty-nine.

A.   Yep, that's the picture.

Q.   Right.  So when did you first see Exhibit 49?

A.   Around that date that it's dated, 5/2/24.

Q.   And what were the circumstances under which you saw
it?

A.   On a conference call with David Banta and Chris -- I
think Chris, I -- I shouldn't -- I'm not sure if
Chris Falkowitz was on the phone.  I think he was.
But Chris Falkowitz, David Banta was on the phone,
Hoard obviously was on the phone, myself, Daniel.  I
think my dad may have been on the phone as well.
I'm not sure.

Q.   Okay.  What was the purpose of the -- the phone
conference?

A.   Okay.  So at -- subsequent to those series of emails
that you showed me, I continued to try to revive the

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 124

project. As I said before, I really wanted to try to make this work. And by this time, I had been exploring alternatives with Mrs. Flowers because it became clear that the building that BKV designed due to BKV's failure to appreciate a lot of aspects of the property, including things related to geotechnical and grading and fire egress and ingress, and all sorts of other issues that -- that they did not anticipate. Despite having billed me over $1.1 million, by this point in time, I was still trying to make the deal work.

And so what I did was I went to Mrs. Flowers and I suggested to her that she might sell us this 2.2 acre property on the corner here which you could see is labeled here. You see there's a number 2.22 A on it?

Q. I do.

A. That's -- and there's kind of like a green line. That kind of -- you see there's a green line that's kind of like making --

Q. I do see it.

A. -- a wide shape sort of? Yeah. So that's the parameters of that parcel, okay?

Q. Right.

A. Good. And what this first sheet is showing you is

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 125

where the building was seated by BKV in all of the drawings that they had prepared up until that date, okay?

Q. Okay. Right.

A. If I go to the next sheet, oops, hold on. I messed up. I went to the next exhibit. Sorry. If you scroll to the next sheet, okay, you can see that BKV placed the building, right, a big chunk of the building, the parking, the fire lane road, and all of that stuff in this area that is bubbled in yellow that says area to avoid, okay?

Q. Yep.

A. Which was known to BKV, right, to be an area not to put building facilities in if it could be avoided because the cost of constructing in this area, due to the soil conditions, the topography and whatnot, was going to be extremely expensive, all right?

Q. Okay.

A. So BK -- but BKV persisted in keeping the building in this area, okay.

Q. Okay.

A. Now, if you look at option A, this shows BKV picking the building up, so you can kind of see here that there's a, sort of a dotted line, outline of a building that's superimposed over the rest of the

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 126 of 303

02/11/2026         BKV Group DC vs Treeline Acquisition, et al.         Michael Schor

Page 126

stuff.

Q. Yep.

A. That's where the building was sitting on back on where it says current plan, okay.

Q. Yep.

A. This shows them picking the building up, the parking facilities up, all that kind of stuff --

Q. Right.

A. -- shifting it to the left --

Q. Yep.

A. -- thereby not putting the building or any of the material facilities of the building in the area to avoid, right?

Q. Correct. Correct.

A. Because if you look on the picture above, right, it's in -- you see there's kind of a black dotted line. That black dotted line shows what the parcel would be with these two acres. Option A showed moving the building over onto a different piece of -- an additional piece of land and you've now removed it from the area to avoid.

Q. Correct.

A. Okay. Option B, right, similarly largely avoids the area to avoid. As I can see the picture, there's a small little tail of the yellow that may protrude

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 127

into that area, but I -- I wouldn't -- and a small area of parking. But largely, option B, right, shows building the building as a four-story no basement because that was another issue that BKV caused, right, which was not understanding the code and not clearing with the fire marshal the fact that they were treating the partial fifth floor in the rear of the basement.

Well, it's actually the terrace level so it's really the first floor that was in the -- in -- only on the rear of the building. They determined from their erroneous code review that they could continue to build the building in a type five construction which is wood construction and then the fire marshal came back and said, huh-uh, sorry, you can't do that very late on in the process.

So they had designed a stick building of a type five building, and there was risk that they could have to go to a metal building, which would be very expensive. Instead, they showed this alternative that on the land, again, they picked up the building, and here not only did they pick up the building, they unkinked the building a little bit. So if you look back at the picture above, the building is not as long and it has -- it's more

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 128 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 128

kinked, right, the orange.

Q.   Yeah.

A.   And this picture of the yellow the building is straighter and longer, okay?

Q.   Right.

A.   But both of the -- and in this -- by lengthening the building and unkinking it, allegedly they were saying that you could eliminate having any, what they refer to as basement, and have a four-story on grade building, right, thereby potentially avoiding at least one of the fire marshal's objections such that you could maintain the building with type five construction.

Q.   Okay.

A.   And so when I say to you that none of their drawings were of any value, you don't just pick up buildings and move them around.  You certainly don't do option B, eliminate a basement, turn the building -- completely change the shape and size and orientation of the building and say that a million dollars of construction drawings are useful.  They'd have to basically throw them away and start again.  It's a completely new building design.  To say nothing of the fact that changing the shape of the building you could change the -- this is a very rough plan.  This

02/11/2026                BKV Group DC vs Treeline Acquisition, et al.                Michael Schor

Page 129

is already not even considering where fire access roads were going to be.  It's all very, very rough.  You'd have to move amenities around.  This could have an impact on what units would look like, how big they would be, how small they would be, how many you could fit.  This is just a sketch plan.

But what I'm saying to you is that none of what BKV did was of any value.  They drew a building that couldn't -- that was built in this area that says don't build.  Area to avoid.

Q.   Okay.  So as you said, the -- what prompted this meeting was that you had contacted Ms. Flowers and inquired about acquiring the adjacent parcel, correct?

A.   Among other things, yes.  I was trying to rescue the deal --

Q.   Right.

A.   -- because again, I'm not in the business of buying lawsuits.  I'm in the business of buying real estate deals and of doing deals.  I don't make any money -- I don't profit from lawsuits, right, so what I wanted to do was to do everything I possibly could to resurrect the deal.  And so that's -- I contacted Mrs. Flowers.  I -- in fact, there was a point in time when I when I spoke to Mrs. Flowers about a

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 130

possibility you had mentioned very early on in the deposition whether there was other land around. There was in fact two parcels of land across the street from the Flowers, our original development site, the contemplated site where we were having discussions with Mrs. Flowers as to whether maybe she would sell us those and we'd build a smaller high-rise apartment style building on the existing site and build additional like cottages, like townhome kind of stuff and put all of the amenities for the entire community across the street.

So we went through iteration upon iteration upon iteration of this deal with Mrs. Flowers in an effort to try to salvage it.

Q.   I know.  What I'm saying is that the purpose of this meeting that you had with BKV, the point of the meeting was that -- was to suppose that you did acquire this adjacent tract of land that you did not have, correct?

A.   Correct.

Q.   Right.  So when they drew option A and option B, that was drawing assuming you actually had a piece of parcel of land that you didn't actually have, correct?

A.   At the time I didn't have it, no.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 131

Q.   You never had it, did you?

A.   No.

Q.   Right.  And so --

A.   But I was discussing -- at that time, I was discussing with Mrs. Flowers an acquisition of it. And actually what threw it really out of balance was when BKV filed a mechanics lien on her property.  e got really angry about that and she lost confidence in the process of the deal.  And at that point in time, she was evaluating an alternative to selling us the property which was to put an ABC store on the property, which I actually don't know today if she ever consummated.  But ultimately, in August of 2024, she said that she was going to go with the ABC store.  And I believe there's an email somewhere in which her broker, a fellow named John Koonce says in that email that the reason she decided to go with the ABC store and not sell us the parcel was because of the filing of the lien.

Q.   The only reason why BKV drew option A and option B on the exhibit we're looking at is because you asked them to if you acquire what it -- to ask them to show what could be done if you acquired this other parcel, correct?

A.   To correct their negligence and move the building

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 132

out of the area to avoid.

Q. I understand that. But they drew these other options not just on a whim, but because you asked them to, correct?

A. Oh, yeah, absolutely. They didn't wake up in the morning and say -- yeah, of course.

Q. And as you said --

A. I was trying to salvage -- just let me finish my answer and then ask any questions you want. What I was saying was simply that he  - that, I apologize, that yes, I went to them and said, guys, despite all the stuff that has happened, I'm working towards getting this deal back on track, if I can, by acquiring an additional parcel of land. I need to see if the building can fit on that parcel of land. So BKV did this in response to that request in an effort to try to salvage the deal, yes.

Q. Okay. And as you were talking about the current plan, you noted that the orange building is where BKV had drawn the building and had -- where -- it had been in that location on all of their drawings, correct?

A. No.

Q. Did you not just tell me that the orange building on current plan is where BKV had showed the building on

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 133

all of their prior drawings?

A. No.

Q. No. Okay.

A. What I'm telling you is that would be -- that is the location that BKV landed the building, right, after moving it several times prior to that. When they commenced doing construction drawings, that's where the building was cited. But prior to them doing the construction drawing, they had already moved the building several times. fact, there's a drawing that I saw that they brought up during Mr. Hoard's deposition that was a hand -- that had handwritten notes on it from Mr. Banta which showed that BKV actually had originally put the building in a wetlands, which you're not allowed to build in, and it sat there for a while.

And then there's a drawing with Mr. Banta handwriting on it where it shows the parameters of the wetlands and them shifting the building around. It has a blue outline of the building and a red outline of the building. So BKV moved the building around even before that. So my -- what I was referring to is I was saying that that location that's shown on the first page of that exhibit, the orange --

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 134

Q.   Yes.

A.   -- is where BKV had cited the building when they started doing construction drawings and where it sat up until we explored these alternatives in May of 2024.

Q.   Okay.  So --

A.   But prior to that, they had moved the building multiple times on the site as well.

Q.   Okay.  And is that somehow improper that before construction drawings, they had moved the building on the site?

A.   Sure.

Q.   Why is that?

A.   Because what it did was it induced us into a false understanding of what the building and the project would look like.  So by way of an example, okay, you made reference earlier to the grade of the property.  There's -- the property has a berm in the front.  You know what a berm is?

Q.   Yes.

A.   Okay.  So the pro -- I didn't -- I'm -- I don't mean to obviously insult your --

Q.   You're fine.

A.   -- intelligence.  I was just asking.

Q.   No, no.  That's fine.

02/11/2026　　　BKV Group DC vs Treeline Acquisition, et al.　　　Michael Schor

Page 135

A.　Okay.　Yeah.　So the property has a berm, okay, of several -- of a few feet, and then the property slopes downwards, right, front to back, okay.

Q.　Correct.

A.　And so initially when BKV placed the building, they -- and placing the building in the wetlands, the building was a certain distance from the street such that when you were sit -- standing in the street, you could see the building.　When BKV moved the building forward, okay, what happened was is it changed the visual sight line of the building.　It made it such that when you were standing in the street, you didn't see the front of the building. You saw the second floor.　The building was down in a hole.　That's extremely undesirable.　We had already, and we had already moved forward with the -- with, you know, expending money on due diligence and things like that when they did that.　That was their first stunt in moving the building around.　It impacted the parking, it impacted all sorts of different things.

So no, BKV all along was moving the building around.　And again, it was based upon really just very basic stuff that an architect who professed themselves to be as experienced as BKV would know

02/11/2026                    BKV Group DC vs Treeline Acquisition, et al.                    Michael Schor

Page 136

not to build in the wetlands.  In fact, Flowers' own engineer told them that it was a restricted area.

Q.   Okay.  But as we're looking at the current plan on Exhibit 49 --

A.   What are you --

Q.   -- the building --

A.   Okay.  Hold on.  Let me -- I'm sorry, I had minimized it.  Just give me a second to open it back up.

Q.   Sure.

A.   Oh, sorry.  This is in Jeff's email?

Q.   Yes.

A.   We were looking at which exhibit number?  I'm sorry, Mr. Katzenbach.

Q.   Forty-nine.

A.   Forty-nine.  Sorry.  Yes, sir.

Q.   Okay.  So looking at the first page, let's actually look at the second page, the -- page two.

A.   Sure.

Q.   Okay.

A.   The one that says current plan?

Q.   Yes, current plan.  Okay.  That building's not in the wetland, correct?

A.   Not that I can see from this, no.

Q.   Okay.  And you can see on the left side the blue

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 137 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 137

line that runs down the left side of the gray parking?

A. The blue line that runs down the left side of the gray parking. I suppose. I mean, you see where it says current footprint, there's like a little yellow window?

Q. Yes.

A. Are you referring to that parking area to the left of that, above and left?

Q. Yes. Correct.

A. Okay. Yeah, sure. I see that.

Q. Is your understanding that blue line is the property line on that side?

A. Plus or minus, yeah. It's actually the green line, I think, but again, it's --

Q. Oh.

A. -- it's -- it's -- obviously, this is estimated, this picture here --

Q. I agree with you, green. Okay. I see it as blue but I can also see it as green. Yeah.

A. Whatever. The long and the short of the story though is that this picture is taken from a GIS map on a computer. So it's it's close, you know, it could -- it's close that -- I would say that, yeah.

Q. Yeah. Okay. And then the bottom of it where -- the

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 138

bottom parking lot is running almost up against, you know, the road that's on the bottom of the of the parcel, correct?

A.   Yeah, that's Flowers Parkway.

Q.   Right?

A.   Yes.

Q.   And then where the building is on the right side there's an existing pond over there, correct?

A.   Well, that's way down a hill.

Q.   Right.  But it's about as far away from that pond as you can get it on the site, correct?

A.   What is?

Q.   The building.

A.   I don't know.  Depends what you shape the building like.

Q.   Okay.  There's not many other places you can put this building on this site than where it is right here; is it?

A.   I'm not an expert in doing that.  I relied on David Banta, BKV, Distinctive and Hoard and Jedlowski to do that.  It's not my job.

Q.   Do you think they should have put the building somewhere else on the site?

A.   I think they should have told me the truth about what size building could be built on the site.

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 139

Q.   And what do you think that is?

A.   I don't know exactly.

Q.   Okay.

A.   I can tell you that there were iterations of the building that were materially smaller when you didn't build it in this area to avoid.  There were some iterations of the building that were as small as 120 units.  I discussed with Douglas, could you downsize the building?  Douglas felt you could get a building of about 120 units.  That's when I started to discuss with Mrs. Flowers the possibility of buying land across the street, across Flowers Parkway, and maybe building some cottages and the amenities and having the folks cross over.  Or that's also the point in time where I discussed with distinctive and Mr. Hoard and Mr. Jedlowski the possibility of converting the property from an active adult to an independent living to an IL, which as we discussed earlier, to, me meant providing meals because by providing meals that's a substantial profit center where I was thinking to myself, well, even though that wasn't the original plan, because I really wanted to salvage this deal, that maybe we could go with that.

And I have -- I had email exchanges with the

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 140 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 140

folks at Distinctive, with Hoard, with Jedlowski,

with Draghiceanu and others about what that would

look like, what increase in rents we could expect to

get to -- from that, what our, you know, whether we

would offer two meals a day, three meals a day, or

we were looking to try to create additional revenue

that could possibly come out of a smaller building.

But in the end of the day, BKV's negligence and

Distinctive's actions or inactions or failure to

advise in the fact that they were in cahoots with

one another because they were passing money between

each other was really a -- the cause of why this

whole project went sideways.

Q. I guess I'm just still confused. What is wrong --

well, as we're looking at Exhibit 49 here, page two,

what is wrong with the building being located right

here where it's shown?

A. The -- on the page that says current plan?

Q. Yeah.

A. We were advised by Douglas, and ostensibly BKV

ultimately concurred with Douglas, as did

Distinctive and Hoard and Jedlowski, that building

the building in this area in this configuration was

cost prohibitive. That there were things that were

disclosed in both Terracon reports, which again, I

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 141

have no technical knowledge or ability to read, but I relied on BKV and Distinctive as my quarterbacks to read those documents and tell me what they said. And they said they're a great report but apparently Douglas didn't think it was a great report.

And when they went to price this out, they needed so much, what I'll refer to broadly as soil amendments and retainage -- retaining walls and things like that in these areas that Douglas said you can't economically build in this area. And those were all issues that were known to BKV and known to Distinctive from the Terracon reports and various other documents that they are the experts in interpreting.

Q. So Douglas told you it was not economically possible or feasible to build in the sloped area on the lot?

A. No, he didn't say in the sloped area. He said in that yellow area.

Q. Okay. In the yellow area, you couldn't build it economically feasibly?

A. Douglas said that you could not build within the budget that Hoard created in that area, no. And it wasn't a matter of a $250,000 overrun on a $28 million project. It was millions and millions of dollars.

Case 5:25-cv-00028-BO-BM          Document 102-6          Filed 03/20/26          Page 142 of 303

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 142

Q.  Okay.

A.  The amount that Douglas was coming in over budget varied over time, but it was in the many millions of dollars.

Q.  Okay.  So it wasn't that you couldn't build it there; you could build it there, it was just a matter of what the cost was going to be, correct?

A.  You could not economically build it there.  You couldn't build it in accordance with any pro forma that would make sense to build it there.

Q.  Okay.  How much extra did Douglas say it would cost to build it -- build this plan as shown here on Exhibit 49?

A.  I don't remember.  They prepared various different budgets.  If you show it to me, I could try to pick it off a line, but I'm quite certain that our expert will be able to show you that.

Q.  Okay.  So you don't recall as you sit here today?

A.  Well, I recall that the gross budget overruns that Douglas were projecting were in the many millions of dollars.  They were in the, you know, neighborhood of -- I don't know.  And we started at 28 and we ended up in some enormous budget overrun, you know, five, six, seven million dollar, an order of magnitude above what the total project cost was at

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 143

$28 million. It wasn't even a ten percent overrun.

It was huge.

Q. Okay. So if it was -- if it -- if the construction cost was ten million more than what was originally contemplated, that -- you couldn't do that; is that what you're saying?

A. Right. I never would have even started the project at that point in time because the numbers would not have supported doing that. It had no economic feasibility at that point in time.

Now, the other thing I just want to note since you're bringing it up here is, this drawing also shows, right, building in all kinds of additional roadways that were necessitated by BKV's negligence because they didn't know the fire code and they didn't investigate the fire code, so this thing is showing roadways and various other things that were going to add onto to the cost.

So again, at this point in time, if the project had a $10 million cost overrun, no, it wasn't economically feasible as it -- as it stood without acquiring the additional land or doing some other maneuver to try to rescue its feasibility at that point in time, economic feasibility.

Q. Is it Doug -- is it -- I mean, did Douglas actually

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 144

tell you it wasn't economically feasible to build the project as shown by BKV?

A.   Douglas told -- was given a budget, right, that was prepared based upon assumptions by Chris Hoard and Joe Jedlowski and people at Distinctive.  I had no input into preparing that construction budget.  I don't have any qualifications to prepare that construction budget.  They ran that budget by Mr. Banta and BKV.  And based on their professional experience, they advised me that that was a reasonable budget to build the 160-unit, 175,000 square foot property that we were contemplating.

We then had Douglas take a look at it, and Douglas looked at it and said with -- you -- that budget is very far off the mark.  There were a lot of things that BKV either specified or didn't specify or didn't account for like soil amendments and various other things.  And when Douglas came back with the budget, they said, if this is the budget where you've determined the economic feasibility of the project, meaning Distinctive determined the economic feasibility of the project on my behalf because again, Distinctive did all of the underwriting -- or Chris Hoard and Ryan Herchenroether did all of the underwriting.  They

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 145

gave all of the numbers to Ziegler. They did all of that work as my quarterback, okay. But so Douglas said those numbers were invalid, right. So it wasn't Douglas who said -- they're a general contractor, okay?

Q. Right.

A. They didn't judge -- they're not a -- an investor. They didn't judge the economic feasibility for me but what they said was, if 28 million is your economic feasibility number, we can't build this building for that based upon the design that BKV gave us and where they're looking to cite the building and with the various things about the building that BKV was calling out.

Q. Okay.

A. Calling out in their drawings, by the way.

Q. Is there anything that could be changed in the design that would have allowed it to be more economically feasible? Did Douglas tell you anything that could be changed in the design that could make the economic -- the budget lower?

A. Somewhat lower, yes, there were. And actually, Douglas didn't have such a favorable experience with BKV even in dealing with those things. So for example, Douglas was highly critical of how BKV

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 146 of 303

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 146

designed the HVAC system in the building, the, you

know, air conditioning and heating and whatnot, and

they felt that there were far more efficient and

cost-effective ways to do it. Yet Douglas on

multiple occasions complained, and particularly this

fellow, Ron Siebenaler, who worked at Douglas who

was -- he was really more of the construction

estimator.

And when they went to talk to folks at BKV,

they were getting resistance that BKV was like, no,

this is our design, right. And it was only after

pulling a lot of teeth that they got people at BKV,

so was there -- BKV to participate. So was there

stuff around the margins? Yes, absolutely.

Okay. But the big stuff, the big ticket stuff

like what was going on under the dirt, right, what

was necessary, the fire egress big ticket item,

right, those items were becoming much, much more

challenging to fit certainly within the $28 million

budget, or even -- look, if the budget was a million

dollars over, we probably could have figured it out,

right? But it can't be six or seven million dollars

over on a $28 million project. If it was a $200

million project, six million is a rounding error.

On a $28 million project, it's a big -- a big amount

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 147

of money.

Q. So the soil issues were one of the big ticket items, I take it?

A. The -- yes, the soil issues, and relatedly, how much retaining wall was necessary. The fire egress and the fire road that was never in the original design was a big ticket item, yes, absolutely. Those are all big ticket items.

Q. So what is your understanding of the soil issues and how they impacted the budget?

A. I -- again, I don't have any technical expertise. What I -- the things that I understand were -- and again, if you're going to ask me to explain what this means, I really would be giving you a very lay person's understanding of it, but that -- the soil conditions were such that they either had to do something where they pushed soil onto this area to avoid. And that they would have to compact it. And then they would have to wait a considerable amount of time to be able to allow the soil to settle because you can't just -- again, this was explained to me. This isn't Michael Schor's knowledge, but what was explained to me was that the -- you can't just, oh, shove the soil over there, tap it down with a shovel, and then say, oh, we're going to put

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 148

the building up. You have to wait an amount of time. And in order to move the soil, you had to mobilize the construction site. And what it would have involved was mobilizing a construction site, doing a bunch of work. Then completely demobilizing it and let it sit there for three months or something like that to settle, then retesting it, that the compaction level had been appropriately achieved. And then you could remobilize the construction.

That maneuver in and of itself is incredibly expensive to do because mobilizing and demobilizing and no general contractor is going to want to do that, right, because it's -- they're going to put a whole force of people up there, a team, a foreman, and everybody, start working, and then walk off the job. That just isn't how a project like this was going to be run.

Q. Those soil characteristics, you just -- you were just talking about, those were inherent characteristics of this site from before you purchased it, correct?

A. They were characteristics that were disclosed in the Terracon reports that Mr. Hoard and Mr. Jedlowski and Distinctive and Mr. Banta and the folks at BKV

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 149

all described as favorable.

Q. Did David Banta ever describe the Terracon report from July of 2023 as favorable?

A. He concurred with Mr. Hoard's assessment.

Q. Okay. That's your recollection?

A. Yes. My recollection is we had calls subsequent to that where Mr. Banta never brought up the soil conditions. And he was copied on the email that Mr. Hoard sent that says all in all, great report. Banta didn't write back to that email and say, actually, Chris, it's a pretty crummy report.

Q. And did -- so after that report was generated in July of 20 -- of 2023, was there additional soil borings that were done by Terracon?

A. There were.

Q. Why did they do additional borings?

A. Based upon Douglas -- would -- by that time, Douglas had already become involved. And Douglas was like, this budget is really off and these soil conditions are really a problem, and we need to do additional borings in order to determine -- they felt that the borings that were specified previously, and again, in which I had no input, was completely done by Distinctive and BKV to specify the scope and where the borings were going to be. Douglas recommended a

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 150

series of additional borings.  I believe it was Mr.
Siebenaler who assisted in working that out, and we
engaged Terracon at an additional cost to do
additional soil borings.

Q.   Okay.  Before Douglas recommended additional
borings, did Douglas tell you don't do the borings,
you can't build a building in this area for --
within your budget?

A.   Douglas had reviewed BKV's budget and they raised as
a concern, right, the foundation systems and the
need for what they refer to as soil surcharging and
that that was a very costly item that was driving
their estimate to be far out of line with the budget
that was originally prepared by Hoard and
Distinctive and BKV.

Q.   And those additional borings were done in November
of 2023, right?

A.   I know the report came out in December of '23.  I
don't know exactly when the borings were done.

Q.   Okay.  Well, if the report came out in December, the
borings would have had to have been done before
that, right?

A.   Could have been done in December and got the report
later in December.  I don't know.  I wasn't there
when the borings were done.  I had nothing to do

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 151 of 303

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 151

with where, how, coordinating them or nothing. They were done at some point prior to issuing the report.

Q. Okay. But is my understanding correct that the -- your understanding was the reason why Douglas was recommending additional borings was because they were having to add into their budget increased cost to deal with soil issues?

A. Right, which neither BKV nor Distinctive advised me of in June or July of '23. They both -- all said, oh, it's a great soil report. So I -- by -- when someone tells me it's a great soil report, as a lay person, I said to myself, great. That means we're inside of our budget.

Q. But you knew there were soil issues by the time Douglas is recommending that there be additional soil borings done, right?

A. Based on when Douglas told me that, yeah.

Q. Right. So what was the reason for even doing the additional soil borings? If the soil issues that were on site were causing Douglas to greatly increase their budget beyond what you were comfortable with, why do any more borings? Why not just stop the project then and there?

A. Because Douglas was trying to come up with a workaround, and what they were saying was that there

02/11/2026                BKV Group DC vs Treeline Acquisition, et al.                Michael Schor

Page 152

were various different kinds of potential depending on what these additional borings would -- might reveal, that there were different foundation systems or different modalities of constructing the building, right, that they might be able to utilize if different soil conditions existed based on the new borings. So it was all in an effort to try to salvage the project.

Q. Right. Okay. So if you had known about these soil issues back in July, you would have still tried to salvage the project, would you not?

A. If I had known about -- I -- give me your question again.

Q. Sure. When you were aware of these soil issues and the impact on the budget in November or December of 2023, you were still willing to explore trying to salvage the project, correct?

A. Yes, I was deeply invested in it by that point in time.

Q. So if you had known about these issues back in July of 2023, you still would have tried to salvage the project then too, wouldn't you?

A. You're asking me to speculate on something. I'm not going to speculate on that. I don't know what I would have done.

Case 5:25-cv-00028-BO-BM      Document 102-6      Filed 03/20/26      Page 153 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 153

Q.   Okay.  Now, the other big ticket item you mentioned is the fire egress issues.  Explain to me your understanding of the fire egress issues and the impact on the project.

A.   Sure.  Essentially, BKV designed the building without code compliant fire ingress and egress.  One of the big issues is is that as the building was designed and as the site was laid out, there's only one point of ingress and egress on the site, okay?

Q.   Okay.

A.   All right.  The fire marshal came back after BKV had already designed the building, was already drawing construction drawings and said, this is no good the way you have it designed.  And they -- we went through an entire process with BKV of trying to modify what they had built -- what they had drawn, excuse me, what they had drawn in order to be able to address the concerns of the fire marshal.  The big concern was that there was no space for fire trucks to turn in and around and -- around in the property.  There were some workarounds that were proposed but all of them materially impacted the building in other ways.  You have to remember here that what we were building was an active adult building with a highly amenitized program.  And the

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 154

amenities included not just activities but included special spaces that you don't see in an -- in a normative apartment building.

So for example, one of the things that I had wanted to include in the property based on having -- I was having lunch with my wife's uncle who lives in a property like this and he had mentioned how much he enjoyed the fact that there was a community garden in their community. I wanted to incorporate that, and especially since our concept was Verdant, which is green and growth in the rear corner to the right if you're looking at the building from the front, we had designed in there a community garden where folks could have a -- an area to do gardening and it was going to be a nice area for sitting and things like that, which I thought was an important amenity to a highly amenitized building. And part of the work around would have destroyed that because they were going to create a -- like kind of a firetruck turnaround.

The other thing that was a major problem, which BKV never anticipated, which I had mentioned earlier on, was the fact that the fire marshal determined that what they called the terrace level. So the property -- the building as it was contemplated was

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 155

going to be four floors from the front, but in the rear it would be five floors so the building was going to be built into a grade, okay?

Q. Right.

A. And on the rear portion of the building, there was a fifth floor and it was really the ground floor, right? So the first floor, right, was on grade. And there were apartments out there. And those apartments were going to have walkout patios which were going to be lost as a result of the negligence of BKV.

And in addition, the -- you could see from their fire road on that drawing the fire marshal came back and said, even with that fire road, we would potentially have to remove the terraces from the fifth-floor apartments on the back of the building because they were five floors above grade. Because from that distance, the fire truck couldn't -- the ladder on the fire truck couldn't reach the terraces on the putative fifth floor on the rear building from that access road.

So in order to get the road closer, we would have had to curve it in towards the building which would have destroyed an area behind the building that was supposed to be like an activities lawn

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 156

where we would have yoga classes and, you know, lawn games and various other things. That was all caused by BKV not anticipating the fire code, not understanding how the, you know, putative terrace level would be treated by the fire marshal. Those were all questions that they should have dealt with much earlier on in the process before drawing construction drawings.

Q. Okay. Well, I wanted to understand, do you -- is it your -- is it Treeline's position that the fire access issues, if they had been identified earlier, would have caused Treeline to abandon this project and not go forward with it?

A. Not necessarily, no.

Q. Okay. And is it your understanding that as of February of 2024 BKV had worked out the issues with the fire marshal?

A. No, they had not.

Q. Okay.

A. Not to our satisfaction, nor to the satisfaction, quite frankly, of Distinctive either.

Q. Okay.

A. Distinctive was expressing concern about the loss of amenities as well.

Q. Okay. But you -- the fire marshal had tentatively

02/11/2026            BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 157

approved by February what BKV was proposing for the fire access, correct?

A.   I don't believe so, no.

Q.   Okay.

A.   I don't believe they ever resolved the issue of the fifth-floor terraces on how that could be handled. I don't believe that was ever resolved.

Q.   Okay.  In the link that Jeff sent you, there's an Exhibit 56.

A.   Yep.

Q.   Okay.  And I'll represent to you, so there's no confusion, you're not on this email, okay?

A.   Uh-huh.

Q.   So just take a look at it.  It's the middle email from Jordan Piper to Dana Nielsen.  Just read it and just tell me if you've ever seen it before.

A.   Yeah, I've seen it.

Q.   Okay.

A.   I saw it during the course of the discovery.

Q.   Okay.

A.   Actually, it totally confirms to me that they never resolved the fire issues.

Q.   And why is that?

A.   Because it says that -- you see it says we asked -- we'd like to ask that a second access into the

Case 5:25-cv-00028-BO-BM      Document 102-6      Filed 03/20/26      Page 158 of 303

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 158

complex be added to the bottom left of the parking

area back onto Southwest Flowers Parkway?

Q. Correct.

A. If this is feasible, please just show that on the submitted plan. They never did that.

Q. Was there -- would there have been any problem with that, with adding that second access, to your knowledge?

A. I've never ever saw a drawing that BKV did that showed that access.

Q. Okay. But is there any reason that you can think of why they wouldn't have been able to add that to the drawing?

A. That I can think of?

Q. Yes.

A. I'm not an expert in the area, but I would think that if they had it all solved and all sewn up, they would have shown it to me and they never did.

MR. KATZENBACH: Okay. We've been going for a little over an hour since we got back, so maybe this would be another good time for a break. Maybe take a break until 3:00. Does that work for everybody?

MR. STODDARD: Sounds good to me.

(A short break was taken at 2:47 p.m.)

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 159

(The proceedings resumed at 3:00 p.m.)

Q. (Mr. Katzenbach) Okay. We're back on the record and I'm going to -- will you pull up in the link to previously marked exhibits Exhibit 23?

A. There's so many things open here. I've got to just find it.

Q. Sure. I understand.

A. Okay. Number 23. Okay. Yep.

Q. Yeah. Okay. So in your testimony before we took the break, you were referencing about BKV moving the building all over the site, and I think you referenced this exhibit, I think, or you meant to reference it.

A. Yeah.

Q. Is this what you were talking about?

A. Yes.

Q. Okay. And what is your understanding of the date of this exhibit?

A. Hold on a second, let me see if I can expand it a little bit.

Q. Sure, go ahead. Yeah, take your time.

A. There appears to be a date in the lower left-hand corner of 6/12/2023.

Q. Okay.

A. So I would assume it's from somewhere around that

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 160

time.

Q.   Okay.  And I guess were -- at the time in June, were you aware that this document had been prepared and that BKV was exploring moving the building around, or is that something you learned later?

A.   No, I saw this document relatively contemporaneously.  In fact, I think -- you see how there's like red, what looks like pen?  I actually don't even think that's pen.  I think this was put up on a computer screen and that was done with like a, you know, a CAD thing or something.

Q.   Okay.  Okay.  And as far as timing, so just your purchase agreement with Flowers was the end of May, like just a few weeks before this, right?

A.   Yeah, that sounds right.  Yeah.

Q.   Okay.  So this is, as far as timing, in like the very beginning of the due diligence period contemplated by your purchase agreement with Flowers, right?

A.   Yeah, but it's like four plus months after, right, so I engaged Banta.  I started talking to him in February and I engaged him, you know, like that letter agreement was in March.  So it's many months after that.

Q.   Okay.  But only a few weeks after you actually

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 161

purchased the property, right?

A. That's what the calendar says.

Q. Right. And so this document has different iterations of possible locations for the building on it, right?

A. It sure does.

Q. Okay. And was it ever -- after this point in time, do you recall any other instances where the building moved around on the site?

A. I think it was moved again from here because, as you could see, he still has portions of the building or facilities of the building in the setback.

Q. Is it your understanding that the building site location was moved to either the blue or the red?

A. Some facsimile of that. I mean, the red is completely idiotic.

Q. So it was never moved there?

A. No, we rejected that one out of hand because you could see he has facilities in the building falling down a 30-foot incline.

Q. Okay. So do you think after this date it was moved to the blue?

A. Approximately. As I said to you, it -- I -- this was a -- what I would call a rough drawing, right? These are just outlines. It's not specific exact

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 162

placement.   So I believe it moved yet again.   But substantially, I believe the blue was where -- was the ultimate sort of shape of the building, relatively speaking.   If you show me something else, I could look at it, but, you know, as I said, it may have shifted again.

Q.   Do you remember any other significant movement of the building on the site other than it moving to generally the blue area?

A.   Not including when we were talking about acquiring the property, you know, adjacent and shifting it around then?

Q.   Correct.

A.   I don't recall the building materially shifting.  I do recall, however, a lot of things that are shown here as being around the building changing in very material ways.

Q.   Okay.  All right.  If you'll open up in the existing exhibit in the previous exhibits, Exhibit 35.

A.   Sure.  Uh-huh.

Q.   Okay.  This is an email, as you can see, from -- well, first of all, do you need -- I don't mean to -- do you need to read it to yourself before we talk about it?

A.   I wouldn't mind.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 163

Q. Yeah, please do that. Absolutely.

A. (Witness reviews document.) Yes.

Q. Okay. So my understanding is this is an email from you to Jack Boarman and David Banta in -- on March 21st. Is that your recollection?

A. It is.

Q. Okay. So in the first paragraph it says, as promised, we have continued to look for pre-construction financing for the project. At this point, we have been -- we have not been able to identify any lenders who are willing to fund the project despite speaking with no fewer than 20 prospects. Did I read that correctly?

A. I mean, did you read the words correctly, yeah.

Q. Yes.

A. Sure.

Q. Okay. Now, was that an accurate statement that you were telling them when you wrote this?

A. Yeah, what I was -- I was referring, though, to pre-construction financing.

Q. Okay.

A. So as I had mentioned earlier on in my testimony, that we in general would not advance expenses all the way down to finishing construction drawings without having, you know, institutional capital and

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 164 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 164

debt in place. I went above and beyond in this project and had advanced the project out of our own pocket to a very substantial point. At this point, as you can see, I note later in here, and again, I was trying to be productive with Mr. Banta and Mr. Boarman. And by this time, I didn't know that they were exchanging kickbacks with Distinctive and with Hoard, so I was trying to maintain a collegial relationship, again, in my effort to try to preserve the deal.

But what I was explaining to them was that I needed them to hold set on -- first of all, not to do any more drawings, and number two, to hold set on their pursuing me for these bills because I had extended myself very considerably already into the deal and I was even willing to extend myself further by finding pre-construction financing. Right? But there just wasn't a market for it at that point in time. So I said to them, look, we've been working on this deal together all the way through. Right? We've been trying to have a productive relationship. I've been trying to think about the deal in every which way possible. I need your cooperation.

And I'm pretty sure I wrote this email after having written to Chris Hoard saying to him, look,

02/11/2026　　　　BKV Group DC vs Treeline Acquisition, et al.　　　　Michael Schor

Page 165

you got to get Banta to slow down here on pursuing us for the bills. The guy was calling Daniel nonstop and whatever. And we said, look, we have a lot of money out on the street. We want to get the project moving. But these guys have to, you know, if we're really going to partner on this and other deals going forward as a team, you got to hold set. You can't pursue me for bill after bill after bill when, you know, there are issues that keep cropping up on the project that we're continuing to try to work through.

Q. Do you remember at this point, as of March, how many months of bills you were behind?

A. Not specifically, no, but it was definitely -- I -- it was definitely in the hundreds of thousands of dollars.

Q. Okay. But at this point in time, you did not have any pre-construction financing in place, correct?

A. That's right. And again, pre-construction financing is financing, generally speaking, that's for a limited purpose of funding expenses prior to going into the ground with the project. If you can obtain pre-construction financing, it gets taken out at the stage of the construction loan.

Q. And it doesn't say anything in here, but how --where

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 166

were you at this point in time on construction financing?

A. There -- Ziegler was working on it for us. And you saw that -- I don't recall the exact dates. I think you saw that update email from sometime in January. So he was working through all of those prospects during this period of time.

Q. But you didn't have it in place at this time, correct?

A. No.

Q. Okay. And the second paragraph deals with this issue about potentially, you know, the other parcel next to the one you had, right?

A. Yep. And it was in response to this ultimately that -- and conversation that I had with Banta, and I don't recall if Boarman was on the conversation. But where I said, guys, look, maybe if I can -- exactly what I wrote here, if I could expand the site, help me out here, maybe I can find a solution that allows us to move the project forward in a more economical way. We'd have to buy more land, that would be costly. We'd have to pay her, but maybe that's less costly, or maybe we could figure out a way to value engineer the project to include that cost. But either way, right, I needed their help in

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 167

order to show what the building would look like pushed over on that site. And Banta said, well, sure, they -- that they agreed to do that, and that's what resulted in the May 2nd drawing. They did it.

Q. All right. They did agree to help you with that, correct?

A. Oh yeah, absolutely. It was in everybody's best interest to try to get the project done.

Q. Right.

A. Right? Because if the project had happened, nobody would have found out that Banta and Hoard were exchanging kickbacks. Likely Banta would have been paid, right? In fact, before I found out about the kickback, I even said to Boarman and Banta that if I could get the project finished, I would try to figure out a way to work their bills into the project. So, you know, we were all trying to be productive until I found out the extent to which things were misrepresented to us, the extent of the negligence that took place here. And, you know, at that point in time, you know --

Q. Didn't you know the extent of the negligence at this point in time, March of 2024?

A. I knew about a lot of it. Yeah. I did.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 168

Q.   Right.

A.   Yeah.  And again, I mentioned to you earlier on, and I'll take the heat for this one.  My dad smelled the rat much earlier than I did.  I really, really wanted this project to work.  I really wanted the business opportunity that I thought was presented not just by the Flowers project, but by the Verdant brand to be a success.  And in perfect hindsight, it was a bad business judgment.  And, you know, I'll take the heat for making a bad business judgment. It doesn't mean I was, you know, agreeing to be taken advantage of.

Q.   And then the next paragraph says, relatedly, the budget on the project at this point is far off where we need to be.  Some of this is market, some of this is design, and some of this is site condition, including the site being tight overall for the building size in general.  So tell me how the market was affecting the budget.

A.   At this point in time, and -- some cost of materials had increased.  You know, during '22 and '23, right, inflation was fairly high.  And certain materials -- and this is also during the time when Trump was rattling sabers about tariffing everybody in the universe.

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 169 of 303

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 169

Q.   Yeah.

A.   And so some cost increases were necessitated by certain materials being more expensive.  I couldn't tell you exactly which those were, but, you know, I do recall steel being one of them.

Q.   Okay.  And what aspect of the design was causing the budget to be off?

A.   Oh.  Having to build fire egress roads that weren't originally budgeted for, having to build retaining walls that weren't originally budgeted for.  Having to materially alter potentially the drawings to the back of the building to remove things like terraces where we were talking about possibly enclosing the terraces to make them like a room inside.  That would've been an additional cost.

Also, there was a point in time where, again, BKV failed to adequately research the fire code.  And when they initially designed the building, there was no firewall in the building.  And at some point, they showed up with the realization that the building was of such a length that from the standpoint of the fire code, it was really two buildings even though they were connected.  And there needed to be a fire separation wall from top to bottom in the building that BKV did not initially

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 170

design nor tell us that was going to be necessary.

And they just threw in a wall from top to bottom of the building.

So that's just kind of a smattering of that. And again, our expert will testify about exact -- each and every deficiency in BKV's work, but it was a lot.

Q. Okay. And then some of this is the site condition, including the site being tight overall for the building size in general. What did you mean by that?

A. It's similar, related to the soil's condition. And in addition, the ability to fit in appropriate fire access that would pass code without destroying the exterior amenities of the building and taking away parking from the building also.

Q. So let's look at -- in the link that I sent you, it's 83_flowers.

A. Okay. Hold on.

MR. STODDARD: Okay. Are we up to 63 now?

MR. KATZENBACH: I don't know. I was just going to ask. What number are we up to? Is it 63?

THE COURT REPORTER: I believe so.

(EXHIBIT NUMBER 63 WAS MARKED FOR IDENTIFICATION.)

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 171

MR. KATZENBACH:  Okay.

THE WITNESS:  I'm sorry, Mr. Katzenbach,

what number?

Q.   It's 83_flowers.

A.   Uh-huh.  Got it.  Yes, sir.

Q.   Just take a look at that and tell me if you

recognize it.

A.   I do.

Q.   Okay.  And which -- what exactly -- it looks like

it's like a -- I don't know.  It looks to me like it

was a proposal from you to the agent for Flowers to

purchase the additional parcel.  But tell me if I'm

misunderstanding it.

A.   No, that's right.  It was a draft.  So essentially

what it was was I was writing to Sarah Godwin, who

I'd mentioned earlier from Foundry, John Koonce from

York Properties.  John was kind of like the on-site

broker.  Okay.

Q.   Okay.

A.   And Len Woodall was kind of like Mrs. Flowers'

business advisor, I would say.

Q.   Okay.  All right.

A.   And at one point or another, she suggested, or maybe

John Koonce suggested, that we get him involved,

that maybe he could help, you know, kind of move her

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 172

along.  And so what I was sharing with them was a draft proposal to acquire the corner lot, the additional 2.2 acres, and then a modification on the existing lot to accommodate Mrs. Flowers' desire that we close on it.

Q.  Okay.  Okay.  And so tell me what happens after this.  After you send this -- do you end up sending this proposal to Flowers or not?

A.  It was shared with Mrs. Flowers, yes, ultimately.  I didn't send it.  It was shared by one or more of Ms. Godwin, Mr. Koonce, and Mr. Woodall.

Q.  Okay.  So what happens after that?

A.  There were discussions about it.  And Mrs. Flowers waffled back and forth as to whether she would sell it to us.  And at some point, I don't remember the exact sequencing, but it wasn't far off from around this point in time that Mr. Banta and BKV filed a lien on Mrs. Flowers' property.  And ultimately, that destroyed this negotiation because Mrs. Flowers became incensed.  And as I said to you, I've seen an email.  It was presented at another deposition, I believe, in which Mr. Koonce writes me in saying something like change -- it was entitled something like change in position and I think it was from August of 2024.  And basically that -- indicating

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 173

that Mrs. Flowers was not prepared to sell us the corner lot because she was angry about the filing of the lien and had lost confidence in the entire operation, if you will, of getting the deal done.

Q.   Okay.  Did David Banta tell you that they were going to file the lien before they did it?

A.   He did.

Q.   He did.  Okay.  And so did you have any discussion with him about trying to work something out for him not to file it so that it didn't have any disruptive effect on these negotiations you were having with Ms.  Flowers?

A.   I asked him not to file it.  I said to him, you'd be filing it at a very difficult point in time and causing a real problem in the deal.

Q.   Okay.  Did you offer to pay them any money towards their outstanding invoices?

A.   No.

Q.   Okay.

A.   Not at that point in time.

Q.   Right.  At that point -- that's what I mean, at that point in time --

A.   Yeah.

Q.   -- to avoid them filing a lien.

A.   That's why I just wanted to be clear.  No, no, I --

02/11/2026  BKV Group DC vs Treeline Acquisition, et al.  Michael Schor

Page 174

absolutely not.  No, I did not.  I said to him that I'm working to try to salvage the deal.  And if you do this -- he -- Banta said to me that he had to file the lien because -- something about factoring their receivables or something along those lines, and they were getting pressure from a factor or something like that and that he had to do it. And I said to him, okay, but understand that if you do it, you're doing it at a point in time that is really going to materially interfere with my ability to maneuver on the deal and to try to salvage it for anyone's benefit.  I said, but you got to do what you got to do.  And that's it.

Q.  I mean, if you just paid them their -- all their outstanding invoices, that would have prevented the lien being filed, right?

A.  I don't know.  I suppose.  But I wasn't going to pay invoices that I didn't think the guy should be paid at that point in time just to avoid him filing a lien.  That's called extortion in my book.

Q.  Okay.  If you'll open up in the -- my link, it's 77 Flowers, and I'll mark this as Exhibit 64.

(EXHIBIT NUMBER 64 WAS MARKED FOR IDENTIFICATION.)

A.  Yep.

Q.  Okay.  And I guess this is in -- now we're into

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 175

September of 2024. And it looks to me like this is an email from you to Eric Johnson at Ziegler; is that correct?

A. Appears that way, yes.

Q. Okay. It says, Eric, Chris advises you may have a source for pre-construction land financing for the Flowers project. It says the project has stalled due to lack of funding, so there's a possibility of obtaining interim financing. It would be a tremendous help.

I'm trying to figure out sort of first, initially on timing. Had Flowers rejected the idea of selling you the property by this point or not?

A. I don't remember exactly. It happened in and around this time frame.

Q. Okay. All right. And did Erik have a source for pre-construction land financing for the Flowers project?

A. No.

Q. Okay. Was he -- did he -- at this point in time, did he have leads on any possible financing, whether it was pre-construction or debt and equity or anything?

A. By this point in time, no, because, as I said to you, once it became apparent in May, June kind of

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 176

timeframe that the project was going to have to materially change, right, you can't -- when you -- in order to close a construction financing and an equity financing, you have to have a design building in a place that it can be built, and a budget that is vetted and ready to go. Okay? None of those things were possible due to BKV and Distinctive because of the negligence and because of the bad advice that they were giving us. Between the building moving around on the site, between needing fire egress roads that we never planned for, between needing excessive amounts of, sorry, retaining walls.

All these issues that kept cropping up, we never got to a point where we could go to a lender and go to an equity partner and say, we have a fully designed project, it's shovel ready, it's ready to go. In this email, I was asking Eric if he had additional financing so that I could potentially -- what I was thinking here was maybe if you -- see how I said pre-construction/land financing?

Q. I do.

A. Yeah, what I was kind of hoping to be able to do here -- because I don't -- again, Mrs. Flowers rejected our offer in and around this time frame.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 177

Right? But I figured, hey, if I get back to her quickly and I have land financing and I could just say to her, hey, you know what, I'll close, right, pursuant to the terms of the offer that she had rejected. Maybe if she saw money in the offing, maybe she'd change her mind. Right? So I was -- honestly, I was really grasping at straws here. I was trying to do anything I could. By this point in time, I'm -- like I said, I'll take the heat for this one. My dad was quite honestly pretty pissed at me over this project because he just thought we were spending a tremendous amount of time and I really didn't want to let it go.

Q. Let's look at -- and in the pretend -- in the link that I sent you of additional exhibits, BKV 2416, and I'll mark this as Exhibit 65.

(EXHIBIT NUMBER 65 WAS MARKED FOR IDENTIFICATION.)

A. Yep.

Q. Okay. So it looks like the bottom few emails are emails from David Banta to you about the status of outstanding invoices. And then the --

A. And about -- something about a downsized project.

Q. Correct. At the very bottom email, correct. Yes. Right.

A. That was the project when I had mentioned earlier.

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 178 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 178

You see how he talks about including food service and whatnot?

Q. Yeah.

A. This was when we had the concept of could we build a smaller building as an IL and -- IL meaning independent living, provide meals and recover the -- sort of the loss in units by additional revenue of providing food and various other services. There were some other services that Jedlowski had mentioned that we could provide, like quasi-medical services that still didn't make us be a licensed facility that he could license out to somebody for additional fees and to see if we could make a smaller building work economically. That's what this was about.

Q. Right. And he was providing this new fee proposal to you at your request, correct?

A. I was trying to -- yes, I had a call you could see here with Jack and David. Right?

Q. Right.

A. And during the call, I had -- I related to them, right, that I wanted to see if there was a way forward. And I had said to them, maybe we could back-end some of your fees, maybe we could, you know, you'll get paid some and you'll write some

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 179

off. We discussed a whole bunch of different scenarios. And one of the scenarios I discussed with them was the idea that maybe they would do some additional work on the arm, meaning basically gratis or write off some fees, right, in order to recover the old fees. So we were just going back and forth. Again, I was trying to find a way to resolve the dispute and see if I could salvage the project.

Q. I guess. So help me understand, after all the problems that you had had with BKV on this project, which by this point in September, you obviously are fully well aware of all that now, right?

A. Yep.

Q. So why are you then asking them for another fee proposal to help redo the project?

A. It's an excellent question. It's one I've asked myself over and over and again, and why I mentioned to you how angry my father was about it. He thought I was basically chasing a dream. And so I was trying no matter what to resolve it. I will tell you, though, that in and around this time, I was also talking to Douglas about doing a project that would essentially involve firing BKV. Douglas wouldn't work with BKV further. So that was sort of a parallel discussion that I was having about BKV --

02/11/2026                    BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 180

about, excuse me, about Douglas taking the project over on a design-build basis and just firing BKV and not paying BKV any further.  So I was having parallel conversations with different people.

Q.  Help me understand why you even need to have parallel conversations.  Like, why not just go ahead and fire BKV right here?  Like, why do you even need a proposal from them?

A.  Good question.  I suppose the answer is, is I wanted to keep my options open.  But as I said, my dad thought I was completely nuts for even continuing to engage with BKV.  You know, my dad often says that I'm a frustrated rabbi in a real estate professional's clothes.  I'm very, by nature, a pretty trusting person, and I take a lot of people on face value.  It's probably my single biggest weakness as a business person, and I should have fired BKV.

Q.  Or at least, I mean, then the top email is you to David Banta.  And says, David, I have no update right now because our ability to settle with you depends on our ability to finance the project.  Did I read that right?

A.  Yes.  You don't need to ask me if you read English right.  I -- yes, you read it right.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 181

Q. Okay. I mean, you didn't even tell him that you thought they had produced worthless documents to you, did you?

A. Oh, I had told -- again, I had told them numerous times in conversations. I was trying to be productive. I could have written them an F-you email, I -- many, many times. And again, as I said to you, I try -- I don't like engaging in conflict. I try to resolve things amicably. I try to settle almost anything. I -- to the point of, I sometimes let people take advantage of me. And while this isn't a psychological examination of Michael Schor, it's an examination before trial. What I'll tell you is it was a very bad judgment. But when I found out that they were making payoffs between each other, that was the last straw for me that I couldn't possibly continue talking to them any further, even despite all of the negligence and all of the bad things that they -- the bad advice that they gave.

And in addition to which, Chris Hoard was talking to them and he was still my quarterback and Jedlowski was still my quarterback and Distinctive was still my quarterback. And they were talking to Banta and Boarman too. And they were saying, Mike,

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 182 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 182

let's just try to smooth it over with David.  Let's just try to get it to work with David.  They've already put so much time and effort into it.  Why start over with somebody new?  When I was talking to Douglas in parallel, I wasn't talking with Distinctive either.  I was thinking about dismissing Distinctive at that point in time as well.  In fact, Mrs. Flowers had introduced me to a fellow named David Ammons, who was her preferred sort of senior living expert for the site.  And I was giving at least some consideration to firing Distinctive as well and bringing on David Ammons and bringing on, sorry, Douglas to do a design-build and firing all of them.  So again, I tried to resolve it as best as I could amicably.

Q.   Okay.  So is it your testimony that prior to September 20th of 2024, you had told David Banta in conversations that you thought all the work that they had performed was worthless?

A.   A lot of it.

Q.   You told them that?

A.   Or that it couldn't be used in the current form.  In May of 2024, when he picked up the building and moved it out of the area to be avoided, right, on that drawing in May of 2024, right?  Anyone who

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 183

knows anything about architecture, and my knowledge of it is very limited, is that construction drawings of a building on one site, you don't just pick them up and plop them down on another site. Doesn't work like that. That means the drawings, the construction drawings you made to build something in an area that you can't economically build it in are worthless. And I did, in fact, tell that to David Banta. And notwithstanding, I still tried to compromise on the fees. Because I figured it would be -- I just figured I didn't want to get into a conflict.

Q. Here's what I'm having trouble understanding, and maybe you can help me understand this. The only reason why David Banta and BKV did those additional drawings in May of 2024 was because you asked them to, correct?

A. Yep. They had the CAD files which --

Q. Right.

A. Right. And I needed access to the CAD files. If I had access to the CAD files -- right. So I asked them to do those drawings. That's right. Because they had already placed the building in the area to avoid. So when I came back to them in May of 2024, I already knew, right, that they had put the

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 184

building in an area to avoid.  But I asked them to make those drawings to see if they could be a vehicle towards helping me resolve the deal by acquiring the piece of land adjacent.

Q.   The building had been in that "area to avoid" since that document we looked at in June, right?

A.   And it was identified as a problem between June and December by Douglas.  Then we got additional soil borings.  Right?  And then in early 2024, right, it became -- right, so and then in May of 2024, they did that additional drawing.  So that's the timeline.  Absolutely.

Q.   Okay.  All right.  Let's look at -- in the prior exhibits, let's look at Exhibit 55.

A.   Yep.

Q.   Okay.  So I'll represent to you that this is the last invoice that BKV sent to -- sent on the project.  You'll see it's dated June 10th of 2024.  But --

A.   Hold on.  Yeah.  Okay.  June 10th of 2024.

Q.   Sure.  So first, do you agree that this is the last invoice that BKV sent on the project?

A.   I've never seen this invoice before.

Q.   You've never seen this invoice?

A.   No.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 185

Q.   Okay.

A.   I don't see the -- I don't see or approve -- I don't -- I don't get the invoices.  They go to an account -- our accounting department.  Actually, wait, this didn't even come to me.  No, I've never seen this. But interestingly, I'll just note that it says Distinctive Living, not Distinctive Living Development, further demonstrating the argument that these folks are making that they weren't one enterprise is fairly ridiculous.  But be that as it may.

Q.   Okay.  Were all the -- all BKV invoices sent to Distinctive on this project?

A.   I don't know.

Q.   Okay.  All right.  You'll see down at the bottom of the invoice there are outstanding invoices and there are six invoices listed?

A.   Okay.

Q.   Do you have any -- do you dispute that all those invoices were outstanding and not paid on this project?

A.   I don't know.  I've never seen those invoices.

Q.   Okay.  So you didn't see --

A.   I don't --

Q.   -- any invoices?

02/11/2026    BKV Group DC vs Treeline Acquisition, et al.    Michael Schor

Page 186

A. I just want to clarify one thing, Mr. Katzenbach.

Q. Yeah.

A. I don't -- yeah, I don't review the invoices.

Q. Okay. Okay. So you've never seen any invoice from BKV?

A. Not that I can recall. Certainly none that I examined in any level of detail. No.

Q. Okay. So who is it from Treeline then that would know, like, what invoices were received and what invoices were paid?

A. Daniel Schor would know better than I would.

Q. He would? Okay. Okay. Thank you.

A. It is interesting, by the way, that it's addressed to Distinctive Living. I don't know how it ever ended up in our office unless --

Q. Well, Distinctive was your -- like, your owner's rep for the project, correct?

A. Absolutely. I just -- as I said, I don't -- I -- the party who signed the agreement was us, not Distinctive Living. So --

Q. Okay.

A. -- maybe they were forwarding the invoices. I don't know.

Q. Okay. And I know you haven't seen this invoice or any invoices, it sounds like, but you'll see under

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 187 of 303

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 187

the phases, there is like a percent complete of the different phases.

A. And Mr. Katzenbach, I apologize. I closed it.

Q. That's fine.

A. Can you just tell me which number it was again and I'll reopen it? I apologize.

Q. Sure. It's Exhibit 55.

A. Sorry.

Q. No, you're fine. That's no problem.

A. There we go. Okay. It's not in the deposition exhibits, it's in the old exhibits.

Q. Correct. Yep. Correct.

A. Okay. Sorry. Give me half a second.

Q. You're fine.

A. I closed the whole thing. Sorry, it's just a lot of back and forth.

Q. It is. It is a lot of back and forth.

A. Okay. Yep. Okay. I got it. Sorry about that.

Q. No problem.

A. Sure.

Q. So I'm just talking about under the different phases, there's contract amount, percent complete, total billed, billed prior, and current billed. Do you see all that?

A. I do.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 188

Q.   Okay.  And again, I know you have never seen this invoice or any other invoices, so.  But this is -- I'll represent to you is the last invoice that BKV sent on the project.  And you'll see the percent complete under the different phases.  Do you see that?

A.   I do.

Q.   So I just want -- my only question is whether or not you disagree with their representation of the percent complete of the different phases.

A.   Well, all that percent shows is the percent of the amount they billed over the contract amount.  I don't view that as representing anything other than that.  If you take $262,242 and divide it by $359,126, you're going to get 73.02.

Q.   Correct.

A.   So --

Q.   No, correct.  That is what that is.  You're right.

A.   So they -- so they billed that amount.  That doesn't mean they did that amount of work.

(Cross communication)

A.   I have no idea -- so yeah --

(Cross communication)

A.   -- I completely disagree -- yeah, I completely disagree with that.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 189

Q.   Okay.  So --

A.   I don't believe -- I actually think that in useful work on the construction documents, the percent complete was zero.  They billed me for 73 percent complete construction documents, but in terms of value, that number should be a zero.

Q.   Okay.  Not -- I'm not interested in whether you view them as useful or not.  What I'm more interested in is, did they complete 73 percent of the construction drawings?  Whether you viewed them as useful or not, do you know whether they completed 73 percent of the construction documents?

A.   That -- you can't measure it in that way.  Who knows?  I don't know.  I don't know what -- I only know what a document that's complete looks like.  What they're telling you is how much of their money they billed, right?  Whether they were complete, I don't know.  If I gave them four more comments the following day, were they 62.9 percent complete?  I have no idea.  Right?  That means nothing to me.

Q.   Okay.  So is it fair to say that you don't know what percentage complete of the construction documents they actually were?

A.   Not based upon this document, no.  All I know is that that percentage represents the amount that they

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 190 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 190

billed over the total amount that they allocated to

that line item in their contract.

Q. How about not even considering this document. As of June 2024, do you have any knowledge or understanding of whether BKV had completed 70 percent of the construction documents?

A. Not specifically, no. I know that they claim to have completed a substantial portion of it, more than they should have completed considering all the problems.

Q. Okay. We're going to switch gears now and -- well, let me -- actually, I'm not going to quite switch gears. Let's do -- let's open up -- in my link that I sent to you, why don't you open up --there is a document in there labeled termination agreement Treeline Southwest, and I'll mark this as Exhibit 66.

(EXHIBIT NUMBER 66 WAS MARKED FOR IDENTIFICATION.)

A. Yep.

Q. Okay. Have you seen this before?

A. I did.

Q. Okay. And can you just tell me briefly, so how did this end up coming about?

A. I reached out to Ms. Flowers' counsel and indicated to counsel that at this point in time -- by this

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 191 of 303

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 191

point in time I knew that BKV and Distinctive had exchanged kickbacks and had defrauded us through the course of the project. Besides for their negligence, me -- and there was just at that point no way that I could proceed with the project in reliance on anything I got from BKV or Distinctive.

Mrs. Flowers was becoming restive, and as I had said early on, you know, by any sort of measurement of good faith and fair dealing, a contract that was signed in May of 2023 and that hadn't closed into December of 2024, I would -- I felt that we were well beyond what was reasonable and Mrs. Flowers was getting upset. And so instead of losing the deposit, which would have increased everyone's damages, I went back to Mrs. Flowers' counsel. And I said, look, if you give us back the deposit, we'll agree to consensually terminate the contract. And she agreed to do that, and she refunded to us the $75,000 deposit.

Q. Okay. It doesn't -- well, maybe I missed it. I didn't feel like it said that in here, but you did get the deposit back?

A. Yes.

Q. Okay. You had mentioned earlier that there were other pieces of land -- parcels that you were

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 192

considering for additional senior housing projects.

Have you moved --

A.   Flowers or in general?

Q.   In general.  You said -- and I think you were saying in general there were just other parcels you were looking at for other possible senior housing projects.  Did I understand that correctly?

A.   At the time that we were working cooperatively with Distinctive, yes.

Q.   Yes.  Okay.  Are you still looking at other parcels, properties for a senior housing development?

A.   Not as a primary focus, but we've seen some.  We haven't ultimately purchased any of them.

Q.   Okay.  So you're not currently moving forward with any senior housing project as it sits here today?

A.   No.  We've really pivoted the focus of our business to some active deals that we have in the pipeline and focusing more in the industrial space.  As I said, there have been some deals that have come across.  I'd need to find a new quarterback who wasn't going to steal from me and defraud me.  But once I find that, if the land comes across, I certainly would consider doing the deal.

Q.   Okay.  I want to talk about -- switch gears and talk about what Treeline has -- and you mentioned in your

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 193

deposition today too -- what you've discussed as the kickback scheme between BKV and Distinctive.

First, just tell me, just from Treeline's perspective, what do you mean by a kickback scheme? What is your understanding or perception of why BKV paid a fee to Distinctive?

A. It was a kickback.

Q. Meaning what?

A. Meaning it was an illegal payment that was clearly designed as an inducement for Chris Hoard, Joe Jedlowski, and Distinctive to induce me into hiring BKV. They were kicking back a portion of their fees.

Q. Okay. So you believe that the payment was for BKV to be referred to the project?

A. Yeah, 100 percent.

Q. Okay. And just tell me what tells you that -- why do you think that that's what that fee was for?

A. It couldn't possibly be for anything else. Chris Hoard and Distinctive and Joe Jedlowski, right, contracted with me to be my trusted partner. They were in fact going to be an economic partner in the deal. Right? They were supposed to be my quarterback, my leader. They were supposed to act in my best interests. Taking payments from the

02/11/2026      BKV Group DC vs Treeline Acquision, et al.      Michael Schor

Page 194

architect, who, while we were trying to work collaboratively, clearly created a conflict of interest for both Hoard and BKV in terms of representing me and my best interests. And there's absolutely no reason why BKV would be paying Chris Hoard any money on this project. Chris Hoard provided -- was obligated to provide all of his services and all of his knowledge about senior housing to me, not to BKV.

And I'll note to you that BKV, in all of the correspondences, never once mentioned it, never once disclosed it. It's not in their AIA contract. Every other consultant is in their AIA contract. So it's clearly a kickback.

Q. Did Jack Boarman disclose the fee to you?

A. All the -- did Jack Boarman disclose it to me?

Q. Yes.

A. No, he didn't disclose it to me. He told me about it after it had already occurred. Disclosing it to me means beforehand. If either of these folks had called me up and said, by the way, before you sign a contract with us, I just want you to know that we have an agreement to pay Chris Hoard $140,000, there wouldn't have been a shot in the world that I would have hired Chris Hoard or BKV. That's just unheard

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 195

of conduct in the industry. It's illegal, it's immoral, it's unethical. It's totally unethical. It's ridiculous unheard of conduct.

Q. But Jack Boarman did voluntarily tell you about the payment, didn't he?

A. Not before it was made. He already had made it. It was not disclosed to me. When I'm saying it's disclosed, okay, it doesn't mean, oowa, they caught me and now I'll fess up. Okay. That's not disclosure. Okay. That's going into the confessional and said, I had an affair, and I confessed to the priest that I had an affair. That's not disclosure. Disclosure means telling your client something that you're duty-bound to tell them before you do it. Admitting to wrongdoing after you did it, yes, he admitted to wrongdoing after he did it. Absolutely.

Q. Well, he voluntarily on his own told you about the payment, didn't he?

A. He told me about it.

Q. Okay. And he -- and they gave you a spreadsheet showing all the consultants on the project, correct?

A. One that they maintained internally, but the contract that they gave me and signed with me did not have it on it. The spreadsheet --

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 196

Q. No, I understand that.

A. -- that he gave me -- no, no, no, no, no. Let me finish my answer. The spreadsheet that he gave me was their own internal accounting, which showed them paying fees to Distinctive. That was their internal accounting. They never showed that to me prior to them confessing to their wrongdoing.

Q. I know, but they didn't have to give you that spreadsheet, did they?

A. They had to disclose it to me one way or the other. They didn't put it in the contract. If Hoard was a consultant, why didn't they put it in the AIA contract? They listed every single other person.

Q. I know, but that they didn't have any obligation to give you the spreadsheet when they gave it to you, right?

A. I would have found it in discovery in this case anyway.

Q. But before they gave you the spreadsheet, you didn't know anything about the payment, correct?

A. Before they gave me the spreadsheet, no. Jack Boarman said it verbally.

Q. Okay. So before Jack Boarman said it to you verbally, you didn't know anything about it?

A. No, that's the problem.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 197

Q.   Right.  I understand that.  But if it was a secret
     payment, like, why would Jack tell you about
     something you didn't know about?

A.   I'll tell you all the reasons why.  Number one is it
     was a secret payment because he was duty-bound to
     disclose it to me before he made it. Right?  He
     would -- his disclosure of it to me after he already
     did the wrongdoing, right, was a disclosure that
     maybe in hindsight he regrets making.  But the fact
     of the matter is, is that he wasn't a good guy for
     disclosing to me that he made a secret payment.  It
     was a secret because they should have told me about
     it.  The ethical canons and the law in North
     Carolina require that they get my written consent to
     do that, and they didn't do that.  So the fact that
     he -- he's some kind of a good guy for volunteering
     it, he's not a good guy.

Q.   So if the payment was a referral for BKV to be
     referred to the project, they didn't make the
     payment until -- is it your understanding they
     didn't make the payment until January of 2024?

A.   Whatever the date on the check is, yeah.

Q.   But is it your recollection that was January of
     2024?

A.   Show me the check.  It's whatever date is written on

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 198

that check.

Q. Okay. Do you have any understanding of why they waited until January of 2024 to make the payment if it was for them being referred to the project?

A. Only from emails that I've seen. Not -- I don't have any independent understanding of it.

Q. Has anybody told you that it was -- the payment was for BKV to be referred to the project?

A. No, but it's obvious that it was, because there's absolutely no reason why BKV would be paying money to Distinctive on this project. Distinctive was my advisor. He was my representative. He was the owner's rep. He didn't -- what advice in the world was he possibly giving BKV that he could be earning a fee from? It's just a silly notion. And by the way, the fee is equal to basically exactly ten percent of all of the fees that were being collected by BKV. And the check was paid to Chris Hoard, right, literally moments after he coerced a payment of nearly $200,000 out of us. And right after that, they turned around and gave Chris Hoard $70,000.

Q. So do you think that you talk -- that Treeline should not have been pressured to pay outstanding invoices?

A. For wrongful reasons, yeah, you're darn right. And

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 199

Banta and Hoard had a -- because of this secret payment and this secret relationship that they had between each other where they were referring business and kicking fees back to one another, they had an incentive to push the project to completion. Because as I -- as you very aptly pointed out, Mr. Katzenbach, had the project closed and all the fees been paid, this never would have been found out. But it was.

Q. And so I think you said earlier that had you known at the time of the AIA contract that BKV was going to be utilizing Distinctive as a consultant, that you would not have entered into the contractual relationship with BKV?

A. Had I known that BKV was going to kick back money to Chris Hoard and to Distinctive and to Joe Jedlowski, there isn't a shot in the world that I would have hired them.

Q. Okay. So if you had not hired BKV then, what would have happened differently on this project?

A. I can't answer that question.

Q. Okay. Because you were never able to get the financing for the project, right?

A. Feasibility of a deal and ability to get financing on a project is very dependent on time. Who knows?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 200

I don't know.  That's like asking me to predict what would've happened if 9/11 didn't happen.  I don't know, but you know, it's -- how would world events have changed?  I don't know.  It's complete speculation.

MR. KATZENBACH:  I agree.  Okay.  Okay.  So it's 4:00 o'clock.  If you don't mind pushing forward, you know, maybe another ten, 15 minutes, I think I'm almost done.  And then maybe we can take a break then and see kind of where everybody else stands as far as questions.  But you all let me know.  I can also take a break now if you want to too.  I'm either way.

THE WITNESS:  I'm good.  Push on.  Unless the other attorneys need to have a bathroom break, I'm good.

MR. STODDARD:  Fifteen minutes to -- sounds like a good breaking point to me.

Q.   Okay.  All right.  Okay.  So I want to turn to this lawsuit and talk about what damages have been incurred by Treeline for their claims asserted against BKV.  So I saw in interrogatories that there was a reference to $696,340 in what was referenced as dead deal costs.  Do you know what that is?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 201

A.   It's largely fees that were paid already to BKV, but Daniel Schor can give you an exact breakdown.

Q.   Okay.  So that's something I should talk to Daniel Schor about?

A.   Yep.

Q.   How about just the idea of damages sustained by Treeline as a result of their claims against BKV, is that something hat should also be addressed to Daniel or you?

A.   No, you could ask me about that.

Q.   Okay.  So just tell me what you --

A.   Daniel knows more of the specific accounting-related stuff.  To me, that's a books and records question, which you can ask Daniel.

Q.   Okay.  Okay.  So I understand that whatever the dead deal costs are, whatever that number is and how it's made up, that's one component of the item of damage that you're seeking against BKV.  Am I right about that?

A.   Against the Defendants.

Q.   Correct.  Against the Defendants.  Okay.  Fair enough.  Yes.  Against -- sorry, I didn't mean to suggest that you weren't -- fair enough.

A.   Right.  Against the Defendants.

Q.   Yeah.  Against the --

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 202

A.   I -- huh?

Q.   Fair enough.  Sorry.  Okay.  So beyond the dead deal costs, what other damages do you believe Treeline's entitled to recover against the Defendants?

A.   Whatever we put in our complaint.

Q.   Okay.  A lot of the discussion would require me to tell you about advice of counsel, which you instructed me not to do.  I discussed them things about measures of damages extensively with our counsel, and we will have an expert witness who's going to testify about damages.  So I can answer general questions.  Or if you want to show me a document about it.  But as far as the measure of damages, my understanding of the measure of damages and what's recoverable based on the kickback or based on the negligence or various -- is really based upon the advice of counsel.

Q.   Okay.  So do you believe that -- let's do it this way.  Let's say, do you believe that Treeline is entitled to recover all of the fees that they paid to BKV?

A.   Yes.

Q.   Okay.  And is that because you told me you think that all of their work was worthless?

A.   Because their work was worthless and because they

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 203 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 203

acted in violation of various North Carolina

statutes by making the kickback, and they should not

be entitled to any fees in the matter.

Q.   Okay.  If you had not engaged BKV, would you -- is

it likely you would have engaged some other

architect for the project?

A.   All the way back when?

Q.   At the beginning of the project.

A.   Sure.  Yes.

Q.   And then you would have had to pay them whatever

architectural fees they generated on the project,

correct?

A.   I suppose.  But again, that's complete speculation.

I wouldn't expect any architect to work for nothing.

No, of course not.

Q.   Okay.  And do you believe you're entitled to some

kind of amount of lost profit?

A.   Yes.

Q.   So what do you contend the lost profit would have

been?

A.   A lot of money.

Q.   Okay.  Do you have any idea, as you sit here today,

what amount of money that would be?

A.   Many millions of dollars.  I mean, I could itemize a

few very specific items.  We believe that we're

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 204

entitled to recover all of the developer fees and other fees that were inuring directly to Treeline. Under the deal, much as Mr. Hoard and Distinctive and Jedlowski have a cause of action to recover, I think, a 1.25 percent fee of some kind, where if the project were to have closed, we had a fee of some percentage of the deal that we were supposed to get as a development fee. We think we're entitled to recover that. We think we're entitled to recover our attorney's fees. We think we're entitled to recover lost profits. Yes.

Q. Okay. I understood from interrogatory responses that it's Treeline's position that all of the pro formas that were prepared by Distinctive were materially inaccurate; is that correct? That's what Treeline believes?

A. In certain respects, there were material inaccuracies, yes.

Q. Well --

A. Not every single box and every single line was inaccurate, but the overall result of that was that the pro formas had material inaccuracies.

Q. Okay.

A. And I should mention that all of the pro formas were prepared by Mr. Hoard and by Mr. Herchenroether and

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 205

by Distinctive under the guidance of Mr. Jedlowski, that they were their assumptions, that they were the ones who were providing all the numbers. I did not provide a single number in one of those. I came to learn subsequently that they were materially inaccurate and that Mr. Hoard and Mr. Herchenroether and Mr. Jedlowski and Distinctive personnel were monkeying around with various line items, as you could see from those pro formas. They're voluminous and they have many, many cells on an Excel sheet. And they were playing around with what the rents were going to be and what the costs were going to be, always solving to make sure the deal still looked like it made economic sense.

Q. Given what you just said, as you sit here today, do you have any faith in any of the numbers generated by those pro formas?

A. I think that there were material inaccuracies in those pro formas.

Q. Is it fair to say we should not be relying on those pro formas for any reason?

A. Not rely on the pro formas for any reason? I -- like I said, I would say to you that the most accurate -- I would say that there were material issues with the pro formas.

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 206

MR. KATZENBACH: Okay. Okay. Why don't we do this? Why don't we take a break? Let me look over my notes. I think I'm just about done. Why don't we take a break till 4:20.

(A short break was taken at 4:10 p.m.)

(The proceedings resumed at 4:20 p.m.)

Q. (Mr. Katzenbach) Okay. So unfortunately, in looking through my notes, I did find another question that I have. I apologize. If in the exhibits that I sent you, if you'll open up the one that's labeled 26109 Treeline's Answers to BKV interrogatories. And I'll mark this as Exhibit 67.

(EXHIBIT NUMBER 67 WAS MARKED FOR IDENTIFICATION.)

A. Okay.

Q. And I'm going to look at just a portion -- just a sentence in your answer to interrogatory number six. So interrogatory number six starts on page nine. And the portion that I'm going to ask you about is on page 11, but feel free to read as much or as little of it as you want and then just let me know and I'll ask my question.

A. (Witness reviews document.) Okay. I don't need to read what's -- if I need to read what's after the page 11, I'll tell you in order to answer the question.

Case 5:25-cv-00028-BO-BM   Document 102-6   Filed 03/20/26   Page 207 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 207

Q. Okay. Great. The part I'm going to ask you about is on page 11 about one, two, three, four, five lines down. It starts at this time.

A. At this time, Treeline is expected to present evidence?

Q. Correct. That's it. I'll just -- it's just -- if you'll just read from at this time to the end of the paragraph.

A. Sure. At this time, Treeline is expected to present --

Q. You can read it out loud if you want to. I just wanted you to -- you can read it out loud if you want to, but I just want you to read it and then I'll ask you a question about it.

A. I don't need to read it out loud. Just give me a sec. (Witness reviews document.) Yeah.

Q. Okay. Is that Treeline's position in this lawsuit?

A. It's in the interrogatories.

Q. Okay. Do you -- so do you agree with it? Do you agree with that statement that's in the interrogatories?

A. I don't put lies in the interrogatories.

Q. Okay. That's all -- I just want to make sure that that that was still Treeline's position.

A. I'll just qualify that and just say that we're going

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 208

to present an expert who will testify to this.

Q.   Okay.  That's fine.  So do you know like at what point in time Treeline sort of figured out that you couldn't build a 160 unit 175,000-foot building with necessary parking and amenities on this site, when you came to that realization?

A.   It was an ongoing realization that we kept trying to resolve, again, by acquiring adjacent land or doing anything that we could.  As I had mentioned to you earlier, the big issue here was you could have built a 160-unit apartment building on this site.  Okay?  You could not build a 160-unit active adult building on this site because an active adult building is not a regular old apartment building.  Okay?  An active adult building has lots and lots of amenity spaces, indoor and outdoor amenity spaces that were constantly being compromised by BKV's negligence and Distinctive's poor advice.

And so what our expert, I believe, will be testifying to you -- testifying about is that BKV breached the standard of care of a reasonable architect in how they conducted the diligence.  Right?  And they didn't advise us to pivot and think about the design in a different way about the project.  So it was an ongoing discovery.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 209

Certainly, by May of 2024 after Doug -- when Douglas had already become involved and it became clear that BKV had, after moving the building several times, landed it in an area where it was economically unfeasible within the parameters of what a reasonable underwriting would sustain could not be built in that area, it became apparent that this statement is true.

Q. Well, just to be clear, because of -- I mean, because of what you just said, there was no place on the site where BKV could have placed it where it would have worked, right?

A. As it turned out, the 160 unit 175,000 square foot, fully amenitized, active adult building standing alone? No, there's nowhere as it turned out that -- again, judging the economic feasibility at the time of the deal, no, there wasn't a spot that they could have put it and BKV should have realized that.

Q. Right. So was there ever any discussion about building, you know, a smaller building on the site, like in the middle of this whenever this is being figured out, was there ever any discussion, let's just make the building smaller so we don't have these issues?

A. As I said to you early on, I had said maybe we could

02/11/2026　　　　BKV Group DC vs Treeline Acquisition, et al.　　　　Michael Schor

Page 210

build one 140 units. Chris Hoard and the guys at Distinctive said the underwriting worked at 160.

Q. Right.

A. Okay? After we discovered all these deficiencies and issues, as in some of the exhibits were borne out that you showed me earlier in the day today, we did think about building potentially a smaller building on this site and building some of the amenities and maybe additional space to spread the cost over other sites that at one point or another Mrs. Flowers might have been willing to sell us. That was part of the overall, what I would say, is discovery process and work that I did and Daniel did to -- along with Douglas to try to explore how we could revive an economically feasible project. But that 160 unit 175,000 square foot building as a fully amenitized active adult, you couldn't fit it on the site.

Q. And my question was simply just is not about whether acquiring another parcel would have worked or anything like that. My question is just was there ever any discussion about building a smaller building on this -- on the parcel that you were -- that you had acquired?

A. The only discussion about that was again in one of

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 211

the documents you showed me. I had had a conversation with Mr. Hoard and with Mr. Banta about the possibility of building a smaller building as an IL, as an independent living, where we had fewer units but we provided even more services including full meal service, right, to the residents and use that as a vehicle to be able to sustain a smaller building.

Q. Was that part of what the exhibit we looked at earlier, the different options?

A. There was an exhibit you showed with some email traffic between myself and Mr. Banta and I think Boarman was copied on it as well where Banta gives a proposal for a smaller building.

Q. Right. Okay. Correct. Yes. Correct.

A. That was really the only discussion about that.

Q. Okay. Did you ever run any detailed pro forma numbers on that concept and its economic viability?

A. Chris Hoard ran some numbers on it and Distinctive.

Q. Would you trust the numbers that he ran on that?

A. Sitting here today?

Q. Yeah.

A. Or then?

Q. No. Sitting here today.

A. Then -- then, yes.

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 212

Q. Today?

A. I told you that I believe that there were material issues with pro formas that he prepared.

Q. Okay. Well, that's what I mean. So sitting here today, would you trust any pro forma numbers that he ran on that smaller concept?

A. It's irrelevant because the state of mind was -- my state of mind was judged at the time he presented them to me. Now that I know that he took kickbacks and that he committed fraud, no, of course, I wouldn't trust him. But at the time, I believed him, of course, and my belief was reasonable. I relied on him. He was my quarterback. He was my partner. I mean, the guy had a fiduciary duty to me. So of course. And as I said to you, I'm a frustrated rabbi in a real estate person's clothing.

MR. KATZENBACH: Okay. Thank you for your time today. Those are the only questions I have for you.

THE WITNESS: Wow. That's it, Dan?

MR. KATZENBACH: That's it.

THE WITNESS: I enjoyed it. Thank you.

MR. KATZENBACH: You're probably the only person to ever say that to me.

* * * * *

www.DigitalEvidenceGroup.com    Digital Evidence Group    202-706-6020

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 213 of 303

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 213

EXAMINATION BY MS. SIVON

Q. All right. Mr. Schor. I'll go next. My name is Amie Sivon, and I represent Distinctive Living Development, LLC, Chris Hoard, and Joseph Jedlowski in this matter. And same ground rules. As Dan said, if you need me to repeat a question, let me know. If you need me to rephrase something because you don't understand it, let me know. If we need -- if you need a break, just let me know. And --

A. Certainly.

Q. -- we'll certainly, you know, try to let each other finish so we don't talk over each other for the benefit of the transcript.

A. Yes, ma'am.

Q. As we noted off the record, I had noticed your individual deposition for today, this -- at -- once I learned you were going to be the 30(b)(6) representative for today and I just want to confirm that based on my understanding before we got started today, you were going to indicate if there were any responses you were giving just on your behalf as opposed to on behalf of your company. And likewise, if there was something that you didn't have personal knowledge of but you were just answering as the 30(b)(6) representative of the company, that you

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 214 of 303

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 214

would so indicate. And I do believe you did that just a small handful of times. But sitting here right now with having that being said, is there -- anything you've said previously today that you want to clarify one way or the other as being just your personal knowledge being just what you understand as being the corporate designate for the company.

A. Not as I sit here. I think I did a reasonable job of that. If something comes to mind, I'll let you know.

Q. All right. Thank you. And I think you did that, like I said, just a handful of times but -- so I think you were kind of keeping that in the back of your mind. So I appreciate that.

I am going to continue with this still being the 30(b)(6) representative deposition as well as your own. So just let me know if there's anything you need to clarify one way or another as we go forward. Okay?

A. Yes, ma'am.

Q. All right. And as happens when you go second, a lot of these questions end up jumping around. So I apologize for that in advance. Just let me know if you're not following where I am because I skipped topics. Okay?

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 215

A. Will do.

Q. All right. I did want to ask a couple of follow-up questions on things you said previously with Mr. Katzenbach. First, in regards to when he was asking you questions about Treeline's damages in this matter, you said something about all developer fees.

A. Yes.

Q. And I just want to make sure I understand what you meant by that.

A. Okay. So in the pro forma, there's a line item for something called a development fee. Generally speaking, it's a customary fee paid to the developer, meaning the, you know -- and we were supposed to receive that fee. It's a -- it -- there's a fee amount. It's a percentage of the job. It's sort of similar to the way that Distinctive was supposed to be compensated as well by a percentage of revenue. This has to do with -- instead of being revenue, it's a percentage of the deal cost.

Q. Okay. And that percentage that Treeline is claiming for damage is whatever percentage is noted in that pro forma? Am I understanding that?

A. Yes. And it's a market-driven percentage. Generally speaking, it's somewhere around five percent. I don't remember if it was five percent

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 216 of 303

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 216

here or six percent, four percent, but it's -- it's there. I don't think that that percentage as a percentage really changed over time.

Q. Okay. All right. In regards to your relationship with Distinctive Living Development, once this project got started, about how many times a week were you communicating with Distinctive Living Development?

A. Well, I'm not going to refer to them as Distinctive Living Development. I'll refer to them as Distinctive because to me, it was all one enterprise. Chris Hoard and Joe Jedlowski represented to me that they were a singular company with diversified capabilities. And so I'll just refer to them as Distinctive. But what I would say to you is quite frequent. I spoke to them or emailed with them likely on a virtually daily basis for -- from, you know, beginning in February or March of 2023, very frequent.

Q. And did you -- in regards to what you understood at that time regarding them, did you understand that they had a -- an entity or a wing or whatever that handled the development portion and then a different aspect providing -- would provide operations?

A. What I understood was that Distinctive was an

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 217

umbrella of a single operation that was engaged in the business of providing owners rep services and property management services and construction related services to senior living facilities.  And all of those capabilities were represented to us by Mr. Jedlowski and by Mr. Hoard.

Q.   And your contract was entered into with an entity called Distinctive Living Development, LLC?

A.   You could show it to me.  It's possible.

Q.   To follow up on that question, did you understand that a different contract would be entered into should Treeline decide to go with Distinctive for the operations aspect of the property once it got built?

A.   Every property that's managed, okay, would be -- would have a management agreement that would lay out the terms of the management agreement separately.  I had no notion at the time that I signed the initial engagement letter with these guys what entity would be on that.  No, that was never made clear to us.

Q.   And were there any discussions about what that kind of contract would look like?

A.   I believe Daniel had some discussions with them about -- with Mr. Jedlowski and others.  So you could ask him tomorrow.  I didn't specifically

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 218

discuss what a management contract would look like. Daniel really took the laboring war on that.

Q. Okay. And then once BKV got involved with the project, was that a weekly meeting that included BKV, yourself, and Chris Hoard and potentially others, but was that a standing weekly meeting or was that as needed?

A. In the initial phases, it was as needed but there came a point in time where there was a weekly meeting -- a weekly sort of all-hands call.

Q. Okay. And then was there also a time that there ended up being like a pre-call meeting before the all-hands all -- all-hands meeting?

A. Not like regularly scheduled, but there would be times where Chris would call or he would say, hey, let's chat about something offline, periodically but not regularly.

Q. All right. Was it your understanding that -- I'm just going to say Flowers or Ms. Flowers? I know technically it was a different entity that owned the company and she had people that worked for that company but is that okay with you if I just --

A. It is. If in the context of my answer I feel that I need to distinguish anything, I'll let you know.

Q. That would be appreciated. So as far as the design

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 219

of the project, the documents that BKV did for that, did you understand that Flowers had officially approved that project?

A. No. And let me give you a -- maybe a nicety here. So Mrs. Flowers and the Flowers Plantation folks had certain limited authority with regard to design. She was not a code officer and you still had to comply with fire code and Johnston County code and all that kind of stuff. However, Mrs. Flowers had some approval rights over the exterior aesthetic of the building. Okay? And so there was a point in time where we had shown Mrs. Flowers the proposed exterior of the building with some elevations and a roofline. And I believe that actually to present this was when Mr. Banta and Mr. Hoard and myself and my father and others traveled to Mrs. Flowers' office and we had sort of an all-hands meeting. It was in the summer of 2023. The main purpose of that meeting was to show her the exterior elevations. There was some back and forth, and at some point or another, she conveyed an approval of that look, if you will.

She had asked for some changes to the way that BKV had treated certainly the rooflines and we figured out how to accommodate her changes, but it

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 220

wasn't an approval of the project. It was just her -- sort of her artistic sense. And if you've ever been to the Flowers Plantation, it's a planned community where she has been very particular about things like what kind of brick are used on the outside, what kind of roofing material. So that was the sort of stuff that we -- that she showed -- we showed her and she ultimately approved.

Q. Okay. And was it a requirement of hers that she'd need to sign off on that first before you submitted things to the county or was it just a request?

A. I don't really know. What I will tell you though is that not having that sign-off would make it difficult to complete construction drawings because one would call out the materials on the construction drawings that you were using on the project. So obviously, it made sense to get that and, obviously, it would affect things like the roofline and where windows were located and the height of doors. As I recall, she had some comment about maybe the height of an archway above a door or things like that. So you know, clearly that would be something you'd want to have signed off.

Q. Right. And I -- with my question, I was not trying to indicate that she was the final authority for

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 221 of 303

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 221

letting this project move forward. I'm just saying as far as Flowers was concerned, she had approved the project -- moving forward as far as the look and the way it was going to occupy the site and that you guys were going to do an active adult project there. You had her stamp of approval, so to speak, to then move forward with the county?

A. We had her -- to the extent that she had aesthetic approval rights, she had conveyed those aesthetic approval rights.

Q. Okay. And then did there become a time later in the spring that she expressed a desire for Treeline to go a different direction with the project?

A. The spring of when?

Q. 2024.

A. So -- I don't actually recall. I don't recall. If you have something you want me to take a look at, I'll happily take a look at it. I do recall that one of the things that Mrs. Flowers did express some concern about or -- yeah, I would say concern about -- was she wanted to -- this was going to be the first active adult property on her entire campus. And again, if you know a little bit of the history of the Flowers Plantation, this was really her baby. Okay? This was land that her father had put

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 222

together.  It had been in her family for generations.  And she really had a great deal of pride in what she had put together out there.  And she wanted to make sure that each and every project in the development was successful.

There was a point in time where she actually did say to us that she thought in her view that we should potentially add more food service to the property.  It was based on sort of her experiential notion that if her friends were going to move into the property, they would want meal service.  But she never said, don't build the project.  She was just saying, look, I really want the project to be a success.  It's important to me and it's important to my overall development here.

Q.  Okay.  Hold on one second.  I thought I had noticed an email from what -- in one of Dan's -- hold on one second.  Let me just see if I can find it.

A.  Sure.

Q.  I think I wrote down the wrong number.  Hold on one second.

A.  So much hopping around --

Q.  I know.

A.  -- it's kind of a pain.

Q.  All right.  I'll try to find it over a break.  I

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 223 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 223

think I wrote down the complete wrong number.  So -- because that didn't work.  Did Ms. Flowers seemed to want Treeline to go to have a broader scope and have different types of communities there on the Flowers Plantation as opposed to just the active adult community?

A.   Well, she had had a vision.  Okay?  As I had mentioned earlier on, she had a vision that this sort of end of the Flowers Plantation would be where she wanted to see senior housing facilities.  And as I had mentioned earlier, across from the subject parcel, I'll say, the 7.4-acre parcel that's the subject of the litigation, let's say, across the street there were a couple of other parcels that were part of her more global vision where she thought maybe you could build like a cottage community like smaller homes that were either, you know, separate or semi-attached.  She had a vision of potentially building a licensed facility.  Over the course of time, we looked into the feasibility of doing some of those.  We also, as I had mentioned that when we started to see that it was going to be a challenge to fit the full building scope that we had imagined on the 7.4-acre site on that site, for the reasons that I discussed and won't repeat again

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 224 of 303

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 224

during the questions with Mr. Katzenbach.  But we did discuss with Ms. Flowers the possibility of being able to acquire some land across the street, perhaps building some cottages and locating the amenities for the building -- the  -- a potentially smaller building on the 7.4-acre site across the street.  So there were some ongoing conversations about that.

There was also even some conversation -- I forget when it took place -- about maybe even looking into doing a licensed facility on one of the other parcels that happened to be the parcel that abutted her home.  So Mrs. Flowers' home is behind these two other parcels that are across from the subject parcel on Flowers Parkway.  And she kind of liked the idea of potentially putting like an assisted living or memory care there because it's a very quiet low-traffic type of a use.  So we had had some discussions about that as well.  But again, didn't -- you know, didn't materialize into anything.  It was just discussion.

Q.   Did Ms. Flowers seem insistent on her engineer, Mike Stocks, being involved in the project?

A.   No.  She offered us to utilize Mr. Stocks when it became apparent that BKV and Distinctive and all of

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 225

them were running into roadblocks.

Q. Who was -- could you explain John Koonce's role?

A. He was a broker --

Q. And who --

A. -- for York Properties.

Q. And who was he -- was he representing Flowers?

A. Yes. All the brokers were representing Flowers. Sarah Godwin represented Flowers, too. I didn't have a broker.

Q. Okay.

A. They were sales brokers. They were co-brokering the same. And my understanding is, just to be clear, that Mr. Koonce was kind of like the house broker for all of the properties in the Flowers Plantation. So he had a very close relationship with Mrs. Flowers.

Q. Okay. And -- thank you because that's what I was trying to figure out Sarah Godwin's role versus John Koonce's role.

A. They were co-brokers. Neither of them represented me or Treeline. They -- we had no broker.

Q. Okay. And then they both kind of served as a go-between between you and Flowers in regards to some of the negotiations?

A. They did. I would say that initially I would

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 226

contact Sarah and Sarah would contact John and John would speak to Mrs. Flowers. But as things progressed, I got to know John and I would just contact Sarah and John together.

Q. Okay. And you indicated, I think, near the beginning of your deposition about, I guess, Sarah was the one who told you about this property? Is that --

A. To my recollection, that's correct. Yes.

Q. And at that time, was Flowers looking for it to be -- this parcel in particular that you ended up having a contract for, was Flowers already wanting it to be senior -- some sort of senior housing facility on that parcel?

A. Yes. That's why Sarah presented it to us because, as I had mentioned earlier, just -- that -- we had been looking at other product types with Sarah. And I had mentioned to her like, hey, by the way, you know, this is something we're looking to get involved in. And she mentioned the parcel at Flowers.

Q. Okay. And did you work with Sarah on looking at other properties for the other potential projects you were going to do in various locations that were senior housing?

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 227 of 303

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 227

A.   Some, but I had an acquisitions guy.  You've probably seen his name on some of the emails.  His name is Bryce Scott.  Bryce doesn't work with us anymore although we're still friendly, but Bryce was our acquisitions guy.  So he was working on sourcing other sites through other brokers.  I think there was at least one other where Sarah was the broker.

Q.   Okay.  All right.  Yes.  And I've seen Bryce's name on a lot of emails.  So -- okay.  The way the discussions involved between you and Distinctive Living Development and Chris Hoard, they were giving certain advice and options to you and then Treeline thought things over and figured out, you know, as far as what -- who they were going to contract with and that kind of thing.  That was Treeline's decision?

A.   No.  That wasn't the nature of the relationship.  The nature of the relationship between us and Distinctive was that we were partners on the deal.  The agreement -- the very retainer agreement provides that Distinctive and Treeline were really fundamentally entering into a partnership and that's how I always viewed the relationship.  It wasn't Distinctive would tell us something.  I was relying on Distinctive 100 percent to quarterback the deal,

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 228

to lead the charge. I didn't have any basis on which to make decisions other than general knowledge as a developer, but I didn't have any specific knowledge in this area and I was completely relying on Distinctive as my trusted partner to make those decisions.

So I didn't count -- in other words, when -- just back to the retainer of BKV, when Distinctive and Hoard and Jedlowski recommended that I go with BKV, I went with them. I didn't say let's arrange six interviews with different folks. Likewise, when Distinctive and Hoard and Jedlowski said let's interview some general contractors, I only interviewed the three general contractors that they suggested I interview. I didn't go to other people. So the nature of the -- of the relationship was that this was going to be the first deal in hopefully an expanding program where we would build out the Verdant brand together. So I don't view that at all as being the case.

Q.  Did Distinctive Living Development ever make any decisions on their own?

A.  About the project?

Q.  About moving forward -- yeah. Any way to move -- in regards to moving forward with the project.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 229

A.   I don't know. And the reason I'll tell -- say I don't know is I know that Distinctive and Hoard and Jedlowski were having conversations with various professionals including people at BKV and BKV sub-consultants and all sorts of other people I -- that I was not privy to. And it's certainly distinctly possible that Hoard or Jedlowski or some other representative of Distinctive told those professionals to proceed in a certain manner and then presented it to me as a fait accompli. So I don't know.

Q.   What kind of professionals are you -- speculating that they might have been doing something on their own as opposed to --

A.   Well, I'm not speculating.

Q.   -- discussing with you?

A.   Sure. I'm sorry. I didn't mean to interrupt you. I apologize. I'm not speculating. I know that they were speaking to folks like engineers like Mr. Banta and others at BKV without me being present. They spoke to Douglas without me being present. They spoke to other contractors without me being present. Okay? And I don't know what they told them in those conversations, and they very well could have told them or represented to them decision-making

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 230

authority or directed their activities in a particular direction. I don't have any way of knowing that. They came back to me with conclusions.

Q. As far as deciding to enter into a contract with BKV, that was a decision Treeline made?

A. I signed the contract, but it was a decision that I made based upon the folks at Distinctive, including Jedlowski and Hoard, saying this is the guy we should go with. And it was -- and when I'm saying we, it meant Chris and Joe and Distinctive as well. Because again, we were creating an enterprise here to build out the Verdant ran together. And that's very clear from the engagement letter that we have with them and all of the course of dealing that we had. I mean, I would have -- separate and apart from the Flowers deal, I had a weekly acquisitions call on which I invited Chris to participate where we evaluated other sites besides for the Flowers site because we were creating a partnership.

Q. And did you enter into any other contracts with any of the Distinctive entities other than the one that's specific to Flowers?

A. Did we ever sign any other contract? Not to my knowledge. No.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 231

Q. Okay. And going back to the architect question, did Treeline consider any other architects for the Flowers project?

A. No.

Q. And then for the general contractor, you did have interviews with three general contractors?

A. I think we only actually interviewed two of them. We didn't interview -- I think the third one had some reason that we couldn't set up an interview. But again, they were all three contractors that were brought by Distinctive and Hoard and Jedlowski. They were not contractors who I knew or that I brought to the table.

Q. And they were brought for Treeline's consideration to make the determination of whether to use on the project?

A. No. They were brought for our mutual consideration. Chris knew them and he had worked with them before, but he wanted to hear what they had to say about the project, too. He didn't know how -- no, absolutely not. They were not brought for Treeline's consideration. They were brought for our mutual consideration. Chris is our quarterback. Distinctive was our quarterback.

Q. And Treeline as a company wanted to stay in touch

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 232

with the various details of the project and stay aware of where things were with each stage?

A.   As any prudent developer would do, I would say that I wanted to be involved in the macro project and understanding where the project stood, absolutely. But I really would have -- didn't want to be involved in the day-to-day and minute-by-minute because that's not how I make my money.  I don't collect the fees that Chris collects for sitting there all day long and talking to contractors and stuff like that.  As I said early on in the deposition, my role at Treeline is to generate investors and generate deals.  Right?  So no, I actually -- I wanted to have a successful project and the reason I brought Distinctive and Chris and Jedlowski and Draghiceanu and all these folks was I thought I was putting together a team that would be able to take the laboring war on the day-to-day decision making and that we would obviously collaborate but that -- it was a partnership.

Q.   Did -- Chris Hoard was the one that was on most of the phone calls and most of the email correspondence.  Do you agree with that?

A.   Chris Hoard was on the bulk of them, yes.  But Mr. Jedlowski was on plenty of them.  Mr. Jedlowski was

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 233

copied on a great deal of the email correspondence.
And whenever an -- a significant issue arose, Chris
would always defer to Jedlowski and we would get
Jedlowski on the phone and there would be a call.
Okay?  And -- so Jedlowski knew what was going on.
George Draghiceanu was on a lot of the emails,
especially as it related to figuring out various
different operational modalities of the property.
There was a woman, Angela -- I forget her last name.
It might have been Clark, I think -- who was
represented to be somebody who was in involved in
Distinctive.  There were leasing personnel that they
brought to the table who actually I met on a trip
that we all went down to Dallas for.  So yes, I
mean, Chris was certainly one of the leads on the
project, absolutely, but they all knew what was
going on.

Q.   And going back to Mr. Jedlowski, as you indicated,
he was CC'ed on a lot of emails or seemed to be
involved if there was something major to be
discussed, but he was involved at a higher level of
the project than Mr. Hoard was, correct?

A.   Mr. Jedlowski, and you can ask Daniel about this
more tomorrow, but Mr. Jedlowski was critically
involved in soliciting our business and in making

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 234

representations to us about the capabilities of

Distinctive. Our first contact --

Q. You mean --

A. Our first contact --

Q. Can I just --

A. Our first contact --

Q. You can finish if you want, but I just wanted to clarify what point in time you're talking about.

A. From the very outset, from the first time we ever met the folks at Distinctive, our initial contacts with them back in early 2023 were with Mr. Jedlowski, not with Mr. Hoard. Daniel can -- will -- can give you a better timeline. But Mr. Jedlowski was the one who initially solicited our business. He was the one who responded to our inquiry from their website. He was the one who spoke to us -- spoke to Daniel about the operational and construction capabilities of Distinctive. He was the one who gave the marketing materials that clearly show the capabilities and the track record of the entire Distinctive enterprise. So no, I don't concur with that. I think Jedlowski was aware of what was going on. Was Jedlowski on every single weekly update call? No, he wasn't. Okay? But he was CC'ed on virtually every significant email.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 235

Q. Right. And I think that's what my question you -- to you was that he was CC'ed on a lot of emails, but as far as being the major communicator, he was not involved with the details of the project? That was my question.

A. Well, I'm not going to characterize what details he was involved with because I don't know what he was discussing with Chris Hoard. I have no idea about that. But I can tell you that when major issues arose on the property, Jedlowski got involved.

Q. And then the -- do you recall -- do you have an estimate for how many phone calls do you remember Mr. Jedlowski being on?

A. No. I mean, well more than a handful.

Q. And by that do you mean more than five?

A. Yeah.

Q. More than --

A. There were well more than five during the introductory phase of the deal in -- excuse me. I dropped something. I apologize -- in early 2023. Yeah. Absolutely.

Q. And let me -- just so we're talking about the same thing, I don't mean the introductory calls. I mean after the -- I would say after the contract was entered into and Flowers -- talking about Flowers

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 236

project specifically under the contract, how many phone calls do you remember Mr. Jedlowski being on?

A.   I don't have a specific recollection of a number, but I could tell you it was more than five.

Q.   Okay.  You also mentioned Mr. Draghiceanu was involved with some of the operations discussions about, I guess, how the facility might best be operated; is that what you mean?

A.   That and what amenities to put into the facility. So he -- and they brought someone else.  I -- there was another guy who was like their food expert.  I forget the guy's name.  I think Chris mentioned his name in the --

Q.   Gus.

A.   Gus.  Gus.

Q.   And I don't -- yeah, his -- I think he had a long last name.

A.   Yeah.  So there was another guy.  Okay.  So -- sorry.  For example, George and Jedlowski were both involved in -- when we were talking about planning for things like a salon and a spa, Jedlowski in particular, I recall, a specific call and conversation that we had about how he was engaged with, and I didn't really exactly understand the relationship with the business, but in developing a

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 237

business where folks who needed home healthcare could contract through this business for home healthcare without the facility needing to qualify as a licensed facility.  And we talked about that as potentially being a new revenue source.  George and Jedlowski consulted also on, as I said, the salon. They had talked about how Distinctive was developing its own sort of relationships where they could provide the salon services and that we might be able to contract through Distinctive for them.  So there were -- it was all really intermingled one into the other.

Q.   And in regards to the discussions with George and Gus and Angela, is it your contention that any of the advice they gave you regarding that was somehow wrong or misled you?

A.   With George specifically?

Q.   With George, Gus, and Angela in regards to the operations questions that they discussed with you.

A.   I mean, George -- my contact with Gus was very limited.  It related to a very discrete issue about how to handle like service of food or liquor and stuff like that in a couple of food service venues. So I would definitely -- I would say that my contact with Gus was quite minimal.  It might have been, you

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 238

know, two or three emails. So I would -- I don't really have a comment on that. Likely my answer is no. And certainly anything he could have said, even if it was misleading, would not have been material. So we can excuse Gus.

Angela, I don't recall. Angela, I don't recall. And I would say that George -- I now understand that George is a principal of Distinctive. I'm not sure I understood that at the time. And so I don't know what George was telling me and what conversations he was having with Jedlowski and Hoard and others at Distinctive, whether it was accurate or not accurate.

But as to a specific statement that George himself may have made, as I'm sitting here today, I'd have to think about whether I can pinpoint an exactly inaccurate statement. However, I will say that to the extent that George may have had input in preparing pro formas for the project, which I believe had material misstatements of fact in them, then George would have made a material misstatement of fact.

Q. Okay. You indicated that -- just now and previously -- that you believe there were misstatements made in the pro formas. What other than the pro formas,

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 239

what misrepresentations do you contend that Chris Hoard or Jedlowski made to you?

A.   Many.  I mean, the -- their -- the whole predicate upon which I hired them was based on misrepresentations.  They misrepresented to me their capabilities in the field of development.  They misrepresented specifically their capabilities in building projects like the one that was contemplated, which they've never built before. They misrepresented their capabilities in being able to program those types of facilities effectively. So those were all material misrepresentations at the very outset of the project that induced me to engage them.  They misrepresented to me the nature of their relationship with BKV because they took kickbacks from BKV.  So that was a material misrepresentation. They misrepresent -- they -- excuse me -- they misrepresented their expertise across a whole panoply of this project, you know, in addition to which, I think, a lot of the big misrepresentations were made inside of the pro formas and the financial analysis.

     I think that Chris and Mr. Herchenroether put false information inside of those -- inside of those pro formas that -- to make them "work".  Every time

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 240 of 303

02/11/2026                BKV Group DC vs Treeline Acquisition, et al.                Michael Schor

Page 240

that an issue would arise because of BKV's negligent work or because of a condition that BKV overlooked or when Douglas was coming in and saying the costs were over, all of a sudden, magically, Chris figured out a way to make it work. And the way he was making it work was he was changing the assumptions inside the pro formas. I think Distinctive also misrepresented to me their ability to quarterback this 100 percent. They misrepresented specifically that they could help me obtain financing for the project. I mean there were a host of misrepresentations.

Q. And in regards to the pro formas and looking at different options, wasn't that their -- Distinctive's role to try to help come up with solutions to the issues that the project was having?

A. Based on truth, not lies. In other words, what truth --

Q. And by lies, are you pointing to the pro formas?

A. Well, yes, the pro formas or based upon hiding facts from me before it was too late and I was really deeply invested in the property.

Q. What --

A. In other words, Chris -- I'll give you a perfect example. I believe that Chris Hoard's email that

indicated to me that the soils report was a great report, right, was a material misrepresentation of fact by Chris Hoard.  Okay?  Chris purported to be an expert.  He purported to be an expert in construction.  That's why I hired him.  He knew how to build buildings.  That's what he told me.  He got a soils report that indicated significant issues with the soil conditions on the property.  He was the expert.  I was the layman.  Okay?

He took that report.  He read it.  I didn't read it.  And he came back to me and said, great report.  That's a material misrepresentation of fact that he made to induce me to continue in the deal. And it's obvious why now.  Because he was getting kickbacks.  He was getting money from BKV.

Q.   And you think calling a soils report a great report was somehow deceptive?

A.   Yes.

Q.   Were discussions had regarding the Terracon report after it came out?

A.   Which one?  The --

Q.   The first one.

A.   -- first one?

Q.   The -- uh-huh.

Q.   Yes.  Absolutely, they were.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 242

Q.   You indicated -- switching gears to when Douglas got brought on.  You indicated that the numbers from Douglas indicated that it was over budget for, I guess, what Treeline had anticipated.  And I just want to clarify.  I think --

A.   No, no, no.  It was over budget based on the budget that Distinctive, Chris, Jedlowski, Banta, and -- and BKV prepared.

Q.   And that Treeline --

A.   Not what Treeline expected.  They prepared the budget.

Q.   Was that what Treeline was going off of?

A.   Yeah.  It was the budget I relied upon.  It wasn't what I expected.  I relied on their representation of that budget.

Q.   Okay.  And my question is, is that in regards to Douglas' preliminary budget estimate that you thought the project was over budget or was that in regards to the kind of second budget Douglas put together after they had gotten some initial quotes from contractors based on the design set of documents?

A.   The initial project budget that was prepared by Distinctive, by Hoard, by Jedlowski, by the Distinctive team, and by the BKV team, including

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 243

Banta, was a $28 million hard cost of construction. Okay? Every single estimate that Douglas ever gave was materially higher than that $28 million. Whether it was the first one, the second one, or if there were more than that, they were all materially higher. They never got close to that $28 million budget number no matter what they did.

Q. Okay. And so my question is, if you thought it was particularly over budget with his initial numbers, what -- why did Treeline decide to keep moving with the project at that time?

A. Because Chris and Distinctive and BKV and Banta assured us that we would be able to, as they use the word, value engineer the project to get much closer to our budget material and -- to our initial budget number. And because Chris Hoard and Mr. Herchenroether and Mr. Jedlowski and the Distinctive team kept changing the pro forma to make it look like the deal worked even at higher numbers. So again, we'll have an expert who will testify as to what the changes that they made were, but they were increasing the rents, they were adding in things called like a market adjustment, they were doing all kinds of things. And again, those pro formas were completely under their dominion and control.

02/11/2026                    BKV Group DC vs Treeline Acquisition, et al.                    Michael Schor

Page 244

They -- the pro forma is 15 or 20 sheets on an Excel thing with hundreds of cells.  I never once even attempted to modify those things.  It was a proprietary model that they created and they manipulated it.

Q.   And the pro formas were sent to you; is that correct?

A.   Some of them were.  Some of them were -- some of them weren't  And in Mr. Hoard's deposition, I think, Mr. Stoddard had Mr. Hoard open a file that had literally probably 30 or 40 versions of a pro forma.  I did not see anywhere near 30 to 40 versions of pro formas, but I saw, you know, four or five or six different versions of pro formas.

Q.   And were there conversations between Distinctive and Treeline that -- about what the rent prices might need to be for the project?

A.   When?

Q.   Throughout the --

A.   Ever?

Q.   Throughout the project, not just --

A.   Sure.  We --

(Cross communication)

Q.   -- but throughout.

A.   Yeah.  I mean, Chris was the one who came up with

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 245

the market rents. He was the one -- Chris and Distinctive, they, again, I think Mr. Hoard testified to this, but that they have some proprietary database or something like that where they were able to pull market comps and information from. And then they also utilized another company that does market research. And they were the ones who developed what the market rents were going to be and they were the ones who kept changing them.

Q. And my question is to you, did they have discussions with you about the market rents?

A. Only to tell me what they were thinking about them in some cases, not in every case. I didn't -- when they sent the pro forma, I didn't look at every single line of the pro forma. In other words, so -- periodically once in a while, sure, I talked to them about what they were thinking about the market rents.

The overarching conversation we always had about the market rents was that the rents in this building were going to be materially more than a regular old apartment building, that this was -- that -- let's say a regular old apartment building within Flowers Plantation, you could rent a one-bedroom apartment for, I don't know, $1,500, $1,800

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 246

a month. And we were looking to get rents in the high $2,000s to $3,000 a month. And that was predicated upon having a highly amenitized building that would cater to basically a sophisticated 55 and over crowd that were looking for more than just a roof over their heads. They were looking for a lifestyle, for activities, for programming, for a really fancy pool area and a bar and a place to hang out and a place to live as opposed to just come home to at night after, you know, our 12-hour day together.

Q. And you had information before you engaged with Distinctive that that was a potential -- profitable area to go into?

A. Did I have -- I'm sorry? Are you asking me a question or are you telling me that I had --

Q. No, I'm asking you a question. You -- had you learned that -- I think you indicated you had had a conversation and I can't find it in my notes -- but with -- is it JP Morgan? Drawing a blank. But you had had a conversation with someone that perhaps this was a profitable development field to go into, this --

A. Field, yes.

Q. -- senior housing.

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 247

A. Okay. Yeah. Sure. I'm -- happily recount that. What initially sparked our interest -- and this was not particular to Flowers. I was unaware of the site. This had nothing to do with the site. What I -- the conversation that I had with someone from JP Morgan was that senior living was an area that JP Morgan was looking to invest in. Right? Because they thought it was a potential growth business, obviously, with baby boomers aging and various other things and that for the right sort of project, right, that they would potentially consider being an investor. Now, obviously, that had to meet certain financial parameters. And I mentioned to them that we were active in the Carolinas on the industrial side. And they said, well, the Carolinas would be a market that we would be interested in as well for active adult.

So I didn't have any particular information about active adult versus IL versus anything else. I just had a general conversation with someone at JP Morgan that sparked my interest. And then I said to my father and to Daniel, hey guys, what do you think about this? Why don't we see if we can get involved? And that's what led Daniel to start to search for someone to consult with because the first

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 248

thing that one -- I think, a prudent person would do in embarking on a new avenue of business was to get a consultant.  And Daniel found Distinctive.

Q.   Okay.  And that's what I was referring to.  So thank you for helping me make sense of this --

A.   Sure.

Q.   -- early in the day.  The -- was JP Morgan actually presented this project?  Were they interested in it?

A.   I don't know if they were ultimately presented the project.  They may have been.  I don't know.

Q.   Okay.

A.   I -- as I had mentioned earlier with -- when Mr. Katzenbach showed me the agreement with Ziegler that they were the exclusive.  So I wouldn't have approached anyone around Ziegler.  It's possible that they showed it to JP Morgan.  I don't know.

Q.   Okay.  In regards to the financing of the project, I just want to confirm and understand your testimony from earlier.  Originally, did Treeline intend to front itself and with maybe -- I think you said some potential investors -- but front all the cost prior to actually breaking ground?

A.   As I said in my earlier testimony, we always intended to front what I refer to as pursuit costs.  Okay?  So we put up the contract deposit to put the

property under contract.  We were fully prepared to fund the baseline due diligence costs, getting a phase one report, those sorts of things.  Right?  And on this project, I even went an extra mile, which is I allowed, right, concept and design development to proceed and pay out of pocket more than I normally would because I really wanted to establish this line of business.  But there came a point in time where because of all of the things that were cropping up on the deal and that were the subject of many hours of testimony earlier today, right, I got to a point where I was uncomfortable advancing more and more money into the deal.  The opportunity cost and the actual cost of me continuing to fund the deal, right, without an end in sight, without an investor in sight started to become untenable for me.

Q.   Okay.

A.   And so --

Q.   Go ahead.

A.   And so at that point in time, I said, I really would like to get pre-construction financing or some other modality to fund some of those expenses other than my own checkbook because, just so you all understand, you know, I -- the any money that was

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 250

coming out was being funded by our company, and we have other obligations and other deals and other things like that. And at some point, we have to be mindful of our capital. So you know, I wanted to be able to try to get pre-construction financing.

Q. But originally, you had not planned on getting pre-construction financing; is that correct?

A. Originally, meaning when we embarked on the project at first?

Q. Yes.

A. I was hopeful that we wouldn't need to because it does add an extra layer of cost. I was hopeful that the way the deal would progress would be that Ziegler would have done their jobs appropriately. In fact, when we signed that term sheet with ACI, which turned out to be a fugazi and they ghosted us, we were on the way to doing that.

If ACI had come through, we were potentially on the way to having the financing, but it turned out that they weren't real and they actually stole 25 grand from us. But be that as it may, I had hoped that, again, by advancing the, what I call pursuit costs, the initial cost and greasing the wheels with some money to keep the project going, that Ziegler would show up with a group that was ready to give us

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 251

a commitment letter for construction financing and equity. And then we would have closed the construction loan and built the project. But because of all the problems due to BKV's negligence and Distinctive's bad advice that they gave us over and again, the project timeline kept pushing out. BKV kept sending me bill after bill after bill after bill. Right? Drawing drawings that had no value.

And at that point in time, I just said, hey, wait a minute. I -- I -- I -- not going to put $2 million or a million and a half dollars of my money into this project when there was so much up in the air and I wanted to get some pre-construction financing.

Q. Was ACI intended to be pre-construction financing or construction financing or like a combination of both?

A. They were not going to be strictly a pre-financing lender. No. They were going to -- my recollection is, is that they were going to be a debt and equity provider. They were going to provide like 80 percent or so of the capital for the entire deal. It may have been as much as 85 percent. Probably in the discovery there's some term sheet floating around from them, but it was not purely a pre-

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 252

construction loan. No. It was --

Q. Okay.

A. -- a loan.

Q. Okay. And then the same thing for U.S. Capital. Was it going to -- was the terms that you discussed with U.S. Capital, was that concerning both pre-construction and construction or just pre-construction?

A. U.S. Capital, as I recall, did have a feature where there was a limited amount you could draw pre-construction, but their terms were beyond onerous. I mean, with the points and the interest, you were looking at paying somewhere between 18 percent and 20 percent interest. That's like -- you know, that's hard money lending. It's -- the project -- even though Chris sent an email saying that he manipulated the numbers to make it work and we could buy down a rate, which -- whatever, 20 percent interest on $50 million, I mean, you could do the math. You know, every year it's ten million in interest. That's just not a sustainable level of interest.

Q. So ultimately Treeline was not presented with any financing options that it found acceptable?

A. No, because we were not able to get the project to a

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 253

point -- so in order to close a construction financing, not pre-construction financing.  Pre-construction financing is usually a few million dollars to close the land and pay fees that you need to get to the point of being able to break ground on the project.  Okay?  But to be able to close a construction loan of this size, the bank needs to have in front of it -- and the potential LP equity partner needs to have in front of it a fully baked set of drawings filed, a permit in hand, right, and a, sorry, and a budget for a -- what is referred to as a G-MAX contract or similar which is that it's a contract under which the general contractor guarantees to deliver the project at a stated price.  Okay?  You need to have all of that in place in order to close the construction loan.

     Now, the lender will give you a commitment letter, right, saying we commit to lend but you have to satisfy these conditions.  If I had had a commitment letter in my hand, right, that's -- then you satisfied the conditions.  But we were never able to get the project to a point of being able to satisfy those conditions because of BKV's negligence, because of Distinctive's bad advice, and because the project kept having to be reconfigured.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 254

That's what I was referring to, by the way, when Mr. Katzenbach pointed out that email. It said the timeline was being extended.

That's exactly what was happening is BKV kept making pictures and pictures and pictures. Months and months were going by and all that was happening was bills were pouring into me and nothing was getting closer to being a useful set of drawings that one could go and say, I'm ready to break ground on this project.

Q. At some point, because of the lack of payment from Treeline, BKV put down their pencils. And so they were not working on finishing a construction set of drawings, right?

A. Thank goodness. That would have just been more useless paper and killing trees. Their drawings were completely and utterly useless.

Q. The -- but they didn't get to the point of presenting them to the county because they weren't able to go further because of the lack of payment.

A. No, they didn't go -- I didn't -- I decided to stop paying them because the drawings that they were making, it was becoming apparent to me, that there were so many deficiencies in the drawings that absent making material and significant changes,

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 255

right, you could present anything you want to the county but it didn't have economic feasibility to build. When Douglas came onto the -- onto the scene, they were saying you can't build this building within this budget because they put the building down in an area where it was extremely costly to build that neither BKV nor Distinctive advised me of. In fact, Distinctive advised me that the soils report was great. Okay?

Neither -- BKV didn't do a proper code analysis. They didn't design proper fire egress. So all of these details about the project -- and their material details -- I don't want to give -- they're not details -- they're -- major issues about the project were unresolved. They were up in the air. And we had to -- and I was engaging with Douglas to try to find solutions to bring the property in closer to budget. As I had mentioned earlier, this wasn't an issue of there being a million-dollar cost overrun on a $28-million project. We would have been able to handle that. Right? But we're talking about cost overruns of a gigantic magnitude that were not appropriately accounted for by my quarterback and by my architect. That's the overarching issue.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 256

So everyone here is making an issue of, well, Treeline didn't get financing. That's because my professionals performed negligently and they committed fraud. And as a result of them being negligent and committing fraud and not -- and hiding from me material facts about the conditions of the property or minimizing their severity, right, they made it impossible for me to obtain financing.

Q. In regards to Douglas' work in the summer of 2024, I think they just did some conceptual drawings and provided some -- just conceptual level information to you in regards to moving to independent living and then also the cottages?

A. Yes. By that time, by the summer of 2024, I was talking to Douglas and as I had mentioned earlier, I was likely going to be firing BKV. And whether I would continue with Mr. Hoard and with Distinctive was up in the air. As I had mentioned earlier, there's another gentleman that Ms. Flowers introduced us to named David Ammons who -- there was a distinct possibility that we were going to fire Distinctive as well and get a new professional team and try to reconstitute the project, but that's when we spoke to Douglas.

Q. And in regards to Douglas, they are not designers

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 257 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 257

and architects; is that your understanding?

A.   Douglas themselves?  So --

Q.   Yes.

A.   -- one of the ways that general contractors often will operate is based upon a design build contract. So essentially, what they do is they give you a price and they bring all of the professionals underneath their contract.  So would Douglas themselves draw the building?  I don't believe so. But I will tell you that I have a lot more faith in -- in Ron Siebenaler's cost estimating than I do anybody at BKV or Distinctive.  So what I would say to you is Douglas actually mentioned to us a couple of architects -- I don't remember the name offhand -- that they would -- and they in fact showed me pictures of some projects that they had under construction and renderings with different -- with other architects that they would propose to replace BKV.

Q.   And that was part of my follow-up question.  Did you actually get into discussions with any other architect or any -- enter into a contract with Douglas for a design build?

A.   No, because by that -- by the time we were talking to Douglas, Mrs. Flowers was royally PO'ed over the

02/11/2026  BKV Group DC vs Treeline Acquisition, et al.  Michael Schor

Page 258

whole fiasco with their mechanics lien. And it was starting to become apparent to me that things were unraveling on that end. And clearly, any project that we were talking about with Douglas was either going to be predicated on a smaller building with IL or the -- as you would recall -- you had mentioned, building some cottages across the street or whatever. And it was becoming fairly apparent to me that that was going to be a real big challenge.

Q. Ms. Flowers, did she give any kind of counter to your proposal to purchase the other lot -- any other lots on Flowers?

A. Well, at one point, she verbally indicated that she would sell us that corner lot. Okay? I think we had had some further negotiation. I think in that email that Mr. Katzenbach showed me earlier, we had proposed a million one purchase price. I think she wanted a little more money. But we had had some back and forth in that she had initially indicated some willingness to do that. But by the end of August of 2024, again, I -- this was shown to Mr. Hoard, I believe, at his deposition, Ms. Flowers -- there was an email from Mr. Koonce, where he essentially said she changed her mind. She's not selling you the corner lot. And the reason is

Case 5:25-cv-00028-BO-BM  Document 102-6  Filed 03/20/26  Page 259 of 303

02/11/2026            BKV Group DC vs Treeline Acquisition, et al.            Michael Schor

Page 259

because she doesn't have -- she's royally PO'ed over the mechanics lien and she doesn't have faith in the project any longer.

Q. Okay. And did Mr. Koonce tell you that he -- yeah, was told not to engage in further discussions about the potential to purchase those properties?

A. Well, his email spoke for itself. But notwithstanding as -- again, Mr. Katzenbach showed me earlier on, even two weeks subsequent to that, I was communicating with Ziegler about potentially getting reconstruction financing together because I figured that maybe if I quickly went back to Ms. Flowers and said to her, okay, I can close in two weeks or something like, that that she might reconsider. But as I testified earlier, Ziegler -- that was all just hot air. Ziegler didn't come up with anything.

Q. Okay. So Ziegler never -- in that fall of 2024 timeframe, they never sent you a concrete --

A. No, no, not --

Q. -- just proposal for --

A. -- that I can recall it. And shortly after that occurred in say mid-September of 2024, that's when we concluded that we didn't see any real way forward with the project. And then when I found out,

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 260

obviously, about the kickback, that was really for me personally the straw that broke the camel's back. And we decided, quite candidly, I think everybody should be thanking us, to try to mitigate the damages. So I went to Ms. Flowers and negotiated to terminate the contract and get back at least our contract deposit.

Q. Okay. So that was something Treeline initiated. That was not initiated by Flowers to terminate the contract?

A. Again, what I said earlier and I'll reiterate again is this. The contract had been outstanding since May of 2023. Although it did not have a time-is-of-the-essence closing, all right, it -- there is -- you know, you can't just delay the contract forever and ever. At some point, it becomes -- you know, it's just not good faith. And since I didn't see a way forward in a relatively short period of time and I had already held the contract open from May of 2023 into September and October of 2024, which is quite a long time. I've never been involved in a contract that's been pending to buy a piece of real property for that long. I figured that we had to terminate the contract, that we were put in a position where we were forced to terminate the

02/11/2026                BKV Group DC vs Treeline Acquisition, et al.            Michael Schor

Page 261

contract.

Q.   Even after the lien was filed, was Ms. Flowers still trying to get you guys to actually close on the property and to set a closing date?

A.   She was.

Q.   And was that for that fall time period that she was trying to push a closing date -- to place?

A.   I'm sorry.  I didn't mean to interrupt you.  I apologize.  There was a lot of back and forth.  I don't remember the exact days, but Ms. Flowers definitely wanted us to close.  And in fact, when she -- when we had the back-and-forth discussions about potentially acquiring the corner lot, obviously, that contemplated closing on both lots simultaneously.  And if you look at that email that Mr. Katzenbach showed, it sort of outlined a timeframe that there would be a closing within some defined period.  And I think that that was sometime before the end of 2024, as I recall it, but the email speaks for itself.

Q.   Yeah.  And I know what you're talking about in that email.  In regards to the lien, if Treeline had gone ahead and closed on the property, that could have solved the issue with Flowers being upset with the fact that the lien was filed on their property?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 262

A.   Sure.  If I closed on the property, I would have owned the property subject to the lien.  There was no way I was doing that.

Q.   But you could have?  Or did you need financing to --

A.   Hold on one second.

Q.   -- to be able to do that?

A.   Sorry.  Just give me a second.  I apologize.  Could you repeat the question?

Q.   Yes.  Sure.

A.   Something was just on the screen strangely and --

Q.   Yeah.  I was going to offer to do that.

A.   -- yeah, could you repeat the question?

Q.   Could Treeline have closed on the property or would you have needed the financing to be able to close on the property?

A.   If all the conditions to closing had been met, if I had the corner lot, if all of the things had fallen into place, right, I would have been able, I believe, to go to individual investors and raise the capital necessary to close.  But the project remained up in the air.  And again, I wasn't closing subject to the lien.  It all had to be resolved all at once.

(Glenn Schor joins deposition proceeding)

MR. STODDARD:  Glenn, can you make sure

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 263 of 303

02/11/2026            BKV Group DC vs Treeline Acquisition, et al.            Michael Schor

Page 263

you put yourself on mute there, please?

THE WITNESS: Okay. Can we take -- can we go off the record, please?

MS. SIVON: It's a good time to go off the record anyway if we want to take a ten-minute break.

(A short break was taken at 5:57 p.m.)

(The proceedings resumed at 6:07 p.m.)

Q. (Ms. Sivon) All right. Mr. Schor, we're back after our break, and I do have some additional questions for you. First, I wanted to mark an exhibit to share with you of what I referred to a long time ago when I was trying to find something. So I'm going to mark this as Exhibit 68.

(EXHIBIT NUMBER 68 WAS MARKED FOR IDENTIFICATION.)

Q. And I'm going to share my screen because I didn't find it in the documents that had previously been shared. All right. Are you able to see that document?

A. Yes.

Q. All right. Do you need me to enlarge it or can you read it?

A. I can read it.

Q. Okay. This is an email from Glenn Schor dated May 29th, 2024 to Ms. Flowers with a bunch of other

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 264

people CC'ed.  It's DLD030190?

A.   Uh-huh.

Q.   And do you recall this email?

A.   I've got to read it.

Q.   Sure.

A.   Obviously, it's not an email I wrote, so.

Q.   Right.  And just tell me -- I enlarged it just a little bit and I'll scroll it down a little bit.

A.   Yeah.  I want you to stop there and I'll tell you when I get to the bottom and then you can scroll it up.

Q.   Sounds good.

A.   (Witness reviews document.) Okay.  Go ahead.  You could scroll.

Q.   Yeah.

A.   (Witness reviews document.) Can you scroll down to see if I could see Flowers' email below this or is this just this email?

Q.   It's just this email.

A.   Okay.  I don't know what Flowers' email said, but I read this email.  Yeah.

Q.   Okay.  All right.  And so my question is -- was in regards to -- did it seem like Ms. -- I think what I had asked you earlier was did it seem like Ms. Flowers wanted to change the concept or enlarge the

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 265

concept of what Treeline was going to develop on the property?

A. Are you asking me about this email or about the discussions we had with Ms. Flowers?

Q. Both.

A. Okay.

Q. At any point in time. But this was the email I was referring to where -- earlier in regards to talking about Ms. Flowers having a -- seemingly having a change in what she wanted done on the property.

A. Okay. So I'll say this in the best way that I possibly can. But as I said to you, Ms. Flowers had very big ideas about the overall project -- the overall Flowers Plantation project development. Okay? And this email is from May -- late May, practically June of 2024. Okay? By this time, that May 2nd, 2024 document that was produced by BKV showing, you know, shifting the building over onto this second site had already been created. And we had a number of conversations with Ms. Flowers about potential restructurings of the project.

During the course of those conversations, Ms. Flowers said, you know, I really would like to see a continuum of care. As I had mentioned to you, that she had these very big plans about -- you know,

she wanted an active adult, then she wanted like an IL, and that she even wanted potentially a licensed facility, that's the reference my father makes in here that the property next to Buffalo Road that was another adjacent public roadway. And you can see he gives -- even makes reference to a certificate of need for a memory care unit. So we had general conversations with Ms. Flowers and she also told us to talk to this guy, David Ammons, who I'd mentioned to you and we did in fact speak to him. We had quite a bit of back and forth with her. And there were obviously some emails exchanged by my father and Ms. Flowers that confused my dad. But what our intention was in the various discussions we had at this meeting with Ms. Flowers was number one, to get the project on the existing parcel built and potentially, in order to most effectively do that, to acquire the corner parcel, the additional 2.2 acres that I had mentioned.

During the course of that conversation, which started at an in-person meeting which my father was at with Ms. Flowers and I think Ms. Flowers' son was there and various other people, Ms. Flowers kept hammering on this, what about a continuum concept and this and that and the other thing. And what we

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 267

said to her, as my dad points out in this email, is look, we've put a ton of time into the existing site. Let's focus on getting the existing site, and in parallel with that, we can talk to you about these other sites, right, about doing a continuum of care. But let's get focused on doing the building that we have already, you know, spent, as my dad said, ten months plus working on.

So she did -- she did want a continuum of care, but she wasn't saying don't build the project that you want to build on the site that you want to build. But she was kind of tying it all together in one bow.

Q. Okay. So she was not -- you didn't -- not get the sense she was indicating that she wanted you to change what your initial project was, just that she wanted to expand upon it to also have additional buildings and services?

A. In large measure. But there's also some discussion in here about a plan that Mike Stocks prepared. Mike Stocks is her engineer and he purportedly prepared a plan that he thought the fire marshal would approve that was different than the plan that was prepared by BKV. And obviously, you could see by this email that while she kept referencing it and

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 268

saying take over Stocks' plan, close on the -- on the property and blah, blah, blah, blah, blah, she at least as of the time of this email did not share Stocks' plan with us. I think maybe David Banta had some conversation with Stocks, but we -- we never -- at least as of the date my father wrote this email, we hadn't seen it. And --

Q. You think you did get that plan later?

A. I do recall seeing something that Mike Stocks drew. I do.

Q. Were you interested in building that?

A. No. It was actually quite a poor plan.

Q. Did you say poor? I just didn't --

A. Poor. Yeah.

Q. Okay.

A. As I recall it, it involved shifting the building into -- back into -- moving it onto this big grade, you know, that was going to create a whole other host of problems. So we weren't really interested in it. No.

Q. Okay. All right. Thank you. I'm going to mark a second exhibit here, which is DLD20056, which is an email from you to Chris Hoard dated March 20th, 2024. Do you see that? Am I sharing it?

A. Yeah. Let me just --

02/11/2026 BKV Group DC vs Treeline Acquisition, et al. Michael Schor

Page 269

Q. Yeah. Let me increase it just a little bit for you.

And so this will be Exhibit 69.

Aa (Witness reviews document.)

MR. KATZENBACH: If it matters that this was marked as Exhibit 33 by me in a previous deposition, if it helps at all.

MS. SIVON: Yes. And maybe that's where -- okay. Let's not mark this Exhibit 69 so we don't repeat if -- I assume that is better for everyone. So it's Exhibit 33, Dan?

MR. KATZENBACH: Correct. It's Exhibit 33. So Michael could pull it up from the link that I sent him with previous exhibits.

MR. KATZENBACH: Do you want to do that or do you just want to see my screen, Michael?

THE WITNESS: As long as it's the same document, it's fine. I read it already.

MS. SIVON: I'm taking Dan's word for it.

THE WITNESS: Yeah. So will I.

MR. STODDARD: I'm looking at both right now and it's the same.

MS. SIVON: All right. Thank you. Thank you for confirming.

THE WITNESS: Well, I'll definitely take Jeff's word for it. The rest of you, I'm not

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 270

sure.

Q.   I'm not representing it either, because I didn't --
I didn't pull up that document.  All right.  So did
you read the whole thing?

A.   Yes, I did.

Q.   That whole top chain?  If you want to see the lower
part of the chain, I can --

A.   You might as well.  That would --

Q.   Okay.

A.   That would be helpful if you want me to have some
context.

Q.   Let me go to the very bottom.

A.   You know what?  If you don't mind, since this is
Exhibit 33, I could just open it up on my screen.

Q.   Absolutely.  Let me see.

A.   And then I'll be able to scroll it at my --

Q.   Yes.  That is even --

A.   -- own pace.

            MR. KATZENBACH:  So in all disclosure, I'm
looking at Exhibit 33.  And what I marked as
Exhibit 33 is just that first email you had.
It doesn't have the rest of the chain on it.

            MS. SIVON:  Okay.

            MR. KATZENBACH:  I think the rest of the
chain is another exhibit that I marked, but

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 271

just --

THE WITNESS:  All right.  So you know what?  Let's -- why don't you then -- let -- let's just go with the one that you have on the screen.

MS. SIVON:  Okay.  That's fine.  And so we'll mark this Exhibit 69 just to make the record clear.  Okay.  Thanks anyway, Dan.

(EXHIBIT NUMBER 69 WAS MARKED FOR IDENTIFICATION.)

Q.  Okay.  So again, this is --

A.  I don't need to see Chris -- yeah.  Okay.  Good.

Q.  Okay. Does --

A.  Whoa.  I want to read from the bottom of the chain up.

Q.  Yes.

A.  Go back down, please.

Q.  Yes, sir.

A.  Yeah.  Stop there.

Q.  Okay.  Okay.

A.  Good.  (Witness reviews document.)

MS. SIVON:  Jeff, did you say something beforehand --

MR. STODDARD:  No.

MS. SIVON:  -- about the exhibits?  Okay.

A.  Okay.  Scroll up, please.  Okay.  Stop here.  Okay.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 272

Keep going.  Go up.  Now you can go -- scroll up.

Q.  Okay.

A.  Okay.  Hold on.  Okay.  Scroll up one more time.

Okay.  Now I got everything.  Go ahead.

Q.  Okay.  All right.  And so this email is talking about -- seems to me, correct me if I'm wrong -- is that you really needed Ziegler to come forward with some financing in order to move the project along?

A.  Are you asking me what my intention was in writing this email?

Q.  Yes.

A.  Okay.  Sure.  I'll explain it to you.  At this point in time, Ziegler presented a group called -- I think it was called U.S. Capital that proposed to give some pre-construction financing.  Okay?  But much like this group ACI that ghosted us with -- for 25,000, now US Capital wanted us to put up $75,000 in potential due -- in potential, what do you call it, it's like a deposit for their due diligence on the project.  And what I was expressing here is to say that I'm -- I was into this thing for well over a million dollars, that I wasn't going to fund pursuit costs into a bottomless pit, that I was really shaken by someone walking with 25,000 of my money, and I didn't want to put another 75,000 into

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 273

U.S. Capital.  Right?  When U.S. Capital was a debt provider.  Right?  And Ziegler hadn't even spoken to the equity and I didn't have, quite candidly, confidence in the bona fides of U.S. Capital either.

And so what I said to Chris was hold set and that Glenn and I were trying to talk to Flowers about the adjacent two-acre parcel and to see if we can buy it in a way that makes sense to the project. And hopefully by doing that and incorporating some additional land, we might be able to alleviate some of the ridiculous cost overruns that was in -- that were engineered into the design.

Q.   So where -- you indicate here there's changes.  This is what you just referred to, I think.  But you have in the fourth paragraph a sentence that says there are some changes developing in the deal anyway where Flowers has an adjacent two-acre parcel that they want to sell to us if it makes sense to the project?

A.   Right.  That's the corner parcel.  So by March of 2024, I was already having conversations through the brokers with Flowers about potentially adding that two-acre parcel onto the 7.4 acres.  And if we could buy it in a way that made sense to the project, I was speculating that it might alleviate some of the ridiculous cost overruns.

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 274

Q.   So is -- and I think you said earlier that the hope was that if you built on this additional parcel, some of the more expensive ways that potentially the building might have to be built on the initial parcel -- might -- can be alleviated because it would be able to be built with cheaper engineering or other kind of --

A.   Right.  Again, we didn't --

Q.   -- cost that that would go into the other parcel?

A.   That was our hope.  Again, we hadn't done any geotechnical testing on the two-acre parcel.  We would have had to do all that.  But our hope was that by acquiring additional land and making the parcel bigger, right, we'd be able to alleviate some of the issues by being able to move the building and redesign the building to fit on a larger parcel.  That was our hope.

Q.   Okay.  And so if you had had negotiations further with Ms. Flowers, then it would have had due diligence where you would have done soil analysis and other things?

A.   We would have had to have due diligence to do soil analysis.  Yes.

Q.   And I think you said initially the two-acre parcel was not an item that you understood was a potential

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 275

parcel for you guys to purchase from Flowers?

A.   Correct.  Initially, you know, back when we first saw the deal in 2023, that's correct.  It was not offered to us as part of the deal.  It was the 7.4- acre parcel for sale.

MS. SIVON:  Okay.  All right.  Thank you.  Can we go off the record real quick?

THE WITNESS:  Sure.

(A short break was taken at 6:20 p.m.)

(The proceedings resumed at 6:21 p.m.)

Q.   (Ms. Sivon) Okay.  Mr. Schor, in regards to the contract entered in with Distinctive Living Development, there was a provision -- although I can show it if you need to -- a provision regarding that there would be a fee owed if the project didn't go forward.  Do you recall that?

A.   In the agreement with Distinctive, there was a provision that a fee might be earned if certain conditions were met, but the conditions weren't met.

Q.   Okay.  And that's just -- was going to be my question.  Is it your contention that those -- your contention that those conditions were not met?

A.   Yes.  And also I contend that that agreement was induced by fraud.  I contend that that agreement was induced not -- I'm sorry, that that agreement's

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 276

validity is in question based upon the fact that Mr. Hoard and Mr. Jedlowski and Distinctive breached their fiduciary duty to me. So I don't think they're entitled to anything. I don't think the conditions to earn it were satisfied, and I don't think they're entitled to any fees under that agreement for other reasons as well.

Q. Okay. And so first, in regards to you think the contract was made by fraudulent inducement, why is that?

A. Because Jedlowski, Hoard, Distinctive, and all of them misrepresented their capabilities and abilities to be my quarterback and to carry out the duties that were stated in that agreement. They didn't -- they professed abilities that they didn't have. They professed expertise that they didn't have. They advised me that they had built buildings like this one before, which they did not. So it was induced by fraud. It was -- they gave us fraudulent representations.

Q. And in regards to -- you also indicated that you think it's void due to breach of fiduciary duties or something?

A. Well, I think they breached their fiduciary duties to me, which they're very clear in there that

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 277

they're my partner and they're my quarterback and they owe me a fiduciary duty of loyalty and of representing my best interests above others and they accepted and arranged to receive kickback payments from BKV without disclosing them to me. And to me, that's just -- it's utter bad faith. It's unheard-of conduct.

Q. And in regards to what you contend is a kickback, what is the contention that that payment itself was a breach of duties owed to Treeline?

A. Based on North Carolina law. I mean, you can -- you know, we'll let the judge and jury decide that, but that's what my counsel advised me what North Carolina law is.

Q. Right. And again, I don't want to know anything about your --

A. I'm not going to tell you what I discuss with my -- understood. I'm not going to discuss what -- what my -- what my counsel told me. But taking a hidden, a secret kickback payment from a vendor when you brought that vendor to the table knowing full well you were going to get a kickback payment when you recommended them to me, when you were supposed to be representing my interests, you had alternative interests behind my back. That's completely

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 278

inappropriate. It's a breach of a fiduciary duty.
It's a payoff.

Q. And what about getting a payment from another vendor
necessarily means that the company would not be
working for the best interest of the project or for
Treeline?

A. Well, I'll ask you, why can't lawyers pay doctors
fees to refer cases? Is it compromised --

Q. I'm not the one deposed in this examination.

A. Okay. But the reason is the same, because it
compromises their judgment. They have an interest
in finishing the project that's contrary to
potentially to my best interest. And Chris Hoard
and Jedlowski and Distinctive had an interest in
receiving a $140,000 payment here if the project was
completed. And that was their -- actually, I'm not
even sure what the conditions of the payment were.
I just know that they were supposed to be -- that
they had an arrangement to receive it. Okay? But
the bottom line is -- is it created an inevitable
and a very clear conflict of interest between Hoard
representing my interests and his own interests in
receiving the payment.
    That's -- I mean, it's -- with all due respect,
Ms. Sivon, it's just like such a ridiculous

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 279

question, it almost doesn't bear answering that having a payoff behind someone's back, you are on both sides of the transaction, it's almost like -- it's almost silly. It's just so obvious on its face that it's inappropriate. I've never been involved in a case or a situation where that happened. And I would never, ever, ever have hired any of these people if I knew they were passing money behind themselves. If Chris Hoard or Distinctive or whatever wanted to get an upfront fee, they should have asked me. Why did they need to hide it from me? Why did they need to be sneaky? That's just sneaky.

There's no advice whatsoever that Chris Hoard or Distinctive or Jedlowski gave to BKV as a consultant that they shouldn't have been giving to me. They owed me an unconditional fiduciary obligation to quarterback this deal to me -- to be - - and to be loyal to me and to me only as it relates to this transaction. Plain and simple. And BKV, by making that payment, compromised their own integrity. They compromised -- they themselves, right, were incentivized to push the project forward and give me bad advice if only to cover up their malfeasance. It's just totally unheard of that an

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 280

architect would make a payment to the owner's rep.

It's just -- it's bribery.  I mean, it's just --

it's just an unheard-of action.

Q.   Okay.  Well, we'll see if the court agrees with your interpretation.  I was just asking for --

A.   They did so far --

Q.   -- a specific --

A.   -- in all the motion practice.  So I'm pretty confident that they will.

Q.   Okay.  Well, I'm not going to argue legal issues with you.

A.   Yeah, me neither.

Q.   I was asking -- I was just asking practically and pragmatically, why do you conclude that that automatically meant that the company was not working in the best interest of the project or with Treeline, was my question?

A.   Ms. Sivon, as I said to you, that question is almost so ridiculous, it doesn't bear answering.  But what I will tell you is is that it created a conflict of interest between myself and the various professionals who were working on my behalf who had a vested interest in receiving a payment without disclosing it to me that was predicated on moving the project ahead.  Thus, their advice in every

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 281

respect was compromised. Okay? It's almost a ridiculous question, with all due respect, and I really -- I do respect you as a fellow member of the bar and I'm really not trying to belittle anything but it's really a silly question.

They -- the bottom line is if that payment was on the up and up, they should have told me about it and they didn't. Okay? There was no -- Chris Hoard's contention that he acted as a consultant to BKV is idiotic. It's just an idiotic contention. There's nothing that Chris Hoard told BKV about his expertise in active adult or anything else that would have justified him getting that payment. And if that was the case, BKV should have written it down in the extensive list in the contract that they gave me. So I mean, really, I -- that's my answer. I don't have another answer. It's just -- it's obvious on its face.

Q. I think you indicated part of what you were trying to do was try to push the project along and find a solution for the project?

A. All along. Yes.

MS. SIVON: Okay. I might have missed something, but I'm going to go ahead and pass you to the next person, and I will check my

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 282

notes to see if I have anything else.  But

thank you for your time.

THE WITNESS:  Absolutely.  Thank you.

MR. STODDARD:  Meredith, I think that's

you, right?

MS. BREWER:  I'm sorry.  My computer froze

there for a second.  I actually don't think I

have any questions for you, Mr. Schor.  So

Jeff, I'll go ahead and pass back over to you.

THE WITNESS:  Thank you.

EXAMINATION BY MR. STODDARD

Q.  Mr. Schor, I only have a couple questions for you.
Mr. Katzenbach was asking you much earlier in the
day about the purpose of the May 2nd, 2024, meeting
with the plans showing the additional options and if
you're able to acquire the adjacent tract that you
didn't have at that time.  Why did you need to try
to acquire that adjacent tract?

A.  In order to be able to fit 160 unit 175,000 odd
square foot fully-amenitized active adult building
on the property and be able to build it hopefully in
a economically viable fashion.

Q.  And around that time or prior to that time, I should
say, you and Mr. Banta had -- I think both agreed
that he would put his pencils down, right?

Case 5:25-cv-00028-BO-BM    Document 102-6    Filed 03/20/26    Page 283 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 283

A.   Yes.  To stop drawing anything new.  Absolutely.

Q.   So why did he pick up his pencil to work on that May 2nd, 2024 drawing?

A.   Because we had had a further discussion subsequent to that where I said to him, David, I'd really like to try to make the project work if you can help me out here.  Right?  And again, my big need was he had the CAD drawings.  Right?  And I did not.  And CAD is just -- so to be clear, it's the architectural design software.  So all the drawings were resident on his computer.  Right?  What I said to him was if we can successfully get this piece of land and make some changes to the building, maybe there's a way that we can move the project forward, and we'll figure out some kind of arrangement with regard to the fees.  We'll move them to the back end, we'll pay them out over time or whatever it was, but I need you to accommodate me here and make these drawings.

Q.   And what did he say in response?

A.   That he would do it.

Q.   Did he say anything else?

A.   He expressed a willingness to work with us on a revised project.

Q.   Switching gears, I'm going to share my screen here

02/11/2026      BKV Group DC vs Treeline Acquisition, et al.      Michael Schor

Page 284

and hopefully we don't lose it.  You were asked a number of questions about Mr. Jedlowski's involvement in this project; is that right?

A.   I was.

Q.   I'm showing what we had previously marked as Exhibit 14, which is BKV005157.  Can you take a look at this email and tell me what you see here at the top?

A.   It's an email from Joe Jedlowski to Mr. Banta and Mr. Hoard.

Q.   And what's he --

A.   And it's dated December 5th, 2023.

Q.   And what's he asking for?

A.   A payment to Distinctive Living.

Q.   And is that a payment for Distinctive living on this project?

A.   Yes.  And by the way, I just wanted to point out that if you look at the signature block for Distinctive on that email and on -- there are many emails -- you'll note that they brand themselves as Distinctive Healthcare.  And then next to it, it says Distinctive Living and Distinctive Development, meaning they're all one entity and one enterprise.  And you see it says, my CFO is yelling at me, right?

Q.   Yeah.

A.   Yeah.  Chris Hoard testified, as I recall it, that

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 285

Distinctive Development basically shared a CFO with Distinctive Living. So they were all one company. They didn't have separate -- you know, separate people.

Q. Thank you. You've seen the pro formas, at least all the ones that were sent to you during this project, right?

A. Yes.

Q. Whose name is listed on all those pro formas?

A. And individual's name?

Q. Yeah.

A. Jedlowski's name is on them.

Q. I'm now going to pull up Exhibit 9 that was previously marked, Treeline 12854.

A. Uh-huh.

Q. And who's this email from?

A. Hold on. It didn't come up.

Q. Sorry.

A. This is from Joe Jedlowski to Chris Hoard, Daniel Schor, and I'm CC'ed on this email.

Q. And is this the day after Treeline and Distinctive executed the Distinctive agreement?

A. It appears to be. Yes.

Q. And how did Mr. Jedlowski describe himself here?

A. As my partner.

02/11/2026            BKV Group DC vs Treeline Acquisition, et al.            Michael Schor

Page 286

Q.   And what does it say in Mr. Jedlowski's signature block?

A.   That he's the chief executive officer of Distinctive living.

Q.   Thank you.  I'm now going to pull up Exhibit 4, Treeline 11198.  And we're actually looking at the second page here.  And the bottom email, is this an email from Howard Schor to a number of individuals?

A.   Yes.  I think, Deborah, by the way, and Linda were folks who were in their marketing -- who were in Distinctive's marketing and leasing group.

Q.   Okay.  And it looks -- so take -- please take particular note of everyone who was receiving either as a to or a CC to Howard's email.  And then after you've done that, let me know and we can scroll up.

A.   Okay.  I've done that.

Q.   And if we start at the bottom here, this indicates this is an email from Mr. Hoard on July 11th, right?

A.   Yes.

Q.   Okay.  And the to line starts here on the first page, but I'm going to scroll to the second page.  And Mr. Hoard says here in the second paragraph what?

A.   I've added my partners to this list as well.  And again, the signature block indicating Distinctive

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 287 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 287

Healthcare both Distinctive Living and Distinctive Development.

Q.   Comparing the recipient lists of these two emails, who are the partners that Mr. Hoard added to this email chain?

A.   Joe Jedlowski, George Draghiceanu, and -- Lisa Rogers.

Q.   Did you have an understanding who Ms. Rogers was at that time?

A.   That she was a partner in Distinctive.

Q.   Okay.  Did Mr. Jedlowski get involved in any of the program design on this project such as any specific amenities?

A.   Yes.  He did.  As I mentioned to you, he was very interested in the possibility of having, as I mentioned, sort of a quasi-medical amenity, if you will, where a person could arrange for home health or medical visits on site.  And he purported that he had contacts or that Distinctive was developing sort of a product to get into that market.  He was engaged with planning vis- -vis things like the salon, the gym amenity, again, purporting to have contractors and folks that they worked with or, again, that that being an amenity that Distinctive could take over and run at some point.  So yes, he

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 288

definitely had input into those things.

Q. When you would discuss the pro formas with Mr. Hoard, did he ever say whether he had to check with Mr. Jedlowski for any information on the pro formas?

A. He absolutely did.

Q. What do you remember?

A. He would consulting him -- sure. He -- when Mr. Hoard would run demand studies, the rent assumptions, he would always run them by Jedlowski. He -- he would --

Q. And how do you know that?

A. Because Hoard told me and because I believe there are some emails indicating as such that Hoard said, yeah, I just want to consult with Joe about A, B, C, or D. But A, B, C, or D generally were the financial assumptions. In fact, when we were determining the size of the property, Hoard would consult with Jedlowski on the demand study to look at the demand study. And even, frankly, when we were looking at some of the other projects during these pipeline calls when we were discussing projects other than Flowers and we got demand studies, Chris would say, you know, Joe isn't really comfortable with the demand here. He doesn't really love this market or he really likes this market and

02/11/2026        BKV Group DC vs Treeline Acquisition, et al.        Michael Schor

Page 289

likes the demand study. So Chris was constantly talking to Jedlowski and getting his input across all sorts of aspects of the property. And again, they portrayed themselves from the very outset, from the first piece of material that they provided us as partners as between them and forming a partnership with us.

Q. Switching gears a little bit, you were asked a number of questions about this project being economically feasible. What does economic feasibility mean to you?

A. Economic feasibility is judged in -- at a particular moment in time. Any project can be economically feasible at a particular moment in time. So by way of an example, you know, in -- when interest rates were 1 percent or two percent, right, folks were buying apartment projects in Manhattan on three percent returns. In those days, a three percent return made buying an apartment house in Manhattan feasible.

Today, when interest rates are eight percent, buying an apartment house in Manhattan at a three percent return is called suicide. So a deal can be feasible one day and not feasible another day. It's judged by the context of the time and what's

02/11/2026       BKV Group DC vs Treeline Acquisition, et al.       Michael Schor

Page 290

available around it.  The risk in development projects like the one we embarked on here is they take a lot of time.  Right?  And things can change and -- you know, during the course of a construction project.  And we all understand that.  That's why when we look at an underwriting, we -- you know, we look at it through a critical lens.  That's the job of a developer.

And again, in this particular case, I looked at the underwriting of the deal through the lens of Chris Hoard's assumptions that he was verifying with Jedlowski in a new product type and in a new market in which I wasn't familiar.  And I was relying on my trusted advisers to guide me.  So was the project economically feasible?  Yes, it was.  Along the way, it was economically feasible.  But then feasibility became challenged when we started to see that there were undisclosed site conditions, when there were mistakes being made by the architect, when there were mistakes being made by Distinctive and -- and the -- and BKV and professionals.  That was challenging to the feasibility.

MR. STODDARD:  I don't think I have any other questions.  I appreciate it.  Thank you.

THE WITNESS:  Thank you.

Case 5:25-cv-00028-BO-BM   Document 102-6   Filed 03/20/26   Page 291 of 303

02/11/2026     BKV Group DC vs Treeline Acquisition, et al.     Michael Schor

Page 291

* * * * *

FURTHER EXAMINATION BY MR. KATZENBACH

Q.   I just have one -- one follow-up for you, Mr. Schor. Earlier you were answering some questions about sort of the process that, you know, institutional investment financing kind of goes through and how you kind of get from the start kind of to the end where -- you know, what it takes to get to closing the loan.  Do you remember some of that testimony you gave?

A.   Sure.

Q.   Yeah.  So -- and to kind of guide you through this a little bit, my question, I want to pull back up Exhibit 61, which we looked at earlier, which should be on the screen right now.  And this was the email from Eric Johnson to Chris Hoard and you in January of 2024 when they sent the term sheet for U.S. Capital?

A.   Uh-huh.

Q.   Yeah.  So at the end -- if you scroll down, at the end there's the term sheet and that was, you know, all the terms that you said --

A.   Well, that's -- I wouldn't refer to that as a term sheet per se.  What I would --

Q.   Okay.  Well, what would you refer to this as?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 292

A.   Sure.  So this is like, what I would call, indicative terms.  So generally speaking, the way I, you know, see financings is a lender will look at, let's say, the package of stuff that Ziegler sent them in this case.  Right?  The marketing package.  They'll look at that and they'll have what I'll refer to as a loan originator, like a business origination guy look at it.  He'll work with an analyst.  He'll assume that all of the assumptions that were presented by Ziegler were correct.  And on that basis, they'll issue something along these lines, which is an indication of terms.  It's very loose.  It's sort of a summary of only very, very major terms.  There's a lot of details missing here.

Q.   Okay.

A.   Okay.  Then what typically happens -- okay.  And then what typically happens is --

Q.   So before you go on to that, I just want to show you -- because I wanted -- what I wanted to scroll down was at the end of this guy's email was this thing he wrote, outline and process for range of terms.  And my question was does this kind of set out like the general outline of like the process of getting from like initial contact with these folks through all the way to getting like an actual closed loan?

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 293

A.   No.

Q.   No.

A.   It's missing a very important step.

Q.   Which step is it missing?

A.   Okay.  This is what was necessary to get to a commitment letter.  He tells you that on the bottom there.  See, issue commitment letter --

Q.   Yeah.

A.   -- or loan docs?

Q.   Yeah.

A.   To get to a closing, there will be -- you know, like when you close your home mortgage or a home mortgage, the bank will send you a letter to say, okay, yeah, you're conditionally approved.  Right?  A commitment letter.  But then it will say, you have to pay off your old mortgage.  You have to show that you have 200,000 of equity in the bank, whatever, a bunch of stuff that the -- that they put on here.  What's missing here is this would get us to a commitment letter, all of this due diligence.  After that, in order to get to a closing of this loan, okay?

Q.   Right.

A.   They would have needed final drawings and permits to build the building.  Okay?  The only thing that I --

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 294 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 294

if you scroll back up, I can tell you is there may be -- if you don't mind, if you could scroll up one more screen.

Q.   You want me to keep going?

A.   No.  You could stop there.  Okay.  So this loan did not provide for any pre-construction financing.  So this loan, what I'm saying to you, is -- would be typical.  They would require that essentially you're ready to break ground within a very short period of time, meaning you had fully baked drawings, fully bid contract -- fully bid general contract and be ready to go into the ground in order to actually fund the money.

Q.   Okay.  And so going back down here to this like sort of process that was outlined here, it actually shows like where this was in the process.  Right?  It says here, present range of terms to client for approval.  And it says above.  That's where we are in the -- we're before the term sheet, right?

A.   I don't even recall if we ever even signed the NDA.  Whether they -- I assume they requested and analyzed financial information and presented -- I assume they did that.  I don't -- I don't have any independent knowledge as to whether they did it.  Those are actions to be taken by U.S. Capital, not by me.  So

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 295 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 295

I don't know if they did it.

Q.  Okay.  But --

A.  In other words, you see, it's just preliminary underwriting.  That's them, not me.

Q.  Right.  I just wanted to show this to say this is early in the process -- what he's sending here is early in the process of this financing journey, correct?

A.  Absolutely.  Yes.

Q.  Right.  Because he hasn't even -- like as you said, you don't even have a term sheet yet, which would be, I guess, the next step after this --

A.  Right.  It's --

Q.  -- if you want to go further would be a term sheet.

A.  Yeah.  Well, he needs to get credit committee approval to give a term sheet.

Q.  Okay.

A.  So he never told us that he had credit committee approval.  But yes, a term sheet would have many more -- like one of the things that it doesn't talk about at all in the -- up there, which would clearly be part of a term sheet is whether the loan would have any recourse to individuals, whether it would be a recourse loan or a non-recourse loan.  It would have a lot of different terms in it.  So this is a

Case 5:25-cv-00028-BO-BM     Document 102-6     Filed 03/20/26     Page 296 of 303

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 296

very, very skeletal outline.

Q.   Right.  And did you decide to go further in the process with these folks like say to get to a term sheet?

A.   No, because the financing terms were brutal.

Q.   Right.

A.   I wouldn't have accepted these financing terms.

Q.   Right.

A.   And this was the group that also wanted me to give them $75,000 in order to go on to the next thing. And since I had already been down that road with Ziegler and got ripped off for 25 grand with the guy never doing all of the things on this list -- see like all the stuff under underwriting and due diligence, the other guy took 25 grand to pay for that stuff and he didn't do any of it, and he just took my money.  So I was pretty reticent to lay another 75 grand on this guy.  I didn't know him, never did any business with him.

Q.   And you were able to get --

A.   So I didn't want to do it.

Q.   And you were able to get this range of terms from U.S. Capital with whatever the state of the drawings were at this stage, right?

A.   It was based upon just the package that Ziegler

02/11/2026                BKV Group DC vs Treeline Acquisition, et al.                Michael Schor

Page 297

presented.  Ziegler -- in the initial package, you see it says request and analyze financial and present the preliminary underwriting package?  Ziegler had prepared like a brochure -- you know, an offering brochure like you might see for a property sale, you know, that had very summary underwriting, things about the market, things about Flowers Plantation and stuff.  So they reviewed that.  I don't think they ever even got, you know, detailed drawings.

Q.   Right.  Because they didn't need detailed drawings to get to this stage of the financing with you, correct?

A.   To get to presenting that range of terms?  I don't believe so.

Q.   Right.  And after this, did you ever get to this stage with anybody else?  Just the range of terms, did you ever get to that with anybody else for the financing?

A.   After U.S. Capital?

Q.   Yes.

A.   I don't recall.

Q.   Okay.  I haven't seen it anywhere in the documents. And so as we sit here today, do you recall getting to a range of terms with anybody else on this

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 298

project?

A.   As I said to -- as I said before, I don't recall specifically, but I can tell you that I was exceedingly disappointed in Ziegler's performance. I think they did a very poor job.  I think there were a number of emails where I expressed that to Chris Hoard and I may have even expressed it -- I know I expressed it verbally to the guys at Ziegler that I thought that they were not doing a good job.

Q.   Right.  The -- earlier you said, in response to Ms. Sivon's questions, that -- I wrote it down -- BKV and Distinctive made it impossible to get financing. Do you remember saying that?

A.   Yeah.

Q.   The truth -- that's not true, is it?

A.   Sure, it is.

Q.   You never got to a stage in any financing discussions where anything that BKV or Distinctive were doing would have mattered one bit as far as getting financing?

A.   That's not true.

Q.   Is that true?

A.   No, it's not true.

Q.   You were able to get this range of terms without -- with the state of the drawings in whatever state

02/11/2026                    BKV Group DC vs Treeline Acquisition, et al.                    Michael Schor

Page 299

they were here in January, weren't you?

A.   I don't -- you have to scroll up so I can see the date of the email.

Q.   Date of the email is January 29th of 2024.

A.   Yeah.  So practically February.  Yeah.  But this range of terms is just a -- it's so vague and so general.  But absolutely, 100 percent that if BKV's drawings were in a timely way and were of a project that could be built, the whole gestalt of how I would have pursued the financing would be different. This -- the reason this is so brutal is that it's like desperation financing.  We were throwing balls up in the air in order to to try to get something done because the project was all over the place.

Q.   Okay.

A.   So absolutely.

          MR. KATZENBACH:  Okay.  No further questions.

          MS. SIVON:  I have nothing further.  Thank you.

          MS. BREWER:  I don't have any questions on behalf of Distinctive Living, LLC.

          (Whereupon, the foregoing deposition was adjourned at 7:16 p.m.  Signature was reserved.)

WITNESS CERTIFICATION


I, MICHAEL IAN SCHOR, declare under the penalties of

perjury under the State of North Carolina that I have

read and examined the contents of the foregoing testimony

as given by me on the 11th day of February, 2026, and

that to the best of my knowledge and belief the foregoing

pages are a complete and accurate record of the testimony

given by me, except as noted on the Errata Sheet attached

hereto.


I have __ made changes/corrections.

I have not __ made changes/corrections.


_____

MICHAEL IAN SCHOR

ERRATA SHEET


RE:          BKV v TREELINE, et al
DEPOSITION OF: MICHAEL IAN SCHOR
          30(b)(6) representative on behalf of
          TREELINE ACQUISITIONS
DATE TAKEN:    FEBRUARY 11, 2026


Please read this transcript with care. If
you find any corrections or changes you wish made,
list them by page and line number below. DO NOT WRITE
IN THE TRANSCRIPT ITSELF. Return the Errata Sheet and
Witness Certification to this office. We appreciate
your prompt attention to this matter.

To assist you in making any corrections,
please use the form below. If supplemental or
additional pages are needed, please furnish same and
attach thereto.


Page Line Correction or Change/Reason for Change

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____


          _____
          MICHAEL IAN SCHOR

02/11/2026          BKV Group DC vs Treeline Acquisition, et al.          Michael Schor

Page 302

## REPORTER CERTIFICATION

I, Melissa Suzanne Shore, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large, do hereby certify:

That there appeared before me the foregoing witness at the time and place herein aforementioned;

That the said witness consented to testify under penalty of perjury in said cause;

That the testimony was taken before me and recorded by Stenomask, thereafter reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in anywise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this the 23rd day of February, 2026.


MELISSA SUZANNE SHORE
NOTARY #:19990780103