# Exhibit 9

# Deposition of Daniel Schor

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 1 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No. 5:25-CV-00028-BO-BM

BKV GROUP DC, PLLC,        )
       )
    Plaintiff,       )
       )
       )
    vs.        ) D-E-P-O-S-I-T-I-O-N
       )
TREELINE ACQUISITION, LLC, d/b/a   )
TREELINE COMPANIES,        )
       )
    Defendants,     )
       )
and        )
       )
TREELINE ACQUISITION, LLC,     )
       )
    Counterclaim Plaintiff/  )
    Third-party Plaintiff,   )
       )
    vs.       )
       )
DISTINCTIVE LIVING DEVELOPMENT,    )
LLC; DISTINCTIVE LIVING, LLC;     )
DAVID BANTA; CHRISTOPHER HOARD;    )
JACK BOARMAN and JOSEPH JEDLOWSKI, )
       )
    Third-party Defendants.  )
----------------------------------

DANIEL SHCHOR

TAKEN VIA ZOOM
February 12th, 2026
10:01 a.m.

Joyce Lear Rodriguez, CVR-CM-M
Court Reporter

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|-----------|----------------|------------|--------|
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |
| _____ | _____ | | |

APPEARANCES OF COUNSEL

Daniel G. Katzenbach, Esquire
CRANFILL SUMNER, LLP
5440 Wade Park Blvd., Suite 300
Raleigh, NC 27611-7808
Telephone: (919) 828-5100
Facsimile: (919) 828-2277
Email: dgk@cshlaw.com
Attorneys for BKV Group DC, PLLC, David Banta, and Jack Boarman

Matthew C. Burke, Esquire
YOUNG MOORE HENDERSON, PA
3101 Glenwood Ave, Suite 200
Raleigh, NC 27612
Email: matthew.burke@youngmoorelaw.com
Attorneys for Plaintiff BKV Group DC, PLLC

Jeffery I. Stoddard, Esquire
WARD AND SMITH, P.A.
P.O. Box 7068
Wilmington, NC 28406
jistoddard@wardandsmith.com
Attorneys for Treeline Defendants
Amie Sivon, Esquire

RAGSDALE LIGGETT
2840 Plaza Place, Suite 400
Raleigh, NC 27612
asivon@rl-law.com
Attorneys for Distinctive Living Development, LLC

Meredith Brewer, Esquire
MAYNARD NEXSEN PC
4141 Parklake Avenue, Suite 200
Raleigh, NC 27612
mbrewer@maynardnexsen.com
Attorneys for Third-Party Defendant Distinctive Living, LLC

OTHER APPEARANCES
Glenn Schor

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 4

I N D E X

STIPULATIONS                                        5

EXAMINATION OF THE WITNESS:
        By Daniel Katzenbach:                  6,123
        By Ms. Amie Sivon                      55,129
        By Ms. Meredith Brewer                   94
        By Mr. Jeffrey Stoddard                98,135

ADJOURNMENT                                      137
REPORTER CERTIFICATE                             138
WITNESS CERTIFICATION                            139
WITNESS ADDENDUM                                 140


                    E X H I B I T S
Name                     Offered By        Identified
Exhibit 70              Mr.  Stoddard          106
(Treeline 7672)

STIPULATIONS

Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Joyce Lear Rodriguez, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large.

Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 6

The witness, DANIEL SHCHOR, being first duly affirmed to state the truth, the whole truth, and nothing but the truth, testified as follows:

(10:01 a.m.)

EXAMINATION

BY MR. DANIEL KATZENBACH:

Q.   Good morning, Mr. Schor.  My name is Daniel Katzenbach.  I represent BKV, David Banta and Jack Boarman in the litigation we are here about today.

This is a 30(b)(6) deposition of Treeline and you've been designated as one of the designees to testify on behalf of the company.  Do you understand that?

A.   Yes, sir.

Q.   Okay, great.  The good news for you is that, as you probably understand, we went a very long time with your brother yesterday and he answered a lot of questions and you probably owe him because he only begged off to you on a couple of different topics.

So I don't think I have a ton for you today.  I plan on just sort of covering a couple of areas that he said you were the person who had kind of the more knowledge than him on.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 7 of 141

02/12/2026  BKV Group DC vs Treeline Acquisition, et al.  Daniel Shchor

Page 7

But if -- have you ever had your deposition taken before?

A. I have.

Q. Okay. About how many times?

A. Two or three.

Q. Okay. So you may know how this goes, then, be familiar with it, but just -- just to be sure we're all on the same page, I'm not trying to trick you or put words in your mouth, so if you don't understand my question or don't understand what I'm trying to ask, please don't answer it. Just tell me that you don't understand my question and then I'll try to re-ask it, hopefully in a way that is clearer for you, okay?

A. Understood.

Q. Okay. And the court reporter, Ms. Rodriguez, is taking down everything that we say and she'll prepare a written transcript later that we can see that'll have, you know, questions and answers.

But it's hard for her to do her job if you and I are talking over each other at the same time. So -- and that goes both ways. So for me, I'm going to try to really wait until I think you're done giving your full answer before I sort

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 8

of start another question.

And then, for you, if you can just kind of wait until I get my full question out before you start answering, even if you kind of have a great idea of what exactly I'm answering, just kind of wait until I get the end question out so we're not talking over each other. Does that make sense?

A. It sure does.

Q. Okay. And we'll take breaks as needed. Yesterday, we took a break every hour or so, but if you need a break before then or we go longer than an hour and you need a break, just speak up and let us know. We'll be happy to take a break at any time, okay?

A. Okay.

Q. Great. Will you just go ahead and state your name for the record?

A. Sure. Daniel Shchor.

Q. Okay. And what is your -- what is your position with Treeline?

A. So I am a principal and I think the website lists me as the Chief Business Development Officer. That's my technical title here, although it probably doesn't sum up entirely what I do here

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 9

on a day-to-day basis.

Q. Okay. Well, why don't you do that for me? Why don't you sum up for me what you kind of do there on a day-to-day basis?

A. Sure. So part of -- my job is -- my role here at Treeline has kind of several facets. The first of them is I do a lot of the management in terms of the inside of the office and office operations here.

I handle a lot of -- I work alongside with Michael in terms of identifying new acquisitions, potential acquisitions and projects for us to work on.

I source investor capital. I support Mike's efforts and our collective efforts in placing debt financing on any of the projects that we're working on. And I also have a little bit more of a on-the-ground, hands-on to some of the active projects and development in terms of leasing, you know, leasing efforts, managing leasing brokers, particularly in the Southeastern US and our portfolio there.

Q. Okay.

A. And I would just add that as a small office, obviously, we all, kind of -- it's always

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 10 of 141

02/12/2026        BKV Group DC vs Treeline Acquisition, et al.        Daniel Shchor

Page 10

an all-hands-on-deck operation and everybody gets a chance to sort of participate.  So we -- you know, that's loosely what I do on a day-to-day basis, but there may be other things where I dip in and out of.

Q.   Sure.  And I'm sorry, you told me and I forgot to write it down.  What is your title?  Chief Development --

A.   Chief Business Development Officer, and I'm --

Q.   Thank you.

A.   -- a principal of the company.

Q.   Okay.  Can you tell me what it is that you did to get -- just to get ready for this deposition?

And before I -- I want to say on the front end of that, I don't want to -- I don't want to know, I'm not entitled to know anything that you talked with your attorney about, okay?  So don't tell me anything you talked to your attorney about, but please do tell me anything else you did to get ready for the deposition.

A.   No problem.  I should say, I'm an attorney, also, so well aware.  Got it.  Secretly, under my vest, I wear -- I wear that Superman

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 11 of 141

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 11

shirt, as well.

Q. I learned that yesterday from your brother that I guess the whole family is a series of attorneys, so yes.

A. No one advised us not to go to law school. Having said that to you, to prepare -- prepare for today's deposition, obviously, I conferred with Counsel, and I won't go into detail of it, but I conferred with my counsel.

I reviewed the documents and some of the documents that were exchanged with respect to this matter. I can't say that I read every single page because there's many, many thousands of pages to be read, but I looked at a vast majority and reviewed particularly exhibits of things that were -- were being exchanged with respect to the depositions that were already taking place.

I did speak to my brother, Michael, and I did speak to my father, Glenn, about, you know, various things related to the preparation of this for the depositions.

Q. Okay. When you spoke to Michael and Glenn, was your counsel present for any of those?

A. Some.

Q. Okay. Did you have a conversation with

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 12

Michael and Glenn in preparation for this deposition where your counsel was not present?

A. Briefly.

Q. Okay. Do you -- what do you recall about any conversations you had with them about prepping for the deposition where Counsel was not present?

A. Sure. The conversations, as I said, were relatively brief. I had previously sat in on some of the other depositions that had taken place for Mr. Hoard and Mr. Banta. We all shared our collective kind of shock to some of the answers that we were -- we were hearing on the record as -- as things that we had suspected all along were now being testified to with respect to the kickback payments that were made and then exchange of things like that.

But other than that, we didn't exchange -- we didn't have conversations outside of the earshot of counsel about anything particular with respect to the preparation for this -- for this deposition.

Q. Were you particularly shocked by anything that David Banta had said in his deposition?

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 13

A. Yes.

Q. Like, for example, what?

A. It was shocking to find out -- and when I say "shocking," I don't mean that I was surprised because I guess, as things unraveled with respect to our -- this project and our business relationships with BKV and -- and Distinctive, we began to suspect, or I did -- I shouldn't say we, I began to suspect that there was more to the story than met the eye.

I was surprised with respect to Mr. Banta's testimony that the -- the idea of these kickback payments had occurred on multiple projects that Mr. Banta, Mr. Hoard and Mr. Jedlowski were involved in together, almost rising to the level of what -- what was a RICO type of conspiracy, even, that none of those owners were made aware of those payments, and that Mr. Banta was -- was freely exchanging that money without -- without making other owners beyond myself or property developers aware.

I was also fairly surprised, based on representations made to me by the Distinctive group, by Jedlowski and Hoard in particular, that none of their projects that they'd worked on with

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 14 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 14

Mr. Banta had come -- had been built or finished or completed or come out of the ground.

Q.   And I'm going to get to your -- your initial conversations with DOD and -- and bringing them onto the project because that was one of the things that your brother said you kind of sort of took the lead on and had more knowledge than him about, so we'll get to that in just a minute.

Is there anything else that David Banta testified to that surprised you?

A.   Again, I was overall surprised by the -- by the experience of dealing with Mr. Banta along the way of the project in terms of his -- and I don't mean just him, but BKV's general malfeasance of the way that they handled this -- this project.

Their lack of focus on, you know, day-one information as they planned the project and the way that they sort of pushed things forward irresponsibly, knowing what they know and as things developed, but it's -- not all of that was new information to me as a -- from the deposition.

Q.   So also in preparation for this deposition, other than Glenn and Michael, did you -- well, strike that.

Yeah, other than Glenn and Michael, did

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 15 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 15

you talk to anybody else, other than Glenn, Michael and your attorney, to get ready for the deposition?

A.   No.

Q.   Okay.  When was the last time that you've spoken to anybody from Douglas Construction?

A.   Me, personally, it would be more than a year, if not more than that.

Q.   Okay.  Do you recall the last time you personally spoke to anybody from Douglas Construction and then what you talked about?

A.   I don't, but I would say that the best of my recollection is that it was still related to the project before things really disintegrated to the point that the property was no longer available to be purchased, so it would be significantly long ago and I don't remember the exact conversation.

Q.   Okay.  All right.  So, as I mentioned, my understanding is that -- I guess you were the one who was principally involved in sort of researching and finding Distinctive Living to be a potential -- you know, someone to work with on this project.  So I guess just tell me about that?

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 16 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 16

Tell me about what you did to, kind of, find either Distinctive or somebody like Distinctive for the project and how that kind of came about?

A. Sure. So we became interested in developing a business model around senior living. Sometime in late '22, early '23, Michael and I had spoken about how we had been hearing from certain capital partners that this was an area of investment of interest to folks, particularly larger investment firms like JP Morgan or others like that.

And so we started to investigate available properties and markets. And we were particularly familiar with the southeastern US because we had been establishing an industrial platform in that area. We had several projects underway and we were continuing to grow our industrial platform in the Carolinas.

So it was logical, as we were exploring these communities from an industrial perspective, we started to explore them and say to ourselves, well, there's great -- you know, great growth, in terms of residential demographics, and this would be a great place to take this. And now, there's

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 17

an interest from investor bases in this kind of a project.

And so part of what I did was -- Michael and I agreed, I should say, that we needed a --- we needed to bring an owner's rep or someone to work with us as a partner in this because we had no experience in senior living, in active adult living of any kind, and that it would be part and parcel of our ability to do any of these projects to have an aligned partner with us.

And so I started researching companies who managed, developed, and did these kinds of projects. I should back up and say that my background, prior to joining Treeline, was as an attorney. I worked in-house for a hotel management firm and so I had a pretty decent idea that firms that did management generally did development and other -- other hard facets of this kind of development.

And so it was a logical place to try to find a management company and then see what their capabilities were and whether they were developing and so on and so forth. I started to do that research and I came across Distinctive, as well as a couple of companies.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 18 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 18

I reached out to them all, frankly, in the blind. I called into their offices and asked for someone to speak to. And Mr. Jedlowski got back to me. I left a message on the general voicemail and I remember that he called me back within the day of that general voicemail that I left and he was, in fact, at a conference or heading into a meeting. We had a very brief telephone conversation.

I introduced myself. I explained what our company was looking for, what we did, and what we were looking to partner with someone to do. And he indicated to me during that phone call that it was absolutely something that Distinctive Living did and was equipped to do, that he would like to speak further about it, that he would email me some introductory information, so, you know, about the company, about the senior executives and owners of the company, their pillars of development and pillars of operation and their core ethos, and then I would look it over and we would then connect via phone.

And he did, in fact, send that to me shortly after the phone call and that document that he sent me, which was several pages long,

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 19 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 19

highlighted exactly what he said it was going to highlight, kind of the core ethos of the company, their senior executives, interestingly, all under the header of Distinctive Living.

There was no distinction in any of those documentation about one company/two companies, it was just simply Distinctive Living and listed amongst its capabilities, development, and showed in it its chief executives and department heads, their chief legal officer, their underwriting team, their -- and in fact, Mr. Hoard was featured in there as the chief development officer of Distinctive Living and it really tried to show their robust capabilities.

So I reviewed that document with -- with my -- my dad.  I believe I showed it to Mike at the time.  And it highlighted also some recent projects they had under management, some things they had worked on, some of which were in the southeast, some of which were in other parts of the United States, as I recall.

And I reached out to Mr. Jedlowski after that and said, hey, I'd like to schedule a time to speak to you.  Ultimately, we did have a follow-up call with him and I believe Mr. Hoard, at that

02/12/2026        BKV Group DC vs Treeline Acquisition, et al.        Daniel Shchor

Page 20

point, was brought -- he brought him to the table as a member of the firm to speak to us about potential development projects to work on together.

And so there were several phone calls in which we vetted one another. I explained to him my business. I explained to him what we were doing. They explained to me what their capabilities were and they made it very clear that they would serve in this role and earn a fee in this role of being our partner and our owners' representative to the project, that they knew all of the key players in the industry. They knew the appropriate architecture firm, the appropriate engineers. They knew the appropriate financing people. They knew -- they just -- they knew the industry across the board and, whoever they didn't know, they had access to find out and bring to the table.

And they explained what their fee was, that they got a very nominal amount of money up front, that they underwrote their fee. And at the time, I explained to them that it had generally been our business model when we were bringing in owners' representatives or people to serve in this

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 21 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 21

kind of a role, which we had done in other projects, to have their interests aligned with ours 100 percent by making them part of the partnership.

In lieu of just being a mercenary vendor, they were going to join the partnership as an -- as an owner's -- as a partner to the deal. And they agreed to do that. And they said that was typical of their arrangement, as well, and that the way they typically did that was they were going to invest, and I don't remember the exact percentage, but it was fairly substantial. I think it was in the neighborhood of 25 or more percent of their up front fees as equity into the deal in order to ensure that we were strategically aligned as partners and fiduciaries to one another.

And that was, from my perspective, a principal selling point to bringing Distinctive to the table because they were going to, or at least represented that they were going to, not only be our owners' rep and advisor, but be a partner in the project.

And we also discussed at some length that we viewed the first project as the first of

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 22 of 141

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 22

many and that we wanted to do this with an eye towards developing a strategic partnership where we would continue to work on not just the Flowers deal, but the next deal and the next one and so on, and continue to have a team of people at the ready so we could develop this business line. And they -- they agreed to -- to that, as well.

They also pointed out to me during those calls that their panoply of services included management of -- day-to-day management operations and leasing of the finished product when it was built and that was obviously something that was important to us to bring on.

And they suggested, and in fact I believe they sent me, their management agreement along with the initial engagement letter. And we deferred signing that up front only because we, Treeline, had not formed the single-purpose vehicle that was going to be our investment vehicle that would own the Flowers development as of yet, so we didn't have the entity to engage with them. And we agreed that we would, down the road, engage that, sign that agreement as a part and parcel of Distinctive Living's overall engagement and partnership to the project.

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 23

Q. Okay. When you -- and I know you said you reached out, you sent some sort of like, I don't know, cold calls out on Distinctive and then I understood maybe there's some other companies, as well. Do you remember any of the other companies you sort of sent a cold call out to?

A. Honestly, I don't remember their names off the top of my head. It was -- some of it was just from good old Google research.

Q. Did you get a call or a response back from anybody else other than Distinctive?

A. There was one other company that did call me back and I did speak to them. I don't remember their name off the top of my head. They didn't have nearly as robust a presentation as Distinctive did, in terms of what they had done to date.

Q. Right.

A. They also did not present a willingness to engage us as a partner, which was, as I alluded to earlier, was a big issue for us and one that we relied on heavily with the Distinctive team.

And frankly, Mr. Jedlowski was located in the Northeast and so their main headquarters being in proximity to our offices in New York was

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 24

also somewhat of an attractive reason to engage them further.

Q. So did you set up any other, like, sort of in-person meetings with anybody other than Distinctive?

A. No. And frankly, I never met Distinctive -- the guys from Distinctive or Jedlowski in person prior to engaging them. It was still very much a bit of a post-COVID world in which these kinds of online meetings were still heavily favored over folks meeting one on one. And Mr. Hoard and Mr. Jedlowski were constantly representing to us that they were traveling from, you know, conference to conference in order to further their business and so it was hard to nail everyone down and we opted for virtual meetings.

Q. Okay. Did you have any virtual meetings with any other companies other than Distinctive?

A. As I said, I believe there was one other. I just don't recall the name of the company off the top of my head.

Q. And I know that you said that Distinctive sent some material over about the company for you to review. Did that material have any information in it about other projects that

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 25

they had been involved in?

A. Yes, it did.

Q. What do you recall about what that material was? What kind of information was in there about other projects they had been involved in?

A. It was very cursory in its presentation. It was really an advertising brochure that they were sending over, but it highlighted at least half a dozen other projects that they had -- they either were or had been involved in. It did not explain the extent of the -- of their involvement with any specificity. And it did not explain whether they were ground-up developments, necessarily, or existing buildings that were rehabilitated, but generally just sort of highlighting the different markets in which they had worked and were certified to work because some of the facilities were -- were not active adult. They were memory care facilities or things where people need licensure in a particular state.

Q. Okay. Did you ask them to provide you any further kind of, like, data or information on other projects that they had been involved in?

A. I did, and things that were in

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 26 of 141

development.  And they did provide some of that information to me.

Q.   And what do you recall them sending over about other projects or other data or information?

A.   They sent a lot of, sort of, what I would call pretty pictures and glossy pictures about things that were in development that they were working on.  And, as a matter of fact, when we were bidding to acquire the Flowers parcel, Ms. Flowers, in advance of accepting a bid from any potential buyer, required a sample of prior work or potential, you know, vision board of what you were intending to create on her site.

The Flowers Plantation was a -- was a planned community and this particular parcel, Ms. Flowers had dedicated for active senior living. And she wanted that execution on this parcel and she wanted to see what kind of mood board -- a kind of a mood board of what you were imagining.

And the folks at Distinctive who were already really partnering with us encouraged me to take some of the mood board images from their prior projects and use it in order to solicit Ms. Flowers and ultimately bid on the project.

Q.   Okay.  Did they send you any further

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 27 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 27

information or material about any, you know, like, completed projects they had worked on?

A.   Yes.  Some of the materials that were in there, but again, it was very cursory in terms of information, you know, detailed information of what they had done or who they had worked on.  But there were some images and references to the projects they had worked on that were no longer in their portfolio for whatever reason.

Q.   I mean, did they send you information about projects, any projects that they had worked on from the ground up that had gone to completion and were operational?

A.   I don't recall, honestly, sitting here today, if those were in there.  They had certainly sent me information on development projects that were in development at the time that they were sending them to me.  I don't recall if they had sent me completed development projects.

Q.   Did they give you, like, names and locations of these projects?

A.   Yes, they did.

Q.   Like the name of the project and it was in whatever city, you know, wherever it was?

A.   Yes, they did.  Often, the projects had

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 28

a name and they were -- they were in various parts of the United States.

Q. Okay. Did you take those names and locations and do any sort of independent research on your own into the projects to see, like -- you know, Google them and see, like, what's the status of this project or what does it look like or, you know?

A. The answer is yes. I Googled some of them and we looked at them. There wasn't a ton of information to be gleaned from the internet in terms of what was available about them or how they had been built, whom had built them.

If they were still actively renting or leasing, you could find leasing information. Often, there was a property website for some of them if they were still being leased or occupied.

A lot of the properties were properties that were no longer in their portfolio that they claimed to have worked on at some stage of the project.

Q. Did you ask for any, like, names or contact information of other developers they had worked with so you could reach out and talk to anybody about their experience working with them?

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 29 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 29

A.   I did not.

Q.   Okay.

A.   But I believe along the way that my brother Michael, at some point, visited with them and saw at least one of their facilities in person here in the northeast.

Q.   Oh, really?  What -- do you remember what facility that was?

A.   I don't, off the top of my head.  I don't.

Q.   Okay.  At some point in time, I assume that pretty -- I gather from the information that pretty soon after you all decided to engage Distinctive, they -- you started talking about, you know, potential architects for the project?

A.   When you -- just to clarify, when you say you started to discuss, which -- who is you?

Q.   Treeline.

A.   We didn't discuss Treeline internally about what architects to use.

Q.   Sorry, you're right.  Bad question. Sorry.

I meant that you had -- Treeline and Distinctive started to discuss potential architects for the project?

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 30 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 30

A.   We did have that discussion pretty early on.  But again, we were relying on Distinctive's expertise.  That's why we were willing to give them, ultimately, what was underwritten in the deal is they stand -- standed to earn -- or they stood to earn, excuse me -- you know, well in excess of a million and a half dollars for their services that they were rendering up front.

And we were paying them that money in reliance on them as our owner's rep and to steer the deal in areas where we did not have expertise.  And so we discussed the need for an architect and an engineering firm.  When you're buying vacant land and intending to erect a building, that's an obvious profession you need to have engaged.

But they brought the recommendation of BKV very early on and represented to us that they were top of class, you know, that they had an existing relationship, they, meaning Distinctive, had an existing relationship with them.

And we expected that Distinctive, Hoard and Jedlowski, were going to be our quarterbacks, our owner's rep.  This was exactly what we brought them here for, to make these representations such that they were in our best interest bringing the

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 31

best-in-class folks to get the best-in-class job done as quickly as possible.

Ultimately, we learned that that wasn't the case, but that's what we were going into the conversation with.

Q. What did they tell you about BKV? What did Distinctive tell you about BKV initially?

A. So initially, they told us that BKV, and particularly Mr. Banta, had a specialty in senior -- in senior living and that they were the best at this, that they -- that Distinctive had an existing relationship, having worked with them on prior projects, and had very good results with them, that Mr. Banta would work with us up front in terms of some of the massing and some of the preliminary studies in order to facilitate us bidding on the project with an eye towards getting the work, and that they were -- they were the best-in-class provider.

Q. Okay. Did you understand that BKV was not going to be a fiduciary or a contractual partner like you had with Distinctive?

A. I understood that BKV would be -- that Treeline would engage BKV directly, okay, as a partner, as a contractual partner and vendor. And

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 32

we would do that pursuant to an appropriate agreement, but that they would be a fiduciary of ours, as we would expect any vendor of ours in any business line to be.

Yes, I always expected that, and I had every understanding and expectation that they would act and comport themselves in our best interest with respect to the architecture and engineering of the project.

In other words, I understood that they were not a partner of mine as an investment partner, but they were a vendor. And it was always our expectation that they would honor -- that they would act in an honorable manner, comport themselves in keeping with appropriate professional codes of standard of conduct, appropriate legal boundaries.

We never had an expectation that they would be paying money and trading money behind our backs, back and forth. We expected to contract for and receive appropriately rendered services within the bounds of good judgment, good character and -- and professional responsibility.

Q.   Did your AIA contract with BKV list them as a fiduciary to you?

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 33

A.   List BKV as a fiduciary to me?

Q.   Yes.

A.   I'd have to look at the contract to answer that question.  But I can tell you that it listed -- amongst the things that I know it listed carefully was the folks that they were going to then hire on our behalf as consultants.  And one of the folks -- and they were going to pay directly, and one of the folks who were not listed there was Distinctive.

And in that regard, when they paid Distinctive, they were acting outside of the scope of the contract and in an appropriate professional and legal relationship with us.

Q.   Did you have any of the initial discussions with BKV when they were first brought to the project?

A.   Yes.  Michael and I spoke to them directly, you know, often -- I may not have been on every single one, but we worked in tandem together, so yes.

Q.   I'm sorry.  I meant more just like when you first were introduced to them by Distinctive as --

A.   Yes.

Case 5:25-cv-00028-BO-BM   Document 102-10   Filed 03/20/26   Page 34 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 34

Q.  -- a possibility.  Okay.

And did you -- I mean, did you ask them any vetting questions when you first met them or did you just rely solely on Distinctive?

A.   So the answer is we relied heavily on Distinctive's recommendation as our partner, as our quarterback, and as our owner's representative here to bring these -- in bringing them to the table.  And they gave -- and Distinctive gave BKV the highest recommendation to us in terms of -- in terms of what they were capable of doing in their position in the senior living space.

We did have an initial conversation and call that I recall with Mr. Banta and there may have been one or two other members of the BKV team on that call and we asked them questions about their prior experience.  We didn't have to ask many questions.  They volunteered.  They were trying to solicit business from us.

So they volunteered to explain to us what they had done, how they were well situated to service our business, and -- and ultimately be awarded this contract for service.

Q.   Okay.  Is anything they told you about their prior experience in the senior living space,

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 35

have you discovered that -- any of that to be not true?

A.   The answer is yes.  Their experience in terms of -- or I should say their representations to us with regard to their work, their familiarity with the codes in North Carolina, their understanding of soil testing, the placements of buildings in wetlands, all of those things proved out to be, if not untrue, at least grossly inaccurate, because their work product did not evidence that it was in keeping with what they represented their capabilities and capacity to be.

Q.   I understand that.  I'm just saying, did they -- did they tell you anything about their prior experience in the field, in the field of senior housing, that you have since learned was not accurate or true?

A.   I don't recall anything in particular.

Q.   As you mentioned, there's a lot of documents and a lot of emails and it seems like on a vast majority of the emails, especially communications coming from Treeline to other parties during the project, it is mostly your brother Michael initiating or responding to those communications, with you, a lot of times, cc'd on

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 36 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 36

the emails.  Was that by design?  Was there a specific reason for that?

I'm just trying to understand sort of, during the project, why it seems like Michael was the one, you know, principally out there communicating or responding or receiving emails with you just being cc'd?

A.   Sure.  Luckily for us, this wasn't our only project that we worked on at one time.  We wouldn't have much of a business.

So oftentimes, as I said to you, Michael and I work in tandem, so we talk about things and then we divide and conquer about who's going to handle what responsibility.  And so there wasn't a deliberate pattern of, hey, Michael should do X versus Daniel do Y.  It was often circumstantial just in dividing work in the office.

I was, at the same time, very taken up in my time with some of our industrial projects that were going on and was handling those.  So Michael was often -- after we would confer, you know, daily, Michael would often take a group of things and run with them and that's, you know, the reason I was copied on them is because we were working in tandem on everything.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 37 of 141

02/12/2026       BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 37

Q. Okay. So another -- the other topic that your brother sort of deferred to you is sort of the issue of, like, invoices from BKV. He said that you would have better knowledge than that from him, so I'm going to show you -- this is what has been previously marked in this case as Exhibit 55. Can you see it on my screen?

A. I can.

Q. And I will represent to you that this is, to my understanding, the last invoice that BKV sent on the project. You'll see it's dated June 10th of 2024.

A. Uh-huh.

Q. First of all, do you -- do you recognize it as the last invoice that BKV ever sent on the project?

A. I'd have to go back and look at all of them. I accept your representation as being possibly true and I'll accept it as what it is. This looks like an invoice from BKV that would have been sent to us.

Q. Okay. In looking at it, do you have any reason to doubt that it was the last invoice sent to Treeline?

A. Again, without going with my accounting

Case 5:25-cv-00028-BO-BM   Document 102-10   Filed 03/20/26   Page 38 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 38

team and sitting and seeing what we received and all that, I couldn't tell you for sure, but I don't have reason, looking at it, that there's something that stands out to me as being the last one.

Q. Okay. And then you'll see at the bottom of it, it references six other outstanding invoices. Does that seem also accurate to you that there were six invoices prior to this that had not been paid on the project?

A. What I can tell you about this is I don't recall if it was six or five or three. The number of -- the outstanding number seems about accurate to me in the aggregate. The $594,000 and change at the bottom there seems about right in the aggregate.

Q. Right.

A. Ultimately, we stopped paying when -- we stopped paying BKV as things were deteriorating in this project. This was a constant moving target. It was a constant moving target on all fronts with BKV, in terms of the way the building was laid out, where it was situated, mistakes that were made, ability to get approvals.

And that constant moving target caused

Case 5:25-cv-00028-BO-BM          Document 102-10          Filed 03/20/26          Page 39 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 39

an enormous amount of headache in terms of the placement of appropriate debt financing and the appropriate -- and being able to raise appropriate investor equity, which is something I'm very much involved in in the office.

As you can imagine, one of the hardest things to do here, whether it's a lender or an equity investor, is to get them to feel comfortable with a project to invest or lend when the project itself, both the design and the associated pro formas, which were being prepared by Hoard and Jedlowski, okay, are constantly moving.

Imagine going to an investor and saying, you should invest in this project, and the picture keeps changing, the financing keeps changing. It created an unholy problem in the office as these design flaws were being revealed and having to be addressed.

So that number looks approximately right to me. Again, I'd have to cross reference it against my accounting records, but this looks to be an invoice from BKV.

Q. Okay. And so looking at this and sitting here today, you don't have any reason to

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 40 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 40

dispute that there were seven outstanding invoices on the project that did not get paid?

A. Again, looking at it right now, I don't dispute that there were invoices, but invoices and obligation to pay don't equate to the same thing for me. As I alluded to earlier in my testimony, I do a lot of the work here inside the office with the accounting team and managing accounting team for all of our -- that does the accounting for all of our projects.

And one of the things we say to one another often is an invoice that is submitted by a vendor doesn't mean, per force, that the work is completed and eligible for payment or that payment is appropriately due. It's just a piece of paper that someone from some company sent to me asking to be paid.

And so what I can say to you is, I don't, sitting here right now, dispute that BKV had demanded $594,000 and change in additional payments. I do dispute that they were eligible -- that they were appropriate to be paid.

Q. And since you were -- I mean, given what you just said and given that you were copied on this email -- a lot of the emails that were sent

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 41 of 141

02/12/2026    BKV Group DC vs Treeline Acquisition, et al.    Daniel Shchor

Page 41

in this project, I'm not seeing any email where either your brother or you sent an email to BKV telling them that none of these invoices are going to be paid because of their terrible work on the project.  Do you recall that email being sent?  And maybe I'm missing it.  Do you recall there being an email like that sent?

A.   Again, as I said to you earlier, there's thousands and thousands of pages of documents in this case and while I reviewed many, I did not review all, and I couldn't tell you if one was sent or not.

What I can tell you is that those sentiments were expressed to them on several phone calls, okay.  In -- I'm just getting my dates.  In December of '23, I believe it was, Mr. Banta was calling me constantly asking me to pay down some of the invoices and to sign the AIA contract that needed to be signed, et cetera, et cetera, that they were going to have to stop work.  They were going to have to stop work and they were constantly peddling and selling me with that, we're going to have to stop work, we're going to have to stop work.

Michael and I were working tirelessly,

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 42

notwithstanding Jedlowski, Hoard and BKV's malfeasance here, to make this project work, okay, and we were explaining to them that all of the mistakes and all of the things that were going wrong were causing major problems on our side.

As I said to you, it was making it impossible, regardless of any debt terms, to find an appropriate and suitable lender when our debt brokers were having to go into the market with new information every day.

When our fundraisers, including myself who raise investor equity, were being asked to go with new information every single day, it was nearly impossible. And that we, Michael and I, were going out of our pocket personally at this point in time to pay for their mistakes. Okay?

I know, factually, that Michael had several conversations with Banta. Okay? I may have been present for one or two of them, where we expressed to them our frustration over their failure to do the work in an appropriate, competent and professionally reasonable way.

And so we told them. There was no surprise that -- we weren't withholding money from them for random reasons. They understood that you

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 43

had sent us invoices for things that you claimed were done.

You see, he has on here marked percentages of completion, but those are completely arbitrary. They're completely arbitrary and determined by BKV. BKV decided construction documents were 73 percent done. That's a ludicrous assertion based on where the project ended because, when the project blew up, they weren't 73 percent done, and that was a changing factor.

So these were just naked assertions on a page from BKV as to what they claimed they were entitled to. We didn't agree.

Q. You referenced a -- a phone call in December before you signed the AIA contract. Is that a -- was that a phone call that you were on?

A. The phone call was to me. Mr. Banta was calling me directly, as was Mr. Hoard. Both of them working, which I later found out was probably part of their overall scheme to -- for this kickback payment.

In December, after we had gone through several rounds of legal negotiations on the AIA contract, Mr. Banta and Mr. Hoard were calling me

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 44 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 44

and frankly trying to coerce me to sign this document as quickly as possible and remit further payments on an immediate basis on threat of stopping the project, and I finally acquiesced to my great regret.

And what I've now come to find out, after all of these things, was that shortly after I made that next payment and signed that AIA contract, Mr. Banta and BKV remitted their kickback payment of $70,000 to Mr. Hoard and Jedlowski and Distinctive Living.

And when they did that, their overall billed kickback was $140,000, almost exactly 10 percent of the contract amount. And they paid 50 percent after pressuring me at the end of the year, knowing exactly what was going wrong with the project, to sign that contract and make a further payment, and I regret it.

I acquiesced because I really, really, really deeply wanted this project to work. I really deeply wanted this business module of ours that we were trying to develop to work. And I acquiesced to, ultimately, I was taken advantage of, and that's just the truth.

And what's come clear to me from having

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 45

seen these other depositions and seeing the testimony is that there were probably others. It was clearly some kind of planned action. There were other developments and probably other owners out there who don't know that they were taken advantage of in the same manner. And frankly, it's to my deepest regret that I acquiesced to that.

Q. So are you saying that, before you signed the AIA contract in December, you were aware and thought that BKV was not doing their job properly on the job, on the project?

A. What I'm saying is that before we signed the contract, there were already issues arising with respect to the project. There were already material issues with respect to BKV's drawings, the ability to do what they said in their concept set could be done, in their schematic design could be done, and they were popping up and we had serious and grave concerns about what they were doing and the way they were handling the project, but we were trying our best to work through it and work forward to getting the project done.

What I was not aware of, and I never would have agreed to, was any kind of payment

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 46 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 46

between Distinctive and -- Distinctive Living,

Hoard, Jedlowski, and BKV and Banta.

Had I known about that from the beginning, had they been honest about it, I never would have hired BKV, and frankly, I never would have hired Distinctive.

As I said to you earlier, one of the predicate things to me hiring Distinctive as my owner's rep and as my quarterback for this project was their willingness to be treated and looked at as a partner. That is not how partners behave with one another.

Had they told me that, I never would have done it. That, I only found out after the fact.

Q. So just so I'm clear about your testimony, before you signed the AIA contract in December, you had serious and grave concerns about BKV's work on the project; is that right?

A. Yes.

Q. Okay. And I think you said with regard to this invoice that you disagree that -- you referenced the 73.2 percent complete of construction documents as of June of 2024.

You're saying you don't believe that BKV

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 47 of 141

had completed 73 percent of the construction documents by that point?

A.   I'm saying the calculation in and of itself is nonsensical, okay, because --

Q.   Okay.

A.   -- because -- because the 73 percent is an arbitrary determination of BKV and what it simply reflects is a calculation of the amount they were asking to be paid over what they had agreed to be paid contractually.

Seventy-three percent is merely a calculation of the 262 over 359.  It reflects nothing about the work that they had actually done.

Similarly, the 100 percent items merely mean that they had billed and been paid $166,000 of $166,000 contractual amount.  It has nothing to do with their work product.

Q.   Okay.  So as of June of 2024, what percentage of the construction documents do you believe were complete?

A.   Again, I couldn't give a percentage. What I can tell you is that 73 percent is a number that's a -- here, is a calculation of dollars, not completion of work.  And each time, that number

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 48

could be floating because if they got two comments back from somebody that required them to make five changes, then the percentage could have gone down by 5 percent.

And then when they successfully completed that, it went up by 5 percent. It was a floating margin. That's why I said to you to begin with, and I don't mean it as an insult, this calculation of percentage complete is nonsensical. It's not -- this is what they were asking to be billed, as I alluded to earlier, and we run into this all the time in this business.

People ask to be paid a certain amount of money by submitting an invoice. It doesn't always mean that you do -- that they have completed the work sufficiently to be eligible to be paid what they are asking to be paid.

Q. Just to be clear, you don't -- you can't tell me, as you sit here today, what percentage of the construction documents were complete by June of '24; is that right?

A. I would be making up a number to assign it, just like they were making up a number in this document, and I'm not going to do that.

Q. Okay. The next topic that your brother

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 49 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 49

sort of said you have the best knowledge of is --
and I can -- I can put it up if we need to look at
it, but in the interrogatories that Treeline
responded to, there was reference to the damage
that had been incurred and one of the things that
was mentioned was $696,340 in what was referred to
as dead deal costs.  Do you know what that's
referring to?

A.  Yeah.  I believe there's a schedule that
goes along with it, was there not?

Q.  There may be a schedule.

A.  Can you put it on the screen?  My
question is did something get put up on the
screen?

Q.  It was just -- I'll show you.  It was
just -- I'll show you.  It's -- hang on, let me
find it.  Let me find it.  It is --

A.  Got to find it in here.

Q.  Whoops, I've gone too far.  Okay.  So
let me show you this.  Okay.  Can you see my
screen?

A.  Coming up.  Okay, I got it.

Q.  So this is Treeline's responses to
interrogatories.  This is number 10.  This is what
the question -- you can read -- I'm not going to

Case 5:25-cv-00028-BO-BM   Document 102-10   Filed 03/20/26   Page 50 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 50

read it out loud, but you can see what the

question is.

And then there was this response, and you're free to read the whole response to yourself. The thing I'm talking about is kind of at the end. You'll see the --

A. Understood. I'm familiar with it. I reviewed this as part of my preparation.

Q. Okay.

A. I was -- I was just asking, you had mentioned putting something on the screen. I wasn't sure if you wanted to show me something before I answered your question.

Q. Oh, no, I was -- yeah, I probably didn't phrase that well enough. I meant, I can show it to you. I didn't know if you knew what I was talking about or not, and if you didn't, I was going to -- I said I could put it on the screen, so --

A. I got it. I got it.

Q. Of course, it was only really -- yeah. My question was only really what is this figure and what is it made up of?

A. Okay.

Q. Making sure you understood the question.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 51 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 51

A.   Understood.  So dead deal costs here refers to costs incurred by us in connection with the Flowers' deal that is now dead.  That's where the term dead deal costs come from.

Q.   Okay.

A.   And those are costs that range from deposits on contract that may not have been refunded, attorney's fees, not with respect to litigation, attorney's fees for attorney's work with respect to developing the deal, contract review.

For example, we incurred significant legal fees to review and negotiate the AIA contract with BKV that we referred to earlier. That was sent to an outside counsel to negotiate.

It may have been setting up entities in order to -- you know, our SPV entities and investment entities.  Those have costs, travel to and visiting these sites, the Flowers site, rather, and meetings in Dallas that I believe Michael and some others attended with regard to interior design for the space, along with BKV.

I myself went to a meeting in BKV's office in Washington, D.C. with David Banta and several others regarding the building and the

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 52 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 52

Flowers project.

All of those costs aggregated that were meant to be reimbursed from the deal, had it gone forward, are now dead deal costs that Treeline has paid out of its own pocket.

Q. Does this figure include the amounts that you did pay to BKV?

A. Yes, it does.

Q. Okay. That's what I'm -- that's what I'm trying to figure out is what is in this figure. And so I gather it is the amount paid to BKV and then the rest of it is the things you just told me about like attorney's fees to review things during the project, travel costs?

A. You're a hundred percent correct. The vast majority of it is BKV's fees.

Q. Okay. And so the -- and the deposit, am I correct, the deposit for the Flowers parcel is not in here because that got refunded?

A. Correct. That was just an example of things that we generally need --

Q. Sure.

A. -- in the infrequent event that we have a deal that doesn't go forward, those are things that would normally get coded as a dead deal cost.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 53 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 53

Q.   Okay.  And do you believe that there's like some kind of like spreadsheet or something that like actually itemizes out all the dead deal costs?

A.   I don't know that there's a spreadsheet that does it presently existing today, but that number wasn't pulled out of thin air.  It was pulled from my accounting team, put together invoices associated.

We keep very detailed accounting records by deal, as I alluded to earlier.  Each deal is a single-purpose vehicle and so we have separate accounting books and general ledgers for each venture and so that would have come out of there.

I don't know if there's an Excel spreadsheet sitting somewhere to that, you know, right now today.

Q.   Okay.  All right.  Well, do you -- do you think there's something in your -- in Treeline's files that itemizes out what's in the dead deal costs?

A.   Might be.  I'd have to go back and look.

Q.   Okay, okay.  If there is -- if there is not, is that something you could provide to your attorney?

02/12/2026         BKV Group DC vs Treeline Acquisition, et al.         Daniel Shchor

Page 54

MR. STODDARD:  Dan, I'll jump in real quick right there.  I'm pretty sure that when we provided either the initial disclosure -- sorry, let me turn my camera off -- either when we provided the initial disclosure or our first document response, I thought there was a folder that included all of the --

MR. KATZENBACH:  Okay.  That's fine.

MR. STODDARD:  -- invoices that made up that.

MR. KATZENBACH:  That's all I -- okay.

MR. STODDARD:  And if you don't have that, I will definitely provide it to you.  There's, like, 20 of them, give or take, so it should add up to that number.

MR. KATZENBACH:  No, that's all I was trying to figure out.  Perfect.  Okay.  Thank you.

Mr. Shchor, those are actually the only additional questions I had for you beyond what I got to talk to your brother about yesterday.

The other attorneys on here may

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 55

have some questions for you, but we've been going for about an hour now, and so maybe this would be a good time to take a break, and then when we come back, we can figure out what other questions maybe some of the other attorneys have.

THE WITNESS: That sounds good to me. I had a bunch of Starbucks this morning, so let's take a quick break.

MR. KATZENBACH: Perfect. Sounds good.

THE COURT REPORTER: Thank you.

(Whereupon, a short recess was taken from 11:01 a.m. to 11:10 a.m.)

THE COURT REPORTER: Okay. Back on the record.

EXAMINATION

BY MS. AMY SIVON:

Q. Thank you. Mr. Shchor, my name is Amy Savon and I represent Distinctive Living Development, LLC, Christopher Hoard and Jack Jedlowski in this matter and I have some additional questions for you today.

Same ground rules as Dan, though. If you need me to rephrase something, let me know. If you need a break, let me know. I honestly

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 56

don't have as many questions for you as we did yesterday, again, because of the topics that were covered yesterday.

But first, I did want to confirm that Mr. Katzenbach noticed your deposition -- or not yours -- noticed Treeline's deposition as a 30(b)(6) deposition and you were indicated to be one of the designees and so you were scheduled for today.

In your responses this morning, were you responding as the corporate representative for the topics you were asked about?

A. Yes.

Q. And then, additionally, I noticed your deposition for today, since I understood you were going to be the designee, in your personal capacity, just for your personal knowledge, and we are also taking this deposition, then, in your personal capacity. Did you understand that, as well?

A. Yeah.

Q. Okay. And to the extent there is any difference between your personal knowledge or you speaking on behalf of the company, if you could just point that out to me, it might be one and the

Case 5:25-cv-00028-BO-BM      Document 102-10      Filed 03/20/26      Page 57 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 57

same, but if there is a difference, if you could just let me know as we go forward with the questions, okay?

A. Understood.

Q. Did you attend yesterday's entire deposition?

A. Yes, I did.

Q. Okay. And so, as you speaking as a designee on behalf of Treeline or Treeline Acquisition, LLC, is there anything that you want to expand upon based upon what was testified yesterday?

A. No.

Q. Any testimony that you have a different opinion on other than what was testified yesterday?

A. No.

Q. Could you tell us a little bit more about your background, as far as college, law school and work after law school?

A. Sure. I went to college at Hofstra University. I graduated with a BA in journalism. I went to law school at Brooklyn Law School, and when I graduated in 2009, I was admitted to the bar in the State of New York in the federal

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 58 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 58

courts.

I practiced right out of law school at a -- after a small government fellowship for a couple of months, I practiced at a small firm in Long Island called Bee, Ready, Fishbein, Hatter and Donovan.  I was there for about eight or nine months and one of our clients recruited me to go in-house.  So I went in-house to Nassau County, the county government, and I served as the director of labor relations for the County of Nassau for two years, just about, a little bit more.  And then I went in-house with Highgate Hotels, where I was a labor attorney representing Highgate Hotels in labor negotiations.  They're a hotel management firm across the United States.

Q.   Okay.  And in regards to when you were working at the law firm that you named, what was your area of practice?

A.   Same.  Since graduating law school until I joined Treeline, which was the -- I'll finish my background there -- is -- my focused area was labor and employment law, and particularly with an emphasis on arbitration, mediation and collective bargaining.  So I worked at the firm doing that. And then when I worked for the County of Nassau

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 59

doing it.  I was in-house doing that work for them and I continued doing that at Highgate Hotels where I also added an employment litigation, employment law component to my job.

I stayed at Highgate until 2019 and that's when I came to Treeline and I've been here ever since.

Q.   Okay.  And so you were practicing -- when you went in-house with the hotel company, it was still in a labor and employment law capacity?

A.   Yes, ma'am.

Q.   And were you involved at all with their management of properties?

A.   To the extent that it overlapped with managing the labor force, the union labor force at the properties, but not on a day-to-day basis, no.

Q.   Okay.  And I think you indicated that you work with the accounting team at Treeline?

A.   It's part of what I do, yes.

Q.   Okay.  And what is your --that part of your role consist of?

A.   I supervise the accounting team, meaning the controller, the accounts payable, accounts receivable folks that work here in the office, you know, generally supervising their activities,

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 60 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 60

making sure that I work on the payable side, some of the receivable side of our business for our various business modules and single-purpose vehicles.

Q. In regards to single-purpose vehicles, you mentioned that a little bit briefly, but did any single-purpose vehicles actually get set up for the Flowers project?

A. I'm sorry. Just to clarify your question, you mean with respect to, like, our ownership in single-purpose vehicles?

Q. Yes.

A. Yes, they did.

Q. Okay. And do you recall what the names of those were?

A. They were all -- we had created a brand around this platform called Verdant, V-E-R-D-A-N-T, and we had -- I don't recall the exact names of the LLCs that were formed, but they all had Verdant in their title.

Q. Okay. And what types of entities were set up? Like, what were they set up to do?

A. They were Delaware LLCs. They were going to be property-holding LLCs. And there was an org chart of ownership -- of ownership entities

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 61 of 141

02/12/2026        BKV Group DC vs Treeline Acquisition, et al.        Daniel Shchor

Page 61

back from the actual property-holding entity that would include a vehicle that would house our LP investors, our limited partner investors, who would potentially join this deal, a manager entity for the deal and other single-purpose vehicles in that chain.

Q. And was Distinctive or Hoard or Jedlowski, were any of them going to somehow be a part of those entities?

A. They were not going to be part of those entities, except to the extent that they were going to reinvest their earned fees as a co-GP, as a co-general, as a general partner. They were not going to join our entities.

Q. Okay. You discussed with Mr. Katzenbach a little bit about your initial conversations with Distinctive. Was your initial contact through a website form or was it just a phone call after finding them on the web? Can you explain that?

A. It was both. I reached out. There was a -- my recollection is there was a website form, as you alluded to, and a phone number to call and I did both. Ultimately, my first contact with Mr. Jedlowski was via telephone.

Q. Okay. And how many -- other than the

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 62

initial calls with either Mr. Jedlowski or with both Mr. Jedlowski and Hoard, once the contract was entered, do you have an idea about how many phone calls Mr. Jedlowski participated in?

A.   I couldn't put a number on it.  Mr. Jedlowski was involved in quite a number of phone calls, including, you know, any time an issue came up, certainly Mr. Jedlowski was involved.  And I'm aware that any kind of underwriting or things that were sent to us from the Distinctive Living guys was always vetted by Mr. Jedlowski.  But I couldn't put a number on the number of phone calls he participated in.  They were numerous.

Q.   Okay.  Chris Hoard was on a lot more phone calls; is that correct?

A.   At some point, Chris -- Chris would call me more frequently.  You know, we were working on not only the Flowers project, but at some point seeking to expand the Verdant brand that we were trying to develop.  We were looking at other properties, as well, so Chris and I had more frequent contact, but Joe was always involved.

And as I said, Chris made it very plainly apparent and clear that, you know, the underwritings or things that were going back and

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 63

forth when there were issues with BKV's drawings, those were being vetted through Joe.

And periodically, Joe would, himself, get involved, whether that was via email or via telephone or some other mode of communication. So Joe remained constantly involved in the planning of the project.

Q. And were some of the communications via a Team meeting or Zoom or that kind of thing or were you guys actually having phone calls? I saw lots of reference to, you know, calls and meetings and so I just wanted -- if you can explain the different ways you were held?

A. Sure. It was a mix of both. It was a mix of all. We tended to use -- phone tended to be easiest, but we did have plenty of Teams meetings. I don't recall if we used Zoom that much as a platform, but same concept.

We had plenty of Teams meetings where Joe and Chris would participate, and same thing with our weekly meetings with the BKV team. Most frequently, they were on Teams.

Q. Okay. In regards to those initial conversations, what do you contend were misrepresentations that were made to you either by

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 64

Hoard or Jedlowski?

A.   Well, the initial conversations were with Jedlowski before -- Mr. Hoard was brought in sometime down the road after I initially met Joe, or met him.  And when I say "met him," I should clarify and say I mean met him by telephone and email --

Q.   Right.

A.   -- and that's not actually in person.  I didn't know at the time that what they were showing me were things -- that they were showing me -- that the projects they were showing me were not necessarily fully developed, full development projects.

I didn't know their extent of their -- of their development background, but they represented themselves to be savvy developers in this area.

More to the point, obviously, I wasn't aware that they were going to engage in a course of conduct that would involve exchanges of money between them and vendors when they were supposed to be my partner and they were signing on to the deal as my owner's rep, my partner, and my fiduciary.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 65 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 65

Q.   Any other misrepresentations you contend that they made?

A.   The nature of the -- the nature of the relationship was misrepresented to me, period.

Q.   Did you explore any other architects other than BKV?

A.   We did not, because, again, we relied on our owner's representative and Jedlowski as the distinctive group to bring these people to the table, these kinds of vendors to the table.  And we took their representation at face value that BKV was first in class for what they were doing.

Q.   In regards to Distinctive generally, did you understand that they had a development side and an operations side, as far as there were differences between the way they handled this?

A.   I did not understand their business structure in terms of what companies were what and that was never made clear.  What I understood, which was clearly given to me in paper -- so I didn't -- I didn't manufacture the understanding, it was given to me -- was they represented themselves to be Distinctive Living, which had a multifaceted business operation, which included development, management, you know, leasing,

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 66

marketing and all of these other components under the banner of distinctive living.

I believe I referred to it earlier when I was talking to Mr. Katzenbach, but if I didn't, I'll say it now, which is in the materials that they provided under the banner of Distinctive Living, Mr. Hoard was merely shown as their chief development officer. There was no distinguishing between Company A, Company B, and I had no reason to know what their corporate structure was.

Q. Did you -- in regards to Treeline's contract with Distinctive, do you understand that that was with Distinctive Living Development, LLC?

A. I understand that the contract says what it says, yes.

Q. Okay. And then there was no contract entered into with Distinctive Living, LLC, correct?

A. Again, the document is what it is. What I said earlier was, at the time that they sent that document over to sign, they sent me -- it may not have been the same -- contemp -- relatively contemporaneous, I don't recall if it was the same email or an email the next day.

They sent me, they being Jedlowski and

02/12/2026                BKV Group DC vs Treeline Acquisition, et al.                Daniel Shchor

Page 67

Hoard, sent me a management agreement for the completed project to review with an eye towards execution. And we deferred doing that at the time because we did not -- we, Treeline, did not have our SPVs set up such that we could appropriately have the right contracting parties on our side listed.

And so we deferred doing that. And in fact, some months later, I don't remember about how many, maybe three months later, they called me, they, Jedlowski and Hoard called me one morning, I was driving to the office, and asked me if I'd had a chance to review it and tried to put that back on the table to execute.

And ultimately, it didn't get executed because we were dealing with the other issues that came up in the project. It was something that got tabled to the back burner.

Q. Did you understand in regards to if they had moved forward with an operations contract that Distinctive Living would also have set up a different entity for that aspect?

A. That was not made clear to me at any time.

Q. And do you have any experience with

Case 5:25-cv-00028-BO-BM        Document 102-10        Filed 03/20/26        Page 68 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 68

development projects other than in the industrial context? You, personally?

A. When you say development, do you mean ground up construction?

Q. Yes.

A. Not outside of the industrial, so the industrial context. Again, that's talking about me personally, just to make that distinction.

Q. Yes, thank you. Sorry, the nature of going second is that you definitely have to jump around because a lot's been -- gratefully, a lot's been covered.

A. I'm the youngest of four brothers. I'm used to going last. I'm accustomed to it.

Q. You indicated that Treeline was a small company. How many employees do you have?

A. It varies. Current headcount, I couldn't give you a top of my head, but it's somewhere -- varies between about 12 and 15 at a time.

Q. Okay. And are you all out of one office?

A. We have employees -- at different times, we've had employees in the Carolinas. We have one presently in the Carolinas, but we've had

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 69 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 69

different employees in the Carolinas.

Other than that, everything in New York is based out of the same office, yes.

Q.   And what type of employees do you have in the Carolinas?  Like what --

A.   Sure.  We've employed folks to assist in acquisitions and on-the-ground acquisitions in the Carolinas, looking for properties and different types.

Q.   You discussed with Mr. Katzenbach being surprised about some of the testimony you heard, and he asked you about what you were surprised as far as Banta's testimony.  What surprised you about Hoard's testimony?

A.   Similar topics that came up with respect to Mr. Banta.  I guess I was surprised to find out that there was a continued pattern of the nature and behavior that's alleged in this -- in this litigation by -- by Treeline.

Q.   Okay.  Anything else?

A.   Yeah.  I guess I was surprised, to some extent, that Mr. Hoard -- Mr. Hoard's testimony evidenced his -- that he didn't understand the issue of the feasibility of the project, the ability to raise investors, the questions that we

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 70

had raised to him that investors and potential lenders were bringing to the project because it was constantly a moving target and not being an issue.

I guess that was surprising to learn, notwithstanding the fact that we had raised that to him on occasions during the course of the project when we were working together.

Q. And in regards to getting investor equity, can you explain what your role was in regards to that?

A. Sure. We work collaboratively in the office, the group of us that work on raising investor capital. We raise it from various sources. Sometimes it's institutional, sometimes it's family offices and sometimes it's, you know, individual one-on-one investors who are committed investors to us that have done deals with us prior or people we know and meet in the course of business.

I was going out and soliciting investment into the project. We had -- at the time, we had another employee on our payroll who was also assisting with that as a full-time job, who was an experienced professional and he was

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 71

experiencing -- and reporting back to us that he

was experiencing the same kind of issues with

regard to his ability to get committed investment

because he was constantly going back to the same

group of investors or others with changing

matrices in terms of the time schedule, drawings,

underwritings, returns, which, again, for an

investor, the project's feasibility or

investability at a given moment is an investor's

decision what to do with their investable capital.

It has to make sense in that moment in time.  And

when that number and those things seem variable,

fluctuating or in motion, no investor would invest

in that kind of a project.

Q.   And was the person you're referring to?
Is that Shuvam?  I don't know how to say it.

A.   Shuvam.

Q.   Shuvam.

A.   Yes.

Q.   And then can you say his last name and
also spell it for the court report?

A.   I'm going to do my best, but I used to
butcher it all the time, so bear with me.  His
last name is Bhaumik, B-H-A-U-M-I-K.  I believe I
got it right.

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 72

Q.   Okay.  And for how long did -- I already forgot how you said to pronounce it?

A.   Shuvam.

Q.   Shuvam.  How long did Shuvam work at Treeline?

A.   I think it was about a year that he was working with us.

Q.   And at what point in time was Shuvam working to get investments for the Flowers project?

A.   As soon as -- as soon as he started with us, but frankly speaking, before he -- before he started with us, the project was already reasonably underway.  I don't remember exactly what his hire date is as I sit here, but Michael and I had already been, you know, going through our normal process of raising investors as we always do with any one of our projects.

Q.   And so I totally get that you don't know exactly when he was hired, but do you know, like, was it spring of '24, winter of '23, like any kind of thing to help us out?

A.   It was a while back.  I don't remember. His main focus when we brought him on -- his initial main focus when we brought him on was

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 73 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 73

Flowers.  And in fact, we didn't give him -- we discussed other projects with him.

We did not give him any other projects to work on but Flowers because we so badly wanted to put this together and we wanted it -- it was a main focus of all of our collective efforts in the office.

Q.   And so between Shuvam, yours and Michael's, did you guys actually get anyone committed to being an investor for Flowers?

A.   One -- we had one commitment which ultimately fluttered out, which Shuvam brought, ultimately fluttered out because of the inability to close the transaction and bring the underwriting and the building drawing and the permits to a conclusion.

Ultimately, the investor decided not to put their money behind their initial commitment.

Q.   Okay.  And if I'm correct from my review of the documents, I believe that was a $250,000 investment that one person made?

A.   That's my recollection.

Q.   Okay.  And otherwise, you guys didn't have anyone else actually commit to the project?

A.   That's correct.

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 74

Q. Okay. And what time period were you and Michael, before Shuvam had been brought onto Treeline, what kind of time period was it when you and Michael were looking for investors?

A. Essentially, immediately. In other words, once we -- well, one of the things, Michael and I developed a fundraising strategy as we're looking at the project, right. We look at things with an eye of how are we going to raise the necessary equity for this particular project before we undertake it.

So from that definition of the term, it was basically immediately, if not before we even went to contract. Once -- in terms of actually going out and looking for investors, we were waiting to get to points where we had a drawing, an underwriting, something to take to an investor as a presentation.

We couldn't just go to people with pie-in-the-sky ideas, so we had to come with some concrete things. And the issue that kept coming up was we would get to a place where we'd say, okay, well, we have reasonably decent drawings and we have an underwriting that we think we can try to raise investor equity with.

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 75 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 75

And then we would go out and talk to people and we might be garnering some initial interest and then things would change. And then you'd have to go back to those people and say, well, we've made modifications and there's only so many times you can do that before somebody says, this looks like an untrustworthy investment.

Q. And so were you using the design drawings and the renderings? Like, what were you using?

A. Any -- the answer is yes, anything we were able to have. Again, investors general -- my general experience is that investors don't look at every nail and screw that goes into a building. They're investing in a concept, but when the -- so when the changes to the building drawings, to the plans are happening, and they're materially changing both the execution of what's happening on the back end in terms of service and leaseability, and that are essentially moving what is an active adult into some other kind of residential living, even closer to market rate housing as you remove amenities, and it's affecting the pro forma, right, then investors tend to get a little bit more nervous about the -- how solid the investment

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 76

is.

Q.   And what changes in particular are you talking about?  And just to clarify, I don't mean when you switch the focus from potential active adult to independent living, but prior to that time frame, what changes are you talking about that you're saying you thought were making investors nervous?

A.   All of them.  You know, by way of example, when you change the orientation of a building and make it smaller or do different things to it where it looks less feasible to be able to be delivered, or it impacts -- the soil impacts and things like that are raising the costs of construction and the construction process and delaying the calendar timeline, because -- you know, not to be a wise guy, but time is money to folks who are investing their money -- you're creating a sense of unrest about the project as a whole.

It's not a question of whether the wall is painted white or blue.  No one cares about that.  These were material alterations that were leading to material alterations in the underwriting.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 77 of 141

02/12/2026        BKV Group DC vs Treeline Acquisition, et al.        Daniel Shchor

Page 77

Q.   Would you have been talking to investors about either one of Douglas's estimates on construction costs?

A.   Construction costs would have been incorporated into the underwriting.

Q.   And did you guys have people who actually, you thought, were good prospects as investors?

A.   We wouldn't have undertaken a project if we didn't think we could raise the investment capital.

Q.   And I understood you guys were looking internally to raise the investment capital and then you were also using Ziegler to do the bigger part of it, as far as, like, pre-construction loan or construction -- the actual construction; is that right?

A.   We were relying -- we were relying on Ziegler to provide debt for the project and potentially institutional capital, to the extent it was necessary and appropriate, and we were working on raising the balance of the equity for the project.

Q.   In regards to the one investment amount you received, my understanding from the emails is

Case 5:25-cv-00028-BO-BM        Document 102-10        Filed 03/20/26        Page 78 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 78

that that money was actually returned to that person?

A. Yes, and we paid interest to that person and -- yeah. Out of our pocket, I should say.

Q. Were you just holding that money in escrow?

A. Yes. Typically, what we do when an investor agrees to invest, they fund a small deposit commitment relative to their overall commitment.

So a portion of the -- let's say by way of example in this case $250,000, the person would put up a nominal amount of it as a commitment to the project and the balance would be funded some short time prior to the closing, to the real estate closing.

In this particular instance, the investor funded that nominal amount. It sat in an account for a lengthy period of time. And when the deal was clearly -- got to a point where it wasn't going to close, the investor sort of lost their feeling, as I said to you, that this was a viable and investable project. And we ultimately returned their deposit along with interest on their money.

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 79

Q.   Before you hired Shuvam -- now I'm
messing it up again.  Say it one more time?

A.   Shuvam.

Q.   Shuvam.  Before you hired Shuvam, was --
did Treeline have somebody else in that role or
was this a new role?

A.   The answer is we had had different roles
in different periods of time over the course of
history.  Much of it predates my time here at
Treeline since 2019, but since the time that I got
in -- that I came to Treeline, that role has
primarily been the focal effort of myself, my
brother Michael, my dad, in terms of raising that
capital.

We have used outside folks to assist
like Ziegler and other folks like that to assist
in the process.  And to clarify, we've never used
Ziegler before this project, but people like them
of that ilk to -- to help out brokers and things
like that.

Q.   Had you had conversations yourself -- I
know Michael talked about one he had had with an
investor that said that the senior housing market
was potentially a good market.  Had you yourself
had any conversations with investors about this

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 80

area being a potential one to look into?

A. Definitely. I had also spoken to investors who were interested in investing in viable projects in the senior living space, for sure.

Q. Is there anything you guys did to research this field before you decided to undertake this project?

A. Sorry. Can you just clarify the question? What do you mean by this field?

Q. Senior housing development projects.

A. We had had some -- we had had some experience with some local developers who developed this kind of stuff here in the Northeast, in Long Island and in the New York area, so we had some familiarity with it going in.

Q. And do you just mean you had had conversations with those folks or what do you mean by that?

A. Me personally, I don't -- this is Daniel not making that distinction. I just had some preliminary conversations with them. I'm not aware of what other folks have done in the office on this particular topic.

Q. Okay. And who was involved with the

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 81 of 141

02/12/2026    BKV Group DC vs Treeline Acquisition, et al.    Daniel Shchor

Page 81

decision, as far as Treeline goes, that this is a direction you guys wanted to pursue? And again, this being looking into senior housing development projects.

A. Myself, Michael, Glenn.

Q. Are you -- I understand -- or just tell me. Who are the principals for Treeline?

A. That's a bit of a more complicated question than I -- it requires a longer explanation, okay?

Q. Okay.

A. Because we have different vehicles and different entities, the principals of the different entities are -- may vary, depending on. Okay?

In other words, our -- if we have a project and the principals or the manager of that company may be one group of people versus our asset management company, which has a certain group of principals or acquisitions company.

So if you could be more specific, I'm happy to answer the question.

Q. Sure. So to start with, in regards to Treeline Acquisition, LLC.

A. Myself and Michael, and I believe Glenn

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 82 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 82

has a principal position there, to a smaller extent, in terms of owning the company.

Q. Okay. And is -- what is the -- or is there an umbrella company?

A. The name "Treeline" is a -- as I think Michael refers to it frequently, is sort of a quasi-DBA. It's an overarching name we use to represent the collection of companies that have different purposes in existence.

Q. And I know on your pleadings it says Treeline Acquisition, LLC, d/b/a Treeline Companies?

A. Uh-huh.

Q. Is there -- does Treeline -- do you consider that Treeline Companies does -- there's more aspects to what is DBA Treeline Companies than just Treeline Acquisition, LLC?

A. Yes. Yes.

Q. And what -- what other -- and I don't mean single-purpose vehicles, but different than single-purpose vehicles that are designed to actually manage a specific project? I don't want you to list all those.

But otherwise, what other Treeline Companies are there?

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 83

A. Sure. We have our asset management company called TL Asset Management Corp, which is our property management and asset management company.

We have a leasing company called -- I think it's called Treeline Leasing or TL Leasing. I don't remember what the technical name of it is, but that handles -- in a lot of our commercial properties, if not all of them, we do most of our leasing in-house, so we have a leasing company.

And I believe we have -- I think that's it. I think I got them all. That's it, and then acquisitions, obviously.

Q. Okay. And could you indicate who the principals are of each of those companies you just listed out?

A. Sure. Treeline Leasing, I believe, is Glenn -- my parents, Glenn and Fran Shchor. TL Asset Management Corp. is myself, Michael and my mom, Fran.

Q. Okay. And was that all of the ones you listed?

A. That's it. That's it.

Q. Okay. All right. And are those all Delaware LLCs?

Case 5:25-cv-00028-BO-BM   Document 102-10   Filed 03/20/26   Page 84 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 84

A.  I don't recall sitting here right now.

Q.  Okay.

A.  Some may be and some may not be.

Q.  You discussed a little bit about what the operational -- that there was, I guess, a draft operational contracts sent to you for either -- for your consideration.  Did you under- -- was it your understanding that the Distinctive folks wanted to go ahead and get that set up or were they just showing that to you as an example of how that might -- how that contract might read?

A.  No, they wanted to get it set up.  And as I believe I said earlier, they -- sometime after we entered into the initial letter agreement with Distinctive and Hoard and Jedlowski, they called me to continue pursuing that and getting that set up.

Because the concept that we agreed upon of Distinctive Living joining the project was that they were going to provide a holistic partnership to this deal, that they were going to be our owner's rep, our partner and ultimately be responsible for leasing the project, managing the day-to-day operations when the project was built.

So we executed the two -- or we executed

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 85 of 141

02/12/2026       BKV Group DC vs Treeline Acquisition, et al.       Daniel Shchor

Page 85

one agreement, and ultimately, with an understanding that the other agreement would be executed once all the SPVs were set up and all of that would be done.

Because they were joining the deal as partners on the -- both for the construction and development, as well as partners for the management on a day-to-day basis. And they were rolling portions of their fees into the deal as equity so that they would actually own a piece of the deal when it was all said and done.

Q. Do you guys have operational agreements in other projects that you all have?

A. I'm not sure I understand that. Do you mean management agreements?

Q. Yeah, I probably didn't word it very well. What? I'm sorry.

A. Do you mean management agreements?

Q. Yes, with the entity that would be managing the property once it's constructed?

A. Yes, we do. Every single one.

Q. Okay. That's what I was going to say. So in the industrial projects, you have those, as well?

A. Yes, ma'am. Even if it's our own

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 86 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 86

company.  So even if TL Asset Management Corp. is going to manage on behalf of SPVX that owns real estate in New York or Carolina, it doesn't matter. We have a management agreement between the two parties, yes.

Q.   Okay.  Did you guys -- sorry, that was a bad question.

Did Treeline -- who drafted the agreement between Treeline and Distinctive Living Development?

A.   The one- or two-page document that was signed?

Q.   Yes.

A.   Distinctive.

Q.   And did Treeline request any changes to be made to that contract?

A.   Not to my recollection.

Q.   And in regards to the letter agreement with BKV, did Treeline request any changes be made to that document?

A.   I don't recall.

Q.   Okay.  And then I believe you said in regards to the AIA contract with BKV, you all -- well, I don't know if that was specifically asked. Did Treeline make any requests for any revisions

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 87

to the AIA contract?

A. We had had some experience with AIA contracts prior, so we knew to refer it to outside counsel, so we had an outside lawyer who reviewed the contract and negotiated most of the terms directly with BKV's counsel.

Q. Okay. And so there were some negotiations in regards to that AIA contract as between Treeline's attorney and between BKV's attorney?

A. That's correct.

Q. Okay. Did Treeline ever enter into a contract with Douglas?

A. I honestly don't recall.

Q. Did Treeline enter into any other contracts in regards to the Flowers project other than for the purchase of the property with Distinctive Living Development and with BKV?

A. Thinking about it, I don't recall any others. There may have been other service contracts for other service providers we may have entered into directly. I don't believe so because all of the due diligence providers were put under BKV's aegis and their contract was by design. They were consultants listed in the AIA contract

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 88 of 141

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 88

that we executed with BKV directly.

Q. Okay. Were you involved with the termination of the purchase contract with Flowers?

A. I was not.

Q. Were there attorneys involved with that discussion?

A. I wasn't involved, so I don't know.

Q. Okay. The industrial projects that you guys have mentioned that you've done in the past, are those -- I know some of them are already purchased properties, but some of them are ground-up construction?

A. Yes.

Q. Okay. And then do you all engage with an architect for those projects?

A. To the extent that it's necessary, yes, sure.

Q. And that's what I'm trying to figure out. Like, is that a -- is that a part of the development of that kind of project?

A. So any ground-up construction project requires an architect, an engineer and a group of professionals of that sort of line of professionals to complete.

Whether we engage them directly or

02/12/2026       BKV Group DC vs Treeline Acquisition, et al.       Daniel Shchor

Page 89

through another party sometimes varies on the nature of the project.  Often, we enter into what's known as a design-build arrangement with a contractor, where the contractor charges us a fixed price for a certain delivery and they're responsible to retain the professionals and arrange for anything that has to be arranged to get drawings done, architectural drawings done, engineering completed, permitting and construction and delivery, essentially a turnkey product to us at the end, and in those arrangements, we're involved.  We speak to the architect along with the contractor, but the relationship is between the contractor and the architect directly.  The contractual relationship, I should say.

Q.  Okay.  And in those projects, does it end up you pay the general contractor or the architect, whichever the case may be, in stages as the project moves along?

A.  Generally speaking, on a design-build, there are progress payments.  Progress payments are generally my experience, and this is my experience, is that progress payments with a general contractor begin when -- when you arrive at permits and beyond and then you have progress

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 90

payments.

And progress payments are verified progress payments, meaning to say when you get a progress payment request from a contractor, they provide backup, and then there's an inspection of the work that it's satisfactory to date before payment is remitted.

Q.   Right.  And then going to the architect scenario where you hire an architect, are there payments made to the architect as they're doing the drawings or only upon completion of the drawings in this kind of industrial project?

A.   Every arrangement is different and -- every arrangement is typically different. Normally, the architect receives defined progress payments on the completion of stages.

In other words, they finish the drawings for permit and they're submitted.  They might get a progress payment.  They don't get weekly progress payments or, you know, something with that level of frequency, but every arrangement is different and is negotiated, you know, independently.

Q.   Okay.  In regards to the communications you had with potential investors for investors'

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 91 of 141

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 91

equity, was that done -- mainly, what type of communications were they? Were they via phone calls or emails or in-person meetings? How did you -- how did you personally go about doing that?

A. Most typically, it's in-person meetings. There may be an initial phone call, talk about the deal with someone I know, and then it's in-person meetings is the most frequent and personal way to get it done.

Q. And then what documents would you take with you to then show the investor?

A. Dependent on the investors and part of the skill or value I bring is -- just like my brother is, we know our investors well and what appeals to one and, you know, what certain people like to see when they're considering an investments.

So there wasn't a typical package, so to speak, that we took to people. Some folks are more numbers-minded. Other people are like me, went to law school to avoid math as long as they possibly could, so they prefer to see pictures and sort of understand the concept. And we tailored what we brought to the person we were meeting with.

Case 5:25-cv-00028-BO-BM      Document 102-10      Filed 03/20/26      Page 92 of 141

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 92

Q. Okay.

MS. SIVON: Let me look at my notes. That might be all my questions.

THE WITNESS: Sure.

MS. SIVON: Just give me a second.

MR. KATZENBACH: Mind if we hop off the record and just do a quick bathroom break while you do that?

MS. SIVON: Absolutely. That's fine. So 12:10?

MR. KATZENBACH: Yeah. Sounds good.

(Whereupon, a short recess was taken from 12:00 p.m. to 12:11 p.m.)

Q. (Ms. Sivon) Mr. Shchor, we're back on the record after a brief break and I just have a couple more questions for you.

The entity that was making payments to BKV, was that Treeline Acquisition, LLC?

A. Yes.

Q. Okay. And then you indicated -- in regards to the damages, I just want to make sure I understand the cost you indicated you incurred.

So the 696,000 includes the payments to BKV, travel expenses of people on the Treeline

02/12/2026       BKV Group DC vs Treeline Acquisition, et al.       Daniel Shchor

Page 93

team, and then I think you indicated the attorney's fees for reviewing the AIA contract with BKV and the attorney's fees for the entities that you mentioned that were set up?

A.   What's the --

Q.   I'm sorry?

A.   I'm sorry.  Is --

Q.   Was there anything else?

A.   Without going through every single invoice, there may be some other things.  That probably comprises the vast majority of that number, but without looking at it, I couldn't tell you for sure.

Q.   Okay.  And then can you just describe the -- Treeline Acquisition, LLC's scope of work?  What's their business function?  I just don't think we've actually asked that question.

A.   Sure.  So Treeline Acquisitions is our business module that identifies and seeks to acquire new ventures, new properties and new projects for the company.

Typically, we work to identify a project or property.  We may do some initial work and then put the project into contract in the name of Treeline Acquisitions, LLC.  Usually, the contract

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 94

has an assignment right such that, right before --
at the closing, we assign it over to the SPV.

And that's what -- and Treeline
Acquisitions will incur the additional -- the
initial expenses for putting the deal together,
the diligence costs.  It may put down the deposit
initially until there's a closing of the real
estate.

Q.  Okay.  And then the -- so the initial
funds spent on the project are coming from
Treeline Acquisitions, LLC's funds?

A.  Correct.

Q.  Okay.

MS. SIVON:  All right.  Thank you.
That's all my questions unless I have follow up
after anybody else goes.  Thank you.

MS. BREWER:  I have just a couple
of questions if it's my turn.

MR. STODDARD:  It is.

EXAMINATION

BY MS. MEREDITH BREWER:

Q.  Okay.  Mr. Shchor, I'm Meredith Brewer.
I represent Distinctive Living, LLC.  Just a
couple of follow-up questions and similar to what
Mr. Katzenbach and Ms. Sivon have said.  If you

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 95

can't understand me or you need me to rephrase something, just let me know. And of course, if you need a break, let me know that, too.

Ms. Sivon had asked you about the Treeline --

THE COURT REPORTER: Can you guys hear me?

(Zoom recording interrupted.)

THE COURT REPORTER: I am so sorry. I don't mean to interrupt, but I lost you guys when Meredith -- as soon as you started, I dropped off the Zoom. I don't know what happened. Y'all all froze. I apologize. I was just able to get logged back in, but you guys didn't miss me.

MS. BREWER: That's okay. And so just you tell me, Ms. Rodriguez, where you want me to start back.

THE COURT REPORTER: From your very first question, just as soon as you started and your first question was when it dropped off.

MS. BREWER: Okay. So do you want me to just start over?

THE COURT REPORTER: I'm so sorry.

MS. BREWER: That's okay.

THE COURT REPORTER: Yes, please.

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 96

MS. BREWER:  That's okay.  That's all right.

Q.   (Ms. Brewer)  So where we left off, Mr. Shchor, I was asking you about your brother, Howard Shchor and I was asking what Treeline entity he was a principal of?

A.   And Howard is not a principal of any Treeline entity.  He works and his work is focused in our property management, asset management department.

And as I mentioned to you, he has some prior professional experience in advertising, marketing and things like that.  And he, from time to time, leverages that experience to help out with other parts of the project.

Like I alluded to in this particular case, Howard assisted along with Mr. Jedlowski, Mr. Hoard, George, I think his last name is Dragiano (ph), but I apologize if I butchered it, and some other folks from the Distinctive executive team to create the branding for this project that was going to go forward.

Q.   I'm going to show you -- I'm going to try to show you again what's previously been marked as Exhibit Number 4.  All right.  Can you

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 97

see that on my screen?

A. I can. If you can make it a little bigger, that would be great.

Q. Is that big enough?

A. Yeah. Got it.

Q. Okay. And this is Treeline_011198 and I'm going to scroll down to this email. You see that where it says from Howard Shchor dated Tuesday, July 11, 2023?

A. Uh-huh.

Q. Okay. And then his signature block, it says Howard Shchor, principal, Treeline. Do you see that?

A. Yeah.

Q. So I guess my question is, what is he a principal of?

A. Howard's a principal at the company, but he's not -- he doesn't own any portions of the company or any of that. That's just a title that's used on the street as a common title.

Q. Okay. What entity does he work for? Does he work for Treeline Acquisition?

A. Howard works for TL Asset Management Corp.

Q. TL Asset Management Corp., okay. And

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 98

then there was another employee that you and Ms. Sivon were discussing, Shuvam?

A. Shuvam.

Q. Shuvam. Sorry, Mr. Shuvam. But who is he employed by? Is he employed by Treeline Acquisition?

A. Shuvam's work was was focused for Treeline Acquisitions. That's correct. But his technical employer was TL Asset Management Corp.

Q. All right.

MS. BREWER: Thank you, Mr. Shchor. Those are all my questions.

EXAMINATION

BY MR. JEFFREY STODDARD:

Q. Good -- I guess we're in the afternoon, Mr. Shchor. It's now my opportunity. A few minutes ago, you were being asked about the principles of Treeline Acquisition, and you mentioned that it was possible that Glenn Shchor was a member of or a principal of Treeline Acquisition. Would you have to double check the LLC records to know that for sure?

A. Yes.

Q. For all those other companies you referenced, were you just trying to give kind of

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 99

an idea or concept for them versus the actual

corporate structure for all of them?

A. Yes.

Q. And what would you need to be able to

know the exact corporate structure for all of

them?

A. I need the LLC agreements and the org

charts for each one.

Q. Okay. You were asked some questions, I

think by Mr. Katzenbach and perhaps by Ms. Sivon,

as well, about how issues with BKV and Distinctive

impacted your ability to obtain investors or

financing for this project, so I want to switch

gears to that topic a little bit.

Did any specific investors express

concerns about BKV and Distinctive's work to you?

A. Yes, several.

Q. Is there a way you can describe those

several a little bit more for us?

A. Sure. I apologize, I was in the middle

of my sentence and I think I cut out for a second.

That's okay.

I had toured several groups through the

project. In fact, in 2024, I forget about when, I

think it was in '24, I had actually taken a group

of potential investors physically to the Flowers location as part of an investor tour, not only of the parcel, the Flowers plantation development and so on, and spent overnight, took them to dinner and did a typical investor presentation for them.

And that was only one of several groups, but they expressed extreme concern about the feasibilities of the building, the ability to place the building on the site in a meaningful manner.

They expressed a lot of concern about the idea of active adult and the distinction between an active adult development and the amenities that would have to be in that building to distinguish it from market rate housing, which was being developed in the neighborhood.

And the idea that there were changes being made that were material to the project by Mr. Banta in terms of the actual building, the soil conditions, the locations of the buildings, the amenities being offered, that there were changes being made by Mr. Hoard to the pro forma that was markedly changing these -- the results and the outputs of these projects led all of the investors to feel, number one, that the investment

02/12/2026　　　BKV Group DC vs Treeline Acquisition, et al.　　　Daniel Shchor

Page 101

itself was not sound and in a reliable footing and was not investable.

All the while, Mr. Banta and Mr. Hoard and Mr. Jedlowski were assuring us that these changes were hiccups. They were minor hiccups. They were pushing us forward by saying these were hiccups that could be resolved. These numbers could be smoothed over in the underwriting and it wasn't a big deal and we were trying to keep up with those things.

They were trying to continue the project moving forward by making those representations, but the investors were really squeamish by the whole thing.

Q. You may have just answered this question, but I'm not sure. Did you bring those specific investors' concerns to Mr. Hoard, Mr. Jedlowski, Mr. Banta, anyone else in the BKV or Distinctive groups?

A. The answer is unequivocally yes. And on several different occasions in different contexts, both directly to Mr. Hoard or Mr. Banta in one-on-one or small group conversations where Michael or Shuvam may have been involved, or in what was a weekly larger call with many more members of the

BKV staff, senior by design staff all attended sort of as a project meeting, I would raise back to him that these were concerns that were coming back to me.

Additionally, I'm aware, because he raised it to me, that Shuvam was also directly telling Mr. Hoard that these were issues he was running into with his own group of investors that he was seeking to get investment from.

And the response was universally the same from Mr. Banta, from Mr. Hoard, from Mr. Jedlowski, that these were hiccups. They were small things along the way. These were small project hiccups that happened and they could be fixed and, you know, the underwriting could just be tweaked.

You know, when the feedback from the Ziegler group with terms that were challenging came back, Mr. Hoard magically came back to us and said, well, this could be incorporated into the underwriting, could be smoothed over, and he was manipulating the underwriting, it seemed, to suit every moment.

Q. So three of the words in there that you used were hiccup, smoothed over and tweaked.

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 103

Could you tell me who used those specific words, if that were the case?

A. It was always Mr. Hoard, Mr. Jedlowski, Mr. Banta. I believe Chris Palkowitz (ph) may have made those kinds of references on some of the larger calls, you know, with respect to the actual design in itself, but those are the four that jump off the page to me.

Q. Do you remember the names of those three specific investors you took to North Carolina for this visit?

A. I remember two of them off the top of my head. Oh, and three, I got them all. Ready? Matthew Nili, N-I-L-I. Okay. Samuel Naim, N-A-I-M, and Philip Shenassa, S-H-E-N-A-S-S-A.

Q. And after you left the Flowers visit, did they give you sort of a formal determination?

A. They did. They chose not to invest.

Q. Do you remember anything specific that any of the three of them told you when they made that decision?

A. I remember very, very clearly that, over dinner with the three of them that evening, after visiting the Flowers plantation and spending some time looking at whatever -- I don't recall the

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 104 of 141

02/12/2026       BKV Group DC vs Treeline Acquisition, et al.       Daniel Shchor

Page 104

stage of the drawings we had, but whatever we had at that moment in time, and looking at the pro forma that was -- the pro forma of the moment, because as I've said, the pro forma was constantly being, quote-unquote, "smoothed over" to -- to ameliorate these hiccups as they were being represented to us.

As we looked them over, I remember very distinctly that Samuel said to me, he didn't have confidence or belief that this project could be executed in the time frame and in the manner that we were showing in the pro forma, and while he liked to invest with us, and he had been a prior investor of ours in other projects, this one he could not get behind.

Q. Did he say why he didn't have that confidence?

A. He did. He didn't believe that the changes were just hiccups. He believed they were more substantial. He believed that the project wasn't well vetted and that these changes -- his own experience as a builder and a developer in the greater New York area led him to believe that these changes that BKV and Mr. Banta and Distinctive with Hoard and Jedlowski were making,

Case 5:25-cv-00028-BO-BM   Document 102-10   Filed 03/20/26   Page 105 of 141

02/12/2026    BKV Group DC vs Treeline Acquisition, et al.    Daniel Shchor

Page 105

were substantial, they were meaningful, and ultimately would result in a project that couldn't -- that couldn't be brought to bear for the results that we were showing on the paper that we were giving. Which I should say, I was not amending any of the underwritings or drawings that the professionals were producing, that we relied on them to produce, right?

Mr. Hoard and his team, I believe he had an underwriter whose name escapes me, on his team prepared every iteration of the underwriting and we relied on it 100 percent. Mr. Banta and his team produced every iteration of a drawing that I would have used or seen or relied upon, and we relied on it unequivocally with them as our professionals and our owner's reps in this project.

MR. STODDARD: Can everyone hear me clearly? Okay. I just got a notice that says your network bandwidth is low, which I've never seen before on Zoom.

I'm going to share my screen here for a moment. Does anyone remember where we left off with for exhibits, what the next number would be? Don't all volunteer at once.

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 106 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 106

MS. SIVON:  Mine yesterday was 69.

Dan, did you mark anything this morning?

MR. KATZENBACH:  I did not mark anything this morning, and in the stuff that Jeff sent over, they went up to 69.

Q.   All right.  So I believe we're going to mark here as exhibit 70, Treeline 7672.

(DEPOSITION EXHIBIT

NUMBER 70 WAS MARKED

FOR IDENTIFICATION)

Mr. Shchor, can you see my screen?

A.   I can.

Q.   Do you recognize what this is?

A.   I do.

Q.   And I can scroll through it a couple pages to probably help a little bit, but can you tell me what this is?

A.   This is the document that was sent to me by Mr. Jedlowski after I made initial contact with him about partnering with us on this project.  It was a package of materials that, as I believe I alluded to in my testimony earlier, highlighted the experience and the various areas of expertise of Distinctive Living, as well as some of their senior leadership and some of their pillars of

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 107

excellence and other things that are in their

corporate branding.

Q.   And I thought you had brought this up earlier, and I wanted to make sure that was what you were referring to.  And if we scroll down to page 11 here, what's listed here?

A.   This is Christopher Hoard.  This is exactly what I was referring to earlier.  Christopher Hoard is Chief Development Officer of Distinctive Living.

Q.   Anything in here that indicates that he is working for Distinctive Living Development as opposed to Distinctive Living?  And take a second to read it.  It's, you know, four or five paragraphs there.

A.   I haven't seen it in a bit, so I'm going to take a minute here and just scroll through it.

No, there's nothing in here that indicates that he works for anything called Distinctive Living Development.

Q.   And in the third paragraph, it says, "Currently, Mr. Hoard is leading the development process from concept to keys on over 1 million square feet of independent living, assisted living and memory care communities in states such as

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 108

Florida, Tennessee, Maryland, New Jersey, Wisconsin and Indiana." Did I get that right?

A. Yes, that's what it says.

Q. Is it your understanding today, after listening to Mr. Hoard's deposition, that none of these developments have actually gotten to the keys, if you will?

A. The answer is 100 percent yes, and that was part of what was materially misrepresented to us and to me at the initial outset.

Distinctive Living, through Jedlowski and through Hoard, represented themselves to be a full-service provider, including that they had done projects, to use the terms of this document they provided, from concept to keys, and they had, in fact -- they had, in fact, completed those projects and that was part of what was really materially misrepresented to us going in.

And part of what -- amongst things that I was surprised about in listening to Mr. Hoard's testimony in his own deposition was to find out that none of the projects they had worked on had actually been completed or brought to a state of keys, so to speak, or leased and operating entities.

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 109

Q.   In this January-February time frame -- January-February 2023 time frame when you were having these initial discussions with Mr. Jedlowski and Mr. Hoard, what would you have done if they had disclosed they had not actually completed a facility from ground up at that point?

A.   I never would have hired them in the first place, because I wasn't looking to hire simply someone or some group that could manage a built and existing facility.

We were looking for ground-up construction from concept to keys is exactly what we were looking for and it was not only part and parcel, it was an essential part of our evaluation of their suitability to be a partner in our deal.

Q.   And if we scroll down to page 38, I think it is, of this PDF, I'm going to show you page 38 here, which will take a second to review, and then I'll show you 39 whenever you're ready.

A.   Go ahead.

Q.   What are these two pages showing?

A.   These are developments that Distinctive purports to say that they have -- that they managed at some point in time, including pre-leasing.  As it says here, sales and marketing, an

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 110

entire strategy that Distinctive Living provided, and the pictures, the images, attempt to highlight other locations where they have gone from concept to keys.

Q.   What does fully vertical development platform mean?

A.   It means that they have a development platform that can cover all the bases necessary to -- and all the disciplines necessary to go from a concept to a finished product, that would include concept design, underwriting, marketing, leasing, all of the things that are necessary to do that.

Q.   And when you received this document and you looked at page 38 and 39, and when you talked to Mr. Jedlowski and Mr. Hoard, was it your understanding that these eight properties that are shown here were properties that they had gone from concept to keys on?

A.   Yes.

Q.   Bear with me a moment.  Much like everyone else has disclosed to you, I'm going to jump around.

You were asked some questions about what you thought BKV's fiduciary obligations were.  Do you remember that testimony?

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 111

A.  Yes, I do.

Q.  Okay.  And in your own words, what would you describe your expectations from this fiduciary context?

A.  With respect to BKV?

Q.  Please.

A.  I would expect that they would act in my best interest at all times, that they would be completely direct, honest and open with me in all their dealings, that they would work to the appropriate professional standard, that they would tell me if a project or an area of opportunity existed in the project or if the project was not viable because of something that they came to learn.

I would expect that they would deal with their sub-consultants and subcontractors in my best interest at all times and constantly be working on the project as if they were standing in my shoes, as the owner.

Q.  Was that your same understanding and expectations from Distinctive, as well?

A.  Yes, and Distinctive, as I testified to earlier, Distinctive was meant to be not only my fiduciary, but my pecuniary partner in this deal.

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 112

Q.   Focusing back on BKV for a moment, you used the words direct, honest and open.  Do you have any examples of when BKV, even if it's in hindsight, wasn't direct, honest and open about statements that were made by Mr. Banta in that February-March 2023 time frame?

A.   There were a number of them.  I mean, Mr. Banta's -- we relied on Mr. Banta as the -- as the -- and his team, I should say, as the subject matter expert.

And for them to have reviewed soil borings and to have told us that things were well, that the reports were good, that the project could proceed, those were misrepresentations of reality that, ultimately, we only learned about in hindsight, right?

We relied on them to tell us about the soil conditions, the need to discharge soil, to move soil, settlements and issues like that, that they didn't tell us about and they were constantly just trying to manipulate the building and move it around, for example, as a material misrepresentation.

Similarly, we relied on Mr. Hoard and Mr. Jedlowski for those things, but all we were

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 113

met with was, it's a hiccup that can be smoothed over. This will work out in the numbers.

There are countless emails where issues came up and we were just being assured by Hoard, Jedlowski and Banta that these minor issues could be fixed or otherwise repaired with a little bit of tweaking to an underwriting or a little bit of tweaking to a design.

But what was really happening was they were materially ruining the project and giving us those answers to push us forward in a project in order to advance their own personal interests.

Q. In the context of the budget, do you have any examples or information that you might want to share about representations regarding the budget that BKV or Distinctive made?

A. Distinctive prepared every budget on this project. From the time they joined the project through into its conclusion, they prepared every single budget. Every budget was prepared by Mr. Hoard. It was reviewed by Mr. Jedlowski.

It may have been physically prepared by one of their underwriters, but both Hoard and Jedlowski were reviewing it. There were inaccuracies in the assumptions from the get-go.

02/12/2026           BKV Group DC vs Treeline Acquisition, et al.         Daniel Shchor

Page 114

They were constantly manipulating the rents to levels that even Ms. Flowers didn't believe they could achieve.

She herself was dubious that they could achieve rents that were well in excess as they continued to trim and trim and trim away the amenities.

Remember, this was not a development of market-rate housing.  It was intended to be a development of active adult senior housing and that was, by design, to allow us to charge a premium rent by offering premium services.

As Mr. Hoard continued to push rents and other parts of the financials while reducing the offerings in the building, he was making the underwriting untrue.

Anybody can put anything they want into an Excel spreadsheet to make something come out of it, but the assumptions themselves were challenged and they were all done in a manner to cover up what was ultimately a problem with the project.

Q.   On the rents, did you think Distinctive was misrepresenting the rents during the project or is that something you learned later?

A.   It's something we learned about later,

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 115

but there were other people who were skeptical of it as we were going through it.

As I alluded to, Ms. Flowers was skeptical that they could achieve the rent. She was skeptical that Mr. Hoard and Mr. Jedlowski were relying on an idea of bringing a majority of their tenant base to the property from out of state. They were making very, very far-reaching assumptions that became dubious to many people as the project went on.

Q. Did you raise those skepticisms with Distinctive?

A. Absolutely, as did Ms. Flowers, as did several other people.

Q. And what happened when those skepticisms were raised with Distinctive?

A. We were told we were wrong. The skeptics were just not correct, that they were the experts, the subject matter experts, that Ms. Flowers was a landowner, that Daniel Shchor was not as expert as they were, and that their analysis was, in fact, correct.

But what was proving out was that the other people who were looking at it, including investors and potential lenders, were also

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 116

struggling with that, to credit their assumptions.

Q.   I had started that question by asking about the word "budget" and I think you had really answered about pro formas.  The budget, or the construction budget, I should say, to be more clear, that was prepared ultimately by Douglas, right?

A.   Correct.

Q.   Okay.  Did Distinctive and/or BKV make any representations to you about either the original construction budget or the Douglas construction budget?  Take me through that, to the extent you can.

A.   Distinctive brought -- just like they brought BKV, Distinctive brought Douglas to the table, okay?  But Douglas was -- unlike the guys at BKV, they were -- they were -- at least from what I could glean from the project, they were earnest in their assessment of this project.

And they were setting what were realistic construction budgets as they looked at it.  And they were themselves dubious of some of the initial figures that Mr. Hoard was using in his pro forma and that became, itself, a source of problems on the project.

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 117

But what became clear was that the folks at Douglas, Bruce Douglas himself, and I forget the gentleman's name, Ron Siebenowler (ph), I believe is his name, were extraordinarily concerned with the budgets that were being put forward to support Hoard's underwriting and Jedlowski's underwriting because they felt there was not accounting for enough of the real world. Go ahead.

Q. That original construction budget, do you remember what that amount was?

A. Don't off the top of my head.

Q. Do you remember who came up with the original construction budget or estimate?

A. When you talk -- when you're asking me that question, just to clarify, are you referring to the one that was in the pro forma before Douglas was involved?

Q. Yes. So my understanding is that the first pro forma was issued on or about February 23rd, 2023 and that contains an estimate of construction costs?

A. That was Mr. Hoard.

Q. Okay.

A. And Mr. Jedlowski.

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 118 of 141

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 118

Q. When you first saw that initial construction budget, did you discuss that with Mr. Hoard and Mr. Jedlowski?

A. We talked about it in the context of reviewing the pro forma, yes.

Q. What did they say about that initial construction budget?

A. They felt that their construction budget initially was appropriate, but clearly it was not. It didn't reflect the real site conditions and what was really going on on the project. It was a number they had put in to the pro forma.

Q. Did you know that at the time?

A. I did not.

Q. When Douglas came in with an initial -- or with its budget construction estimates in the fall of 2023, do you remember how much higher they were than the initial estimate?

A. I don't remember the dollar figure, but they were substantially higher.

Q. Do you remember in that time frame talking with BKV or Distinctive about that increase in the construction budgets?

A. That probably would have been Michael who would have handled it more than I did at that

02/12/2026  BKV Group DC vs Treeline Acquisition, et al.  Daniel Shchor

Page 119

level.

Q.   Okay.  We're talking about the signing of the AIA contract in December of 2023.  Do you remember that?

A.   Yes.

Q.   Okay.  Do you remember testifying in response to Mr. Katzenbach's questions that, by that point, you had had some serious and grave concerns with BKV's work product?

A.   Yes.

Q.   Did you participate in any conversations where those concerns were raised to BKV or Distinctive?

A.   Yes.  They were constantly being raised, to both -- to both --

Q.   Well, let's focus on just this December 2023 time frame.  What do you remember about those concerns being raised?

A.   We had raised concerns from the get-go as the -- we relied -- as I said earlier, we relied heavily on Mr. Hoard and Mr. Jedlowski and Mr. Banta and the BKV team as our owners, reps, and designers of this project, okay?

And we very much were concerned as we got some initial -- when the initial feedback on

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 120

the soil borings, by way of example, was positive.

And then, we were finding out that there was issues with respect to the placement of the building, setbacks, common code things that were not being understood by BKV.

And we were already in a position where changes were being made to the overall design and that, going in, was really concerning and concerns that we expressed.

But as I said earlier, any concern was brushed aside as a normative hiccup, a normative bump, a normative something that could just be smoothed over, which is why we allowed it to go forward.  But ultimately, we really relied on them heavily and we were pushed and taken advantage of in that regard.

Q.   In this December time frame when you signed the AIA contract, was Mr. Hoard pushing you to sign the AIA contract, as well?

A.   Yes.

Q.   What do you remember about that?

A.   I remember getting phone calls from both Mr. Hoard and Mr. Banta in that time frame urging me to, for different reasons from different angles, execute the contract and remit an

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 121

additional substantial payment of about -- my recollection is between $150,000 and $200,000 to BKV, or BKV would have to stop work, it would slow down the project, the project would be delayed, we would be the cause of a potential delay, and that kind of a pressure tactic would do that.

Q.   If you hadn't signed the AIA contract, would you have had any ability to obtain investors or debt financing?

A.   No, and that was the other piece of it that was very important.  In order to be able to go to the market as we -- for debt financing or investor equity, there's a certain amount of fixed information that those people who would either lend or invest in a project would require.  It's just good prudence.

And that includes a signed AIA contract with an architect engineering firm who's going to produce the building itself and get you to the point of permits, right?  That would include those kinds of things and a good pro forma that is fixed in a place where you can reasonably rely upon it.

And so signing the AIA contract, in and of itself, was a necessity to move the project forward.

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 122 of 141

Q. When you signed the AIA contract, did you think you had any other options?

A. I'm not sure what you mean by options.

Q. Did you think you had a viable option to not sign this AIA contract?

A. No.

Q. Why not?

A. Because we were substantially down the road on the project. We had spent a considerable amount of time to get to this point. And again, what was being represented to me by Banta, Hoard and Jedlowski was any issues with the project were mere hiccups and could be smoothed over and we needed to move the project forward. We needed to be able to go into the markets for these investors and for the -- for the debt, and this was a material necessity to getting that done.

Q. Switching gears a little bit, you were asked some questions about what percentage of the construction documents were done. Do you remember if you ever actually saw any construction drawing documents?

A. I do not recall seeing them.

Q. Do you have any software that would open what's called a CAD file?

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 123

A.   We do not.

Q.   Would you defer to your expert on what percentage of construction drawings were done?

A.   We would, and we would always defer to them on that front.

MR. STODDARD:  I don't think I have any other questions.  Thank you.

FURTHER EXAMINATION

BY MR. KATZENBACH:

Q.   Mr. Shchor, I have a few follow-up questions.  Hang on one second.

So you were asked some questions about specific investors that you brought to the site and you mentioned that there was a tour that you provided at the site with three investors.  When was that?

A.   It was in 2024.  I just don't remember what month it was.

Q.   You don't remember when in 2024?

A.   Yeah, that's correct.  I'd have to look through my calendar to find it, if I have it -- I haven't blocked in that.

Q.   Well, was it in early '24 or was it in spring or summer of '24?

A.   Honestly, I don't remember off the top

02/12/2026        BKV Group DC vs Treeline Acquisition, et al.        Daniel Shchor

Page 124

of my head.

Q. Okay. And what records would you have which would show that?

A. If I had put it on my Outlook calendar and it was still there and Outlook kept it, it might be there. Other than that, I don't have, you know, records sitting in front of me.

Q. Did you have any email communication with these investors about the project, about that tour, about them deciding not to invest?

A. My recollection is those guys, in particular, two of them are older investors. So generally speaking, we talk on the phone and sit together in person is my general recollection of how I deal with them and how I've dealt with them on other investments they've done with us.

Q. So no written evidence of any of these communications? Is that what you're saying?

A. I may have exchanged emails with them. I'd have to look. I honestly don't recall.

Q. Okay. And what type of -- I'm trying to understand, in the context of the investment, these were not debt and equity investors, correct?

A. They're equity investors.

Q. Well, my understanding was that, like --

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 125

like institutional investor like U.S. Capital was going to provide the debt and equity up to like, say, 80 percent and then there would be the remaining 20 percent that these types of investors would be providing?

A.   That's if we accepted that U.S. Capital arrangement, but there was always a need for single individual or small-equity -- you know, equity investors into the deal.

Q.   So were these all small-equity investors?

A.   No.  They write checks of varying sizes depending on their investable capital.

Q.   So how much would they potentially have invested?

A.   I couldn't tell you.  They've invested with me -- millions of dollars with me over time.

Q.   Would they have invested $20 million?

A.   Again, you're asking me to speculate.  I can't do that.

Q.   Okay.  Would they have been able to -- were you looking to them to invest 80 percent of the debt and equity needed?

A.   We hadn't gotten to a point in the project where we were talking about a check size

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 126

at that point in time.

Q. Okay. Well, you mentioned that they weren't interested, but as we just talked about back in January of 2024, U.S. Capital was interested and they provided potential terms for providing up to 85 to 90 percent of the $50-plus million for the project, correct?

A. They provided some kind of framework of terms via email.

Q. They provided an email that contained potential terms, correct?

A. They provided an email with potential framework of terms that they would -- that they would consider.

Q. Okay. Did you all move forward with that with U.S. Capital?

A. No, we didn't, but that was not because of -- to frame the project carefully here and to be very clear about it, we would -- even if we had chosen U.S. Capital or any other lender or institutional equity, it would never have been able to proceed because we didn't have the base documents completed that would have allowed them to even get to a term sheet or loan documents because without construction documents in hand

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 127 of 141

02/12/2026    BKV Group DC vs Treeline Acquisition, et al.    Daniel Shchor

Page 127

that were suitable and permittable, without other -- without finalized drawings, these things were not possible to be attained.

That email from U.S. Capital, okay, was a -- a -- loose terms that they would be bound by if and only if the next set of guideposts had been met, including providing final drawings for the project.

The reality of the world is that the constant moving goalposts by Mr. Banta and Mr. Hoard and Mr. Jedlowski with respect to the building itself, the actual construction documents, the financial pro formas that accompanied them, the constant moving of those goalposts made this project unable to be financed because the markets were constantly getting a new project.

We were going to the market for debt. Then the project would change and we'd have to go back again and that made any lender uneasy. That made any investor, equity investor, from a tiny check to a giant check, uneasy because they were looking at a project that was constantly moving and none of them would commit to the project.

Q.  Did U.S. Capital ever say that to you?

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 128

A. What U.S. Capital said in the team -- I didn't speak to U.S. Capital directly, I wasn't involved in that and I would have to defer to Mike on that conversation.

Q. Okay. That's fine.

A. What I will say to you is U.S. Capital's email says what it says, it is a parameter of terms.

Q. So you didn't deal with U.S. Capital; is that what you're saying?

A. I didn't speak to them directly.

Q. Okay. Did you deal with any large institutional investor who was going to provide potential debt and equity?

A. To the extent that Ziegler brought them and we were involved in group conversations, sure, I was involved in them.

Q. Okay. What other institutional investor did you talk to that Ziegler brought to you?

A. The gentleman from ACI who took -- who they brought to the table, we funded a $25,000 deposit on his contract and he took it and ghosted us.

Q. Okay.

A. I recall that one. I don't think

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 129

Ziegler was able to produce anyone else that I can recall, frankly for all the same reasons.

Number one, as I alluded to previously in what I just said to you, they were constantly getting rewritten pro formas to take to the market, which was causing a massive problem placing the debt and equity, because Mr. Hoard, Mr. Jedlowski and BKV were constantly moving these goalposts, number one.

Number two, I believe that the guys at Ziegler who were brought by Mr. Hoard may not have been working in the same -- in other words, they were constantly being given changing sands and so they had a hard time.

MR. KATZENBACH: I don't have any further questions. Thank you for your time.

FURTHER EXAMINATION

BY MS. AMIE SIVON:

Q. All right, thank you. This is Amie Sivon again. I do have just a few follow-up questions.

Did you actually have communications with Ziegler?

A. Yes.

Q. Okay. And was Treeline getting

02/12/2026  BKV Group DC vs Treeline Acquisition, et al.  Daniel Shchor

Page 130

frustrated with Ziegler for not bringing them additional opportunities for debt and equity on the project?

A.  We were frustrated across the board, to be very frank with you.  And these were all people who were brought by Mr. Hoard and Mr. Jedlowski and represented to us to be first in class in what they did, the best in the business and the clear choice winner for who to engage for any one of these areas of expertise.

And so, yes, we had increasing levels of frustration with it.  And when Ziegler brought ACI and we agreed to proceed at their recommendation and Mr. Hoard's strong recommendation and Mr. Jedlowski's strong recommendation, and that person ghosted us and took $25,000 of our money straight away and did nothing with it, yes, frustration was high with that relationship.

Q.  And did you understand that it just wasn't a good time in the market to pick up potential investors for this type of project?

A.  The market is a moving element, right?  It's something that's constantly moving.  Some times they're better than others and it may have been a moment in time where some things were

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 131

harder than others.

But the greatest level of feedback was that this constant moving goalpost, as I alluded to, was causing market uncertainty for our project, not in the market, if that makes sense to you.

Q.   Yes, thank you for clarifying that.

And then are you saying that Ziegler told Treeline that, because of the changes to the project, it was making it hard to find financing options?

A.   They had expressed -- I was on at least one call where someone did -- Ziegler had expressed that sentiment.

Q.   Okay.  And do you know what time frame that was?  Was that like end of 2023, like after having just gotten the design documents, or was this like summer 2024?

A.   I honestly don't recall.

Q.   Okay.  I know you said you can't remember when you brought the group of investors to the project, but my understanding is that one of the meetings with Ms. Flowers was in May of 2024.  Does that -- were you a part of that meeting?

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 132

A. I may have been a part of the meeting, but the two meetings didn't coincide.

Q. Okay.

A. The investor group was a separate trip to the Carolinas.

Q. And that was my -- that was my first question, if that coincided with that meeting. Okay, so it did not.

Do you recall if it was that your meeting with the potential investors was before or after this May 2024 meeting with Ms. Flowers?

A. I honestly don't recall. I'd have to try to see if it was on my calendar.

Q. Okay. That's --

A. We do these tours pretty regularly as part of raising investor capital for any project. Sometimes the dates mend together a little bit.

Q. Yeah, fair enough. I didn't know if that meeting would help you figure out what kind of time frame it was.

Did you bring any other investors to the project other than the three you mentioned?

A. I spoke to a lot of investors about the project. They were the only group that I actually -- who wanted to go see the site physically and

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 133

fly down from New York and go visit, you know, the site physically.

Most of my other investors are either maybe in market themselves or they have no interest in visiting the sites as much as reviewing the pro formas and other documents as part of their analysis of the investment.

Q.   I know you don't remember when Shuvam was hired, but was the focus on funding -- excuse me, funding for this project that Shuvam was working on, was that mainly the summer and fall of 2024?  I'm just asking because that's when a lot of the emails I have seen are in that time period.

A.   That sounds --

Q.   I just didn't know if it was -- if that had already started some time period before that?

A.   It certainly was at its height at that point in time.  It may have been before that, as well.  As I said to you, the moment Shuvam joined our firm, this was his number-one priority to go out and work on that out of the gate.

Q.   Okay.  And you do recall that a lot of that effort was in the summer and fall of 2024; is that correct?

A.   Much of his effort was around that time.

02/12/2026 BKV Group DC vs Treeline Acquisition, et al. Daniel Shchor

Page 134

Q. You just don't know how much before that time it was going --

A. I'd have to look and see when he was hired, but I can tell you from day one -- it was part of his interview process, in fact.

The reality is that Michael and I were doing anything we could. We desperately wanted this project to find a way to work and we were -- we were thinking about it all the time and when we brought Shuvam on, it was his highest priority.

We talked about it with him before bringing him on as it was going to be his first project. He understood what he was getting himself into, in terms of raising the money. I think the email traffic that's been -- that's part of the document discovery, you can see that he is constantly kind of reaching out to investors, different folks in his network, so it was very much a focus of his work.

Q. When did he stop being employed with Treeline?

A. I'd have to look. I think it was the end of 2024.

Q. Okay. And did he leave? Was he terminated?

02/12/2026     BKV Group DC vs Treeline Acquisition, et al.     Daniel Shchor

Page 135

A.   It was a mutual decision to part company.

Q.   And do you know where he is now?

A.   I do not.

Q.   And so Shuvam was employed for less than a year?  Does that --

A.   Again, I'd have to look.

Q.   Okay.

A.   I'd have to look.

MS. SIVON:  I believe those are all my questions.  Thank you.

MR. STODDARD:  Meredith, I don't know if you have anything else, but I just have one on that very last topic that Amie was asking about.

MS. BREWER:  I don't have any further questions.

FURTHER EXAMINATION

BY MR. JEFFREY STODDARD:

Q.   Mr. Shchor, in terms of Shuvam -- and correct me if I'm wrong, I'm not trying to put words in your mouth, but it looked to me like I saw a lot of emails with Shuvam and Mr. Hoard in January of 2024.

And just in terms of a timeline, does

Case 5:25-cv-00028-BO-BM     Document 102-10     Filed 03/20/26     Page 136 of 141

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 136

that, at all, refresh your memory of when he was hitting the pavement for investors?

A.   Like I said, the answer is yes.  It clearly goes back for much -- you know, goes back further than I originally had answered earlier.  As I said, I don't have an exact recollection.

What I said earlier on standby is it was his first priority and his number one priority from the day he joined the firm until the day he no longer worked here.

MR. KATZENBACH:  That was all.  Nothing else from me.

THE COURT REPORTER:  Anybody else?

MR. STODDARD:  Nothing else from me.

MS. BREWER:  Nothing further.

THE COURT REPORTER:  Okay.  That concludes our deposition.  And would you like the witness -- would you like to read and sign?

THE WITNESS:  Yes.

THE COURT REPORTER:  All right.  And if you guys would say your name and tell me whether or not you'd like a transcript, that would be great so that I make sure I get it correct.

MR. KATZENBACH:  Daniel Katzenbach

02/12/2026      BKV Group DC vs Treeline Acquisition, et al.      Daniel Shchor

Page 137

and electronic with exhibits.

THE COURT REPORTER:  Okay.

MS. SIVON:  Amie Sivon, electronic. I don't think I need the exhibits.

THE COURT REPORTER:  Okay.

MR. STODDARD:  And for everyone's benefit, I just uploaded that exhibit to that Sharelink from this morning.  Sorry, Meredith, I cut you off.

MS. BREWER:  That's okay.  Meredith Brewer.  I don't need a transcript at this time.

MR. STODDARD:  Jeff Stoddard, electronic copy, please.

THE COURT REPORTER:  Okay, great. All right.  Thank you all very much.

MR. STODDARD:  Thank you.  Have a good one.

THE COURT REPORTER:  Thank you.

(Whereupon, the deposition was adjourned at 1:10 p.m.)

Case 5:25-cv-00028-BO-BM    Document 102-10    Filed 03/20/26    Page 138 of 141

02/12/2026　　BKV Group DC vs Treeline Acquisition, et al.　　Daniel Shchor

Page 138

CERTIFICATION

I, JOYCE LEAR RODRIGUEZ, CVR-CM-M, Notary Public in and for the County of Mecklenburg, State of North Carolina at Large, do hereby certify:

That there appeared before me the foregoing witness at the time and place herein aforementioned;

That the said witness was sworn by me to state the truth, the whole truth, and nothing but the truth, in said cause;

That the testimony was taken before me and recorded by Stenomask, thereafter reduced to typewriting under my direct supervision, and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in any wise associated with any of the parties to said cause of action, nor their counsel, and that I am not interested in the event(s) thereof.

IN WITNESS WHEREOF, I have hereunto set my seal this the 24 day of February, 2026.


JOYCE LEAR RODRIGUEZ, CVR-CM-M

NOTARY #202203400131

02/12/2026          BKV Group DC vs Treeline Acquisition, et al.          Daniel Shchor

Page 139

WITNESS CERTIFICATION

I, DANIEL SHCHOR, do hereby certify,

That I have read and examined the contents of the foregoing pages of record of testimony as given by me at the times and place herein aforementioned;

And that to the best of my knowledge and belief, the foregoing pages are a complete and accurate record of all the testimony given by me at said time, except as noted on the attached here (Addendum A).

I have ____, Have not ____, made changes/corrections to be attached.

_____ (Signature)

I, _____, Notary Public for the County of _____, State of _____,

do hereby certify:

That the herein above named personally appeared before me this the _____ day of _____, 20_____;

And that I personally witnessed the execution of this document for the intents and purposes herein above described.

_____

NOTARY PUBLIC

My Commission Expires:                    (SEAL)

02/12/2026        BKV Group DC vs Treeline Acquisition, et al.        Daniel Shchor

Page 140

ADDENDUM A

Upon the reading and examination of my deposition testimony as herein transcribed, I note the following changes and/or corrections with accompanying reason(s) for said change/correction:

************************

| Page | Line | Is Amended to Read |
|------|------|--------------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |